IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
Jackson Division

MISSISSIPPI ASSOCIATION OF
EDUCATORS, BARBARA PHILLIPS,
JAMES THOMAS, DAWN ZIMMERER,
L.E. JIBOL, UNITED CAMPUS WORKERS
SOUTHEAST LOCAL 3821, MADISYN
DONLEY, ALEXIS COBBS, KAREN
ADERER, FOSTERING LGBTQ+
ADVOCACY, RESOURCES,
ENVIRONMENTS AND WOMEN IN
SCIENCE AND ENGINEERING,

    *Plaintiffs*,

v.

BOARD OF TRUSTEES OF STATE
INSTITUTIONS OF HIGHER LEARNING,
MISSISSIPPI COMMUNITY COLLEGE
BOARD, MISSISSIPPI STATE BOARD OF
EDUCATION, MISSISSIPPI CHARTER
SCHOOL AUTHORIZER BOARD,

    *Defendants*.

Civil No. 3:25cv00417-HTW-LGI

---

## **MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

i

## TABLE OF CONTENTS

I. BACKGROUND AND OVERVIEW ........................................................................2

   A.   **Plaintiffs** ..................................................................................................4

   B.   **Defendants** ..............................................................................................5

   C.   **The Challenged Law, House Bill 1193** ..................................................6

   D.   **The Bans** .................................................................................................7

      *1.   The Prohibition of Awareness and Understanding of Issues Relating to Race, Sex, Color, Gender Identity, Sexual Orientation, and National Origin – Sections 3(b) and 2(d) and Section 3(i)* ...........................................................................7

      *2.   The Prohibition on "Promot[ing]" Certain Ideas and "Endors[ing]" Certain Concepts – Section 3(f)* ..............................................10

      *3.   The Prohibition on "Diversity, Equity, and Inclusion Training" – Section 3(g)* ...........11

   E.   **The Vague, Confusing, And Illusory Exceptions** ................................12

      *1.   The Application of the Prohibition on Students, Student Organizations, Guest Speakers, and Performers in Certain Circumstances – Section 5(c)* ........................................12

      *2.   The Purported Exception for "Scholarly Research" and "Creative Work" – Section 5(b)* ........................................................14

      *3.   The Purported Exception for Complying with State and Federal Law – Section 5(h)* ........................................................14

      *4.   The Purported Exception that Commands State and Local Officials to Ignore the First Amendment – Section 5(d)* ..............................15

      *5.   The Purported Exception for Complying with Accreditation Standards and Requirements – Section 5(j)* ..........................................16

   F.   **Policies And Procedures Required By The Act** ..................................17

   G.   **Consequences For Teachers, Administrators, And Students** ..............18

II. A TEMPORARY RESTRAINING ORDER SHOULD BE ISSUED PENDING RESOLUTION OF THE PRELIMINARY INJUNCTION MOTION, AFTER WHICH A PRELIMINARY INJUNCTION SHOULD BE GRANTED ........................................20

   A.   **The Plaintiffs Are Likely To Prevail On The Merits** ..........................20

      *1.   The Challenged Provisions of HB 1193 are content-based and viewpoint-based restrictions on academic freedom and speech that violates the First Amendment* ...............21

         a.   <u>Professors have First Amendment rights against viewpoint discrimination</u> ..............23

b.   Students have a corresponding right to receive the speech of their professors and teachers ....................................................................................................24

c.   Student groups have the right to funding free of viewpoint discrimination ..............28

d.   HB 1193 fails strict scrutiny ...................................................................29

2.   *The Challenged Provisions Are So Vague, Confusing, and Contradictory That They Violate The First And Fourteenth Amendments* ................................................29

**B.   The Plaintiffs Will Suffer Irreparable Harm In The Absence Of An Injunction .......32**

**C.   The Defendants Will Suffer No Harm From Temporary And Preliminary Relief ....33**

**D.   The Public Interest Will Be Served By An Injunction ................................................33**

**III. CONCLUSION ................................................................................................................33**

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                    **Page**

*Arce v. Douglas*, 793 F.3d 968 (9th Cir. 2015) ........................................................25

*Ashcroft v. ACLU*, 542 U.S. 656 (2004).................................................................29

*Bazaar v. Fortune*, 476 F.2d 570 (5th Cir. 1973) ....................................................25

*Black Emergency Response Team v. Drummond*, 737 F. Supp. 3d 1136 (W.D. Okla. 2024).....20

*City of Chicago v. Morales*, 527 U.S. 41 (1999)........................................................30

*Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328 (5th Cir. 1981) .........................32

*Elrod v. Burns*, 427 U.S. 347 (1974)......................................................................32

*Epperson v. Arkansas*, 393 U.S. 97 (1968) .............................................................26

*Fed. Sav. & Loan Ins. Corp. v. Dixon*, 835 F.2d 554 (5th Cir. 1987)......................................20

*Grayned v. City of Rockford*, 408 U.S. 104 (1972) ....................................................30

*Howard Gault Co. v. Tex. Rural Legal Aid, Inc.*, 848 F.2d 544 (5th Cir. 1988)........................30

*In re Dinnan*, 661 F.2d 426 (5th Cir. 1981) ............................................................23

*Ingebretsen on Behalf of Ingebretsen v. Jackson Pub. Sch. Dist.*, 88 F.3d 274
   (5th Cir. 1996)....................................................................................33

*Jackson Women's Health Org. v. Currier*, 760 F.3d 448 (5th Cir. 1998) ................................20

*Kennedy v. Bremerton*, 142 S. Ct. 2407 (2022) ........................................................27

*Keyishian v. Bd. of Regents*, 385 U.S. 589 (1967) ................................................21, 22, 25, 30

*Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384 (1993) .........................22

*Local 8027 v. Edelblut*, 2024 U.S. Dist. LEXIS 94052 (D.N.H. 2024)....................................31

*Martin v. Struthers*, 319 U.S. 141 (1943) ..........................................................24-25

*Meyer v. Nebraska*, 262 U.S. 390 (1923)................................................................26

*Minn. Voters All. v. Mansky*, 138 S.Ct. 1876 (2018)..................................................29

*NAACP v. Dept. of Edu.*, No. 25-cv-1120, 2025 WL 1196212 (D.C. Cir. Apr. 24, 2025) .............20

*Nat'l Edu. Assn. v. Dept. of Edu.*, No. 25-cv-091, 2025 WL 1188160
    (D. N.H. Apr. 24, 2025) ...................................................................................20

*Pernell v. Fla. Bd. of Governors of the State Univ. Sys.*, 641 F.Supp.3d 1218, 1276 (N.D. Fla.

    2022) ...................................................................................................................20, 29

*Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265 (1978) ................................................23

*Reno v. ACLU*, 521 U.S. 844 (1997) ..............................................................................30

*Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819 (1995) .............21, 22-23, 28, 29

*Speech First, Inc. v. Cartwright*, 32 F.4th 1110 (11th Cir. 2022)...............................................25

*Sweezy v. New Hampshire*, 354 U.S. 234 (1957) .............................................................23, 24

*Texas v. Johnson*, 491 U.S. 397 (1989) ..........................................................................21

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969) ...................................26, 27

*Wieman v. Updegraff*, 344 U.S. 183 (1952) .....................................................................24

*Whitney v. California*, 274 U.S. 357 (1927)......................................................................21

## Statutes, Rules, and Regulations

H.B. 1193, 2025 Legislature, Reg. Sess. (Miss. 2025) ........................................................*passim*

Miss. Code Ann. § 37-11-77 .............................................................................................15

Miss. Code Ann. § 37-11-79(1) .........................................................................................15

## Other Authorities

A.B.A., *Standards and Rules of Procedure 2024-2025*, Section 303c (2024).....................16-17

A.B.A., *Standards and Rules of Procedure 2024-2025*, Interpretation 303-6 (2024) ..............17

Southern Association of Colleges and Schools Commission on Colleges, *Resource Manual for
    The Principles of Accreditation*, Section 6.4 (4th ed. 2024).............................................16

Miss. Coll. & Career Readiness Standards for Soc. Stud., Miss. Dep't of Edu. (2022), available
    at

https://www.mdek12.org/sites/default/files/Offices/Secondary%20Ed/Social%20Studies/mde_ccrs_social_studies_standards_final_filing_jan_25_2023...........................................17, 27

The plaintiffs have moved for a temporary restraining order and preliminary injunction prohibiting enforcement of several blatantly unconstitutional free-speech restrictions for Mississippi's public universities, colleges, and K-12 campuses contained in House Bill 1193 of the 2025 legislative session. Among other things, the act prohibits any educator in any public school in Mississippi, and apparently students as well, from "engag[ing]" in any action that "increas[es] awareness or understanding of issues related to race, sex, color, gender identity, sexual orientation or national origin." That and the other challenged provisions are content-based and viewpoint-based and clearly violate the First Amendment. The sections of the act being challenged here are 3(b), 3(f), 3(g), and 3(i).

Moreover, much of the language in the act is so vague and confusing as to violate the Fourteenth Amendment and it leaves open the possibility that educators and students could be disciplined for any alleged violations, including potential termination for the teacher and expulsion for the student. The organizational and individual plaintiffs — composed of educators, students, and the parent of students — will be irreparably harmed in the absence of temporary and preliminary relief. Summer school is underway and the fall semester will commence as early as July. A temporary restraining order and a preliminary injunction preventing enforcement of the challenged provisions are necessary to protect their rights so that they are not unconstitutionally disciplined, terminated, or expelled while this Court reviews the merits of this case. The Defendants will not be harmed by temporary and preliminary relief, and the public interest will be served, by preserving the status quo. Public education in Mississippi can continue as before without the potential disruption that flows from these draconian and confusing free speech restrictions.

This memorandum will first describe the background of this case and the provisions of HB 1193 that are being challenged and will then discuss the relevant preliminary injunction factors.

## I.    BACKGROUND AND OVERVIEW

Under HB 1193's prohibition on "engage[ment]" in any action that "increas[es] awareness or understanding of issues related to race, sex, color, gender identity, sexual orientation or national origin," history teachers will be banned from discussing slavery, the Civil War, discrimination of many kinds, the civil rights movement, the women's suffrage and women's rights movements, the LGBTQ rights movement, and many other aspects of American life and life throughout the world.  Constitutional law professors must excise from their textbooks and lectures all references to the Fourteenth Amendment and cases about discrimination.  Courses in family law, sociology, and biology must avoid discussions of differences and different treatment related to sex and gender identity.  Teachers of English Literature must remove from their reading lists, and school librarians must remove from their shelves, works by authors like Richard Wright, Toni Morrison, William Faulkner, Jane Austen, Rita Mae Brown, and many others.

In addition, the law prohibits all public-school educators, and apparently students, from "engag[ing]" in a number of so-called "divisive concepts" that would effectively ban discussion of certain viewpoints concerning affirmative action, unconscious bias, and collective responsibility.

Moreover, at least one of these "divisive concepts" is stated in language so incoherent as to be almost meaningless.  And many provisions of the overall law are so vague, confusing, and contradictory that it is difficult for administrators, teachers, and students to distinguish prohibited

2

actions from permissible ones, making the law particularly susceptible to arbitrary and discriminatory enforcement.  Adding to the confusion is a provision of the act that appears to create an exception to protect "freedom of speech pursuant to the First Amendment of the United States Constitution" but only so long as the First Amendment and other so-called "protected tenets" do not "conflict with the act."

The prohibitions of the act come with open-ended and potentially severe consequences for any violations.  Schools are required "to cure all actions relating to the violation," but the law provides no specifics on what constitutes a "cure."  Given that most "violations" of the free speech restrictions are likely to come from teachers and students, and that no language in the bill states otherwise, it is reasonable to conclude that teachers can be disciplined and even terminated and students can be disciplined and even expelled as part of a school's "cure."  Moreover, if a school violates the law with respect to two or more specific violations, "the State of Mississippi shall withhold the disbursement" of "any and all funds appropriated by the Legislature" for the particular university, community college, junior college, or K-12 public school at issue.  Without state funding, the school would likely close, all students would be sent home, and all teachers and all other employees would be terminated.

The law calls for the relevant statewide boards of education to establish a formal complaint process for any student, parent, faculty member, staff member, or contractor to accuse any administrator, teacher, or student of saying the wrong thing about the wrong subject in violation of the free speech bans in this law, and a formal process for investigating the accused person.  This opens the door to a wave of ideological attacks by people who disagree with the political beliefs of others.  School officials will be required to investigate these accusations to

determine who said what to whom, what they meant, and whether each statement is a transgression of these broadly worded and vague free-speech prohibitions.

### A.   Plaintiffs

This case is brought by students, parents, educators, and organizations that collectively represent the interests of those whose constitutional rights are violated by this law. Plaintiff Mississippi Association of Educators ("MAE") is an association of nearly 8,000 members composed of Mississippi elementary and secondary teachers, higher education faculty and staff, educational support professionals including administrators, retired educators and college students preparing to become teachers.

Plaintiff United Campus Workers Southeast Local 3821 ("UCW") is a union representing over 4,800 members across eight states, including 237 members in Mississippi. These members include faculty and graduate students on the campuses of the University of Mississippi, Mississippi State University, the University of Southern Mississippi, Mississippi University for Women, Jackson State University and Delta State University.

Fostering LGBTQ+ Advocacy, Resources, Environments ("FLARE") is student group at Mississippi State University in Starkville, MS.  It has over 250 members.  FLARE's mission is to create a culture of diversity, inclusion, and equity for the LGBTQ+ community and other marginalized communities through programs and events.

Women in Science and Engineering ("WiSE") is a student group at the University of Southern Mississippi in Hattiesburg, MS. It has over 100 members and, like FLARE and many other student groups, has received funds from the University. It seeks to change the perception of what a scientist looks like including by expanding who participates in science, technology, engineering and mathematics ("STEM") fields.

Plaintiff Barbara Phillips is Adjunct Professor of Law at the University of Mississippi School of Law in Oxford, MS. Plaintiff James Thomas is Associate Professor of Sociology at the University of Mississippi in Oxford, MS. Plaintiff Karen Aderer is Lecturer in Social Work at the University of Southern Mississippi in Hattiesburg, MS. Plaintiff Dawn Zimmerer is Administrative Librarian for McLendon Library at Hinds Community College in Raymond, MS.

Plaintiff L.E. JiBol is a parent of two public school students who attend Jackson Public Schools in Jackson, MS. Plaintiff Madison Donley is a third-year law student at the University of Mississippi School of Law. Plaintiff Alexis Cobbs is a third-year law student at the University of Mississippi School of Law in Oxford, MS.

### B.    Defendants

The defendants are the Board of Trustees of State Institutions of Higher Learning ("IHL"), the Mississippi Community College Board ("Community College Board"), the Mississippi State Board of Education ("State Board of Education"), and the Mississippi Charter School Authorizer Board ("Charter School Board").

These defendants are required by Section 3 of the act to "ensure that each institution, college and public school, as applicable, shall not" do any of the things prohibited by Section 3, including those bans that are challenged in this case. Section 7(2) requires these defendants to adopt a model complaint process and policies and procedures for investigating alleged violations. Sections 7(3) and 7(6) require them to receive complaints, investigate them, make findings as to any alleged violations, and also trigger the obligation of public schools and post-secondary institutions "to cure all actions relating to [any] violation" and issue a formal finding detailing any alleged violation they found and the curative response. These defendants, and any findings they make of alleged violations, also play an important part in the operation of Section 8 of the

act, which requires the State of Mississippi to withhold the disbursement of state educational funds to any public school or public postsecondary institution upon the occurrence of two uncured violations of the act.  If these defendants are enjoined from enforcing this act, the harms will be abated.  If not, the harms will continue.

### C.    The Challenged Law, House Bill 1193

Section 3 of HB 1193 sets forth the various actions prohibited by the new law.  It provides:  "The [Defendants] shall ensure that each institution, college and public school, as applicable, shall not:".  It then lists several different actions, in Sections (a) through (i), that will be prohibited.  Of these, this lawsuit challenges the prohibitions in Sections 3(b), 3(f), 3(g), and 3(i).

Section 5 of the act lists certain purported exceptions to the prohibitions.  But several of those exceptions – contained in Sections 5(b), 5(c), 5(d), 5(h), 5(i) and 5(j) – are vague, confusing, and illusory.  Although the exceptions do not restrict or punish speech, they contribute to the vagueness that infects the prohibitions in certain portions of Section 3.

Although the requirements contained in Section 3 place the onus initially on the Defendants to ensure that each school adheres to the prohibitions, the consequences may be severe for educators and students accused of violating them.  This is explained more fully in the discussions of Sections 7–9.

This memorandum speaks of "educators," which includes teachers, librarians, and administrators.  To the extent that administrators, including those who are members of Plaintiffs MAE and UCW, are responsible for designing and administering programming to faculty and students that could violate the free speech bans in the act, they are subject to discipline and even termination for any violations they cause.  In addition, they are in the unusual position of being

called upon to enforce the act's prohibitions on teachers, librarians, and students. This will violate their own rights when forced to enforce speech restrictions they disagree with or do not understand because of the vagueness, and they are subject to discipline and termination if they fail to "cure" any alleged violations of the act.

### D.    The Bans

1.    *The Prohibition of Awareness and Understanding*
*of Issues Relating to Race, Sex, Color, Gender Identity, Sexual*
*Orientation, and National Origin – Sections 3(b) and 2(d) and Section 3(i)*

The most striking of HB 1193's prohibited actions is in Section 3(b), which lists the following as a prohibited action: "Engage in divisive concepts as defined in *Section 2(d) and (e) of this act*[.]" (Emphasis added). Of these two Sections, 2(e) lists eight so-called "divisive concepts." The other Section, 2(d), is a definition of "diversity training" which is described as "any formal or informal education, seminars, workshops or institutional program that focus on increasing awareness or understanding of issues related to race, sex, color, gender identity, sexual orientation or national origin." In other words, the school shall not "engage in . . . increasing awareness or understanding of issues related to race, sex, color, gender identity, sexual orientation or national origin." Of course, the very purpose of schools is to increase understanding and awareness.

Similarly, Section 3(i) describes one of the prohibited actions as follows: "Require any 'diversity training' as defined in Section 2 or any other policies or procedures that result in any formal or informal education, seminars, workshops or institutional program that focus on increasing awareness or understanding of issues related to race, sex, color, gender identity, sexual orientation or national origin." This is almost identical to Section 3(b)'s prohibition on

"engage[ment]" with Section 2(d) except 3(i) applies to "[r]equire[d]" classes or other events or "other policies or procedures."

These restrictions imposed by Section 3(b)'s incorporation of Section 2(d), and also imposed by Section 3(i), are based on content. Speech is prohibited regarding "issues related to race, sex, color, gender identity, sexual orientation, or national origin," but speech is permitted on other important issues including economics and religion and political party and a host of other matters. This content restriction is not justified by any compelling state interest.

*The Prohibition on "Engagement" with Eight "Divisive Concepts" – Sections 3(b) and 2 (e)*

As mentioned previously, Section 3's prohibitions include the actions set forth in Section 3(b): "Engage in divisive concepts as defined in *Section 2(d) and (e)* of this act[.]" (Emphasis added). The prior section of this memorandum discussed Section 2(d). Section 2(e) separately lists eight statements that are labeled as "divisive concepts." (A copy of HB 1193, including this list, is attached as Exhibit 16 to the Motion for Preliminary Injunction).

This provision as a whole is extremely broad, prohibiting any sort of "engage[ment]" with any of the "divisive concepts." Each of the "divisive concepts" is framed as a viewpoint that is banned by the act. Meanwhile, the act permits "engage[ment]" with certain viewpoints contrary to the "divisive concepts." In other words, the act prohibits those viewpoints with which the legislature disagrees, while allowing other viewpoints.

For example, Section 2(e)(viii) states that "[m]eritocracy or traits such as hard work ethic are racist or sexist . . . ." While "[m]eritocracy" is not necessarily a racist concept, it was often used in history in conjunction with the theory that other races were inferior to the white race and that segregation and exclusion of other races from certain professions, from government, from voting, from education, and from other arenas of public life were justified by "meritocracy." In

that sense, "meritocracy" was used – and occasionally is still used today – as a racist concept and also was and is used as a sexist concept to exclude women from many aspects of public life.  But the prohibition on "engage[ment]" of this idea, contained in Section (viii), can be read to ban any sort of discussion of it, even in a history or sociology class.

Similarly, Section 2(e)(ii) prohibits engagement with the idea that "[a]n individual by virtue of his or her race, sex, color, national origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously."  This prohibition could apply to discussions of ideas such as implicit bias, whether in a sociology, psychology, medical school, or other class, while allowing engagement with the viewpoint that implicit bias does not exist.

Section 2(e)(iii) bans engagement with the concept that "[a]n individual should be discriminated against or treated adversely solely because of their race, sex, color, or national origin." This can be read to prohibit discussion of, as well as support of, the concept of affirmative action to remedy prior discrimination, which has been and still is a feature of American law and public life.

Other sections, particularly Section 2(e)(vi) – "[a]n individual, by virtue of his or her race, color, sex or national origin, bears responsibility for actions committed in the past by other members of any class listed herein" – can be interpreted to prohibit discussion of, as well as support of, the principle of collective responsibility.  The notion of collective responsibility and collective remedial action is a legitimate subject for study and discussion, including in a history, sociology, philosophy, or law class about Nazi Germany, apartheid in South Africa, racism and sexism in America, or discrimination in a host of countries around the world. These restrictions are based on content and viewpoint and are not justified by any compelling state interest.

These "divisive concepts" also suffer from compounding layers of ambiguity.  For example, Section 2(e)(iv) states that speakers *cannot* "engage in" the idea of whether "[m]embers of one (1) race, one (1) sex, one (1) color, one (1) national origin *cannot and should not* attempt to treat others *without* respect to race, color, national origin or sex, gender identity, sexual orientation, or national origin."   Most of the other concepts include undefined words and phrases that create confusion as to which topics would fall within the ban and which do not.

Another problem stems from the breadth of the word "engage" in Section 3(b), which instructs schools that they cannot "[e]ngage in divisive concepts as defined in *Section 2(d) and (e)* of this act[.]"  If a history teacher describes the prevailing doctrine of white supremacy during much of the history of our state and nation, will the teacher be "engag[ing] in the divisive concepts" by describing the beliefs of most white people during those times that their race was "inherently superior to another race" (to quote Section 2(e)(i)) and that "an individual's moral character is necessarily determined by his or her race" (to quote Section 2(e)(v))?

Whether individually or taken as a whole, the ban on engagement with these "divisive concepts," and the definitions of the "divisive concepts," can be read to encompass important matters of public concern and are restrictions on free speech, but also are so vague, confusing, and elastic that educators and students will be forced to guess what runs afoul of this law and what does not.

2.    *The Prohibition on "Promot[ing]" Certain Ideas and "Endors[ing]" Certain Concepts – Section 3(f)*

Section 3(f) states that it is unlawful to: "Maintain any programs, including academic programs or courses, or offices that promote diversity, equity and inclusion, endorse divisive concepts or concepts promoting transgender ideology, gender-neutral pronouns, deconstruction

of heteronormativity, gender theory, sexual privilege or any related formulation of these concepts."

Similar to Section 3(b), this section's prohibition singles out viewpoints "endors[ing]" the "divisive concepts" listed in Section 2(e), along with additional concepts "promoting" a host of undefined terms related to gender and sex "or any related formulation of these concepts." In addition, it bans viewpoints "promot[ing] diversity, equity and inclusion." These restrictions are based on content and viewpoint and are not justified by any compelling state interest.

There is no definition of "promote," "endorse," "transgender ideology, gender-neutral pronouns, deconstruction of heteronormativity, gender theory, sexual privilege," or "related formulation of those concepts."  If a constitutional law professor discusses the issue of affirmative action and speaks of it favorably, is the professor teaching a "course[] that promote[s] diversity, equity and inclusion"?  If a teacher uses a student's gender-neutral pronoun, discusses transgender rights in a history course, or sexual privilege in a sociology or psychology course, is the teacher "endorsing" those concepts?  Or if freshman advisors consider warning students about the possibility of date-rape, is that an "endorsement" of the "related formulation" of "sexual privilege"?  These are among the many examples in this legislation of vague language that makes it difficult for educators and students to navigate the boundaries of the free-speech restrictions it imposes.

3.    *The Prohibition on "Diversity, Equity, and Inclusion Training" – Section 3(g)*

Section 3(g) prohibits "[r]equir[ing], as a condition of enrolling at, accepting employment with, or being awarded a contract at an institution, college or public school, or as a requirement of continuing enrollment, employment or contractual obligation at an institution, college or public school, any person to participate in diversity, equity and inclusion training."

11

While Section 2(1)(a) defines "diversity, equity and inclusion" and Section 2(1)(d) defines "diversity training," there is no definition of "diversity, equity and inclusion training" in the act. Even if one assumes that "diversity, equity and inclusion training" refers to any "training" on "diversity, equity and inclusion" as defined in Section 2(1)(a), the provision is still ambiguous due to the ambiguity in the definition of "diversity, equity and inclusion." Section 3(g) prohibits requiring "training" – another undefined term – on any such "effort" described in Section 2(1)(a).

The convoluted language of this ban is confusing. For example, would a required constitutional law course that covers affirmative action or the equal protection clause be considered "training" on "[a]ny effort to select or influence the composition of the faculty, staff, employee or student body by favoring applicants based on race, sex, color or national origin"? The provision fails to provide sufficient guidance on this and similar questions, leaving students and educators confused as to what is permissible and what is not.

### E.    The Vague, Confusing, And Illusory Exceptions

Section 5 of the act lists certain things that the act "may not be construed to apply and/or prohibit."  Although none of these provisions explicitly restricts or punishes speech, some of them are so vague, confusing, and illusory that they exacerbate the uncertainty created by the language of the unconstitutional prohibitions in Section 3.

> 1.    *The Application of the Prohibition on Students, Student Organizations, Guest Speakers, and Performers in Certain Circumstances – Section 5(c)*

Section 5(c) states as an exception: "An activity of a registered student organization, guest speaker or performer at an institution, college or public school *as long as state funds are not used.*"  (Emphasis added).  In other words, if state funds are used, a guest speaker, performer,

or person attending an activity of a registered student organization is bound by the act and therefore cannot, for example, "engage in . . . increasing awareness or understanding of issues related to race, sex, color, gender identify, sexual orientation or national origin" as prohibited by Sections 3(b) and 2(d).

The act does not make clear when "state funds are used." If the student organization holds a meeting or a guest speaker or performer makes a presentation in a school building constructed with state funds whose utilities are paid with state funds and which is cleaned by a state-paid janitorial staff, perhaps with state-paid faculty present, it would seem that "state funds are . . . used" and the prohibitions apply. And maybe state funds are used if the student organization receives funding from the school and chooses to purchase refreshments for the event or reimburse a speaker's travel expense.

The vagueness and viewpoint-based nature of the law has already led the University of Mississippi to withdraw funding for the 2025 Oxford Pride Week – and prohibit University departments from official participation in Pride Week – in an effort to comply with HB 1193. The University had first participated as a sponsor of Pride Week in 2016.

Beyond that, the prohibitions of the act appear to cover the actions of individual students. Given that Section 5(c) states that the act does not apply to the actions of "registered student organization[s]" when "state funds are not used," it appears that the restrictions of the act clearly do apply to unregistered student organizations. And given that the act applies to unregistered student organizations, it may well apply to individual students. There is no language in the act stating that the prohibitions do not apply to students. All of this raises the distinct possibility that students are banned from, among other things, making statements in the classroom regarding "divisive concepts" or "issues related to race, sex, color, gender identity, sexual orientation or

national origin" as prohibited by Sections 3(b) and 2(d).  Ultimately, the law is erasing academic debate not only from class but from campus.

### 2.  The Purported Exception for "Scholarly Research" and "Creative Work"—Section 5(b)

Section 5's list of matters that the act "may not be construed to apply to and/or prohibit" includes Section 5(b), which creates an exception for "[s]cholarly research or a creative work by students, faculty, employee or staff at an institution, college or public school or the dissemination of that work."  But what if the subject of the research or creative work is about, or touches on, one of the legislature's disfavored concepts that educators and students are prohibited from "engag[ing]" in?  Can the scholarship or creative work be discussed in class?  What if students in a particular class are assigned to conduct scholarly research or write a creative work on a subject of their own choice, and one or more students chooses one of the banned concepts pursuant to the alleged protection of Section 5(b)? Can the students discuss their work in the classroom in the same manner as other students who discuss their work?  And can the teacher respond to the students' presentations or allow students to ask questions and engage in a classroom debate the same way they can with other subjects?  Or is that prohibited "engage[ment]"?

### 3.  The Purported Exception for Complying with State and Federal Law – Section 5(h)

Section 5(h) states that the act does not prohibit: "[a]n institution, college or public school from requiring or taking action against a student, employee, faculty, staff or contractor for failing to comply with federal or state law."  Although the sentence is confusing, it appears to say that schools can require compliance with federal and state law.  But what if federal or state law conflicts with the prohibitions of Section 3 of this act?  Which law are institutions, administrators, teachers, and students supposed to follow?

14

For example, while certain provisions of the act prohibit "enage[ment]" with certain subjects, discussion and support of certain concepts, and apparently prohibit the use of state funds by student groups with respect to the those subjects and concepts, another provision of Mississippi law, Miss. Code Ann.§ 37-11-77, guarantees students the right to "engage" in political expression, to "organize" political groups or clubs, and to have "access to school facilities for assembling" for these groups "during and after the school day" to the same extent students and student groups are allowed to do so with respect to nonpolitical expression and activities.

Similarly, Miss. Code Ann. § 37-11-79(1) makes it "unlawful for any public school which has a limited open forum to deny equal access or a fair opportunity to, or discriminate against, any students who wish to conduct a meeting within that limited open forum on the basis of the political, philosophical, ideological or other content of the speech at such meetings."

Thus, a student or student group who wishes to use school facilities to discuss "issues related to race, sex, color, gender identity, sexual orientation or national origin" or issues of affirmative action or collective responsibility, and a faculty sponsor of that group, will be in danger of violating Section 3(b), even though they are exercising rights protected by Miss. Code Ann. §§ 37-11-77 and 37-11-79(1).

4. *The Purported Exception that Commands State
and Local Officials to Ignore the First Amendment – Section 5(d)*

Among the other items listed in Section 5, Section 5(d) states that the act "may not be construed to apply to and/or prohibit" "[a] policy to limit or restrict freedom of speech pursuant to the First Amendment of the United States Constitution or Section 13 of the Mississippi Constitution or academic course instruction that undermines the duty of a public school, or public postsecondary educational institution to protect academic course instruction, intellectual

diversity and true expression *provided that none of these protected tenets conflict with the act*." (Emphasis added).  The language of the act is telling state and local officials, particularly education officials, that in the event of a conflict, they must apply the act and ignore the First Amendment, Section 13, and the duty of a school to protect course instruction and true expression.

> 5. *The Purported Exception for Complying with Accreditation Standards and Requirements – Section 5(j)*

Section 5(j) states that the act does not "[p]rohibit a public school or public postsecondary education institution from complying with any applicable academic accreditation standards or requirements."  But many accreditation standards require respect for academic freedom that is inconsistent with HB 1193's prohibitions on engagement with the legislature's disfavored subjects and concepts.

For example, all colleges and universities in Mississippi are accredited by the Southern Association of Colleges and Schools Commission on Colleges.  That organization's manual states that institutions of higher learning must "preserv[e] and protect[] academic freedom."  The manual adds:  "Academic freedom respects the dignity and rights of others while fostering intellectual freedom of faculty to teach, research, and publish."  Southern Association of Colleges and Schools Commission on Colleges, *Resource Manual for The Principles of Accreditation,* Section 6.4 (4th ed. 2024).  Read literally, this accreditation standard would wipe out the bans on free speech that are challenged in this lawsuit.

In addition, the University of Mississippi School of Law is accredited by the American Bar Association ("ABA") and must comply with its Standards and Rules of Procedure.  ABA Standard 303c demands that:  "A law school shall provide education to law students on bias, cross-cultural competency, and racism: (1) at the start of the program of legal education, and (2)

at least once again before graduation. For students engaged in law clinics or field placements, the second educational occasion will take place before, concurrently with, or as part of their enrollment in clinical or field placement courses."

Interpretation 303-6 of the ABA Standards provides further: "With respect to 303(a)(1) [addressing professional responsibility and the values of the profession], the importance of cross-cultural competency to professionally responsible representation and the obligation of lawyers to promote a justice system that provides equal access and eliminates bias, discrimination, and racism in the law should be among the values and responsibilities of the legal profession to which students are introduced."

Also, Mississippi's curricular standards in Social Studies require Fourth Graders to learn about "Mississippi Studies and Regions," including "Antebellum society," "role in Civil War," "Reconstruction," and "Civil Rights Movement," Miss. Coll. & Career Readiness Standards for Soc. Stud., Miss. Dep't of Edu. (2022), at 38, available at

https://www.mdek12.org/sites/default/files/Offices/Secondary%20Ed/Social%20Studies/mde_ccr s_social_studies_standards_final_filing_jan_25_2023.pdf, and Fifth Graders to learn "US History," like "the Constitution" and "Compare and contrast the treatment of African Americans, Native Americans, and women regarding the principles in the Bill of Rights," *id.* at 46.

It is entirely unclear how this accreditation exception will be applied with respect to the challenged provisions and teachers face a difficult choice of whether to rely on this exception and risk being disciplined and terminated or to comply with the unconstitutional restrictions on their free speech contained in the act. *See, e.g.*, Ex. 2 (Phillips Decl. ¶ 7) (ABA standards); Ex. 10 (Boler Decl. ¶ 4) (American Library Association Code of Ethics).

### F.    Policies And Procedures Required By The Act

Sections 7(1)–(2) require Defendants to adopt certain policies and procedures within ninety days of the effective date of the act. Nothing in these policies will ameliorate the unconstitutionality of the provisions banning a wide array of legitimate speech at Mississippi schools. As required by Sections 7(1)–(2), the policies and procedures will relate only to the process for submitting complaints to schools about violations of those provisions and to investigating the teachers, students, and administrators accused of saying the wrong words about the wrong things.

### G.    Consequences For Teachers, Administrators, And Students

Although the statute's requirements as contained in Section 3 are placed initially on the boards to ensure that each school not engage in these matters, the consequences for teachers, administrators, and students can be severe.

Section 7 provides that the relevant board – whether one of the statewide Defendant boards or a local K-12 school board – must investigate any reported violation of the act, and Section 7(6) provides that the school must "cure all actions relating to [any] violation" found by the board. The statute does not define what is necessary to "cure all actions relating to [any] violation," but this language seems to allow the school to terminate or otherwise discipline any educator who, contrary to Section 3(b), "engages in divisive concepts," including (to quote Section 2(d)) by "increasing awareness or understanding of issues related to race, sex, color, gender identity, sexual orientation or national origin." Under Sections 7(3) and (4), a complaint of a violation can be made by any employee, faculty, staff or contractor, student, or parent, guardian, or next friend of a student under 18.

Obviously, complaints can and will be made against teachers, librarians, and other administrators. But it stands to reason they will also be made against students who speak or

write about the banned subjects.  The previous discussions about the exceptions in Sections 5(b) and 5(d) seem to confirm that individual students can be charged.  Also, Section 3(h) states that students and educators cannot be penalized for refusing to support an undefined "diversity, equity or inclusion concept," implying that students can be penalized for actually supporting such a concept.  In the face of these indications that students are covered, there is nothing in the act that states the prohibitions cannot be applied to students, that complaints cannot be made against students, and that students cannot be disciplined as part of the "cure [of] all actions relating to [any] violation."

Further, Section 7(7) provides that any person who complains to one of these boards of an alleged violation and who is aggrieved by a formal final finding of the board may file an appeal de novo in chancery court.  If the chancery court finds a violation has occurred, it "may award relief in the form of an injunction and/or actual damages."

On top of that, Section 9 allows the Attorney General, after notification by a complainant of aggrievement of the action or inaction of the respective board, to file a writ of mandamus in the chancery court, which can then "award relief in the form of an injunction and/or actual damages."  The act does not specify whether the injunction and damages obtained through either of these routes can be awarded only against the school or can be awarded against the teacher, administrator, or student who allegedly committed the violation.

There is no direction or guidance for administrators, teachers, and students as to whether the law is violated, and whether the schools must "cure all actions relating to the violation" if the teacher or student did not realize that their words allegedly violated the act.

Finally, and most ominously, Section 8 provides that if a school violates the law by failing to cure all actions relating to two or more specific violations, "the State of Mississippi

19

*shall withhold* the disbursement" of "any and all funds appropriated by the Legislature" for the particular university, community college, junior college, or K-12 public school at issue. (Emphasis added).

## II.    A TEMPORARY RESTRAINING ORDER SHOULD BE ISSUED PENDING RESOLUTION OF THE PRELIMINARY INJUNCTION MOTION, AFTER WHICH A PRELIMINARY INJUNCTION SHOULD BE GRANTED.

The plaintiffs seek a preliminary injunction and, more immediately, a temporary restraining order while the Court considers the request for a preliminary injunction.

The Court must weigh four factors when deciding whether to grant a motion for a temporary restraining order or a preliminary injunction: (1) the likelihood of success on the merits; (2) the irreparable injury to the movants if the injunction is denied; (3) whether the threatened injury outweighs any damage that the injunction might cause the defendant; and (4) the public interest. *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 452 (5th Cir. 1998). Absent factual disputes, the Court may rule without an evidentiary hearing. *Federal Sav. & Loan Ins. Corp. v. Dixon*, 835 F.2d 554, 558–59 (5th Cir. 1987).[1]

### A.    The Plaintiffs Are Likely To Prevail On The Merits

---

[1] Multiple courts have preliminarily enjoined similar anti-DEI laws or regulations. *See Pernell v. Fla. Bd. of Governors of State Univ. Sys.*, 641 F. Supp. 3d 1218, 1291 (N.D. Fla. 2022) (granting, in part, preliminary injunctions on state law banning DEI-concept instruction as unconstitutional viewpoint discrimination under the First Amendment); *Black Emergency Response Team v. Drummond*, 737 F. Supp. 3d 1136, 1156 (W.D. Okla. 2024) (finding plaintiffs have a substantial likelihood of proving state law banning instruction on certain race, gender, and sexuality subjects is impermissibly vague under the Fourteenth Amendment); *Nat'l Edu. Assn. v. Dept. of Edu.*, No. 25-cv-091, 2025 WL 1188160, at *18-*27 (D. N.H. Apr. 24, 2025) (finding federal regulatory bans on DEI-related instruction likely unconstitutionally vague and discriminatory on the basis of viewpoint); *NAACP v. Dept. of Edu.*, No. 25-cv-1120, 2025 WL 1196212, at *5-*7 (D.C. Cir. Apr. 24, 2025) (granting preliminary injunction of federal regulatory bans on DEI-related instruction as likely unconstitutionally vague).

1.    *The Challenged Provisions of HB 1193 are content-based* and *viewpoint-based restrictions on academic freedom and speech that violates the First Amendment.*

In *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819 (1995), the Supreme Court explained that viewpoint-based discrimination, a subset of content-based discrimination in which the government prohibits the expression of disfavored views on a subject, is presumptively unconstitutional and subject to strict scrutiny.

> Discrimination against speech because of its message is presumed to be unconstitutional. . . . [T]he government offends the First Amendment when it imposes . . . burdens on certain speakers based on the content of their expression. When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant. Viewpoint discrimination is thus an egregious form of content discrimination.

*Id.* at 828-829 (citations omitted).

Indeed, the First Amendment's "bedrock principle" provides that the "government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989). Redress for bad ideas comes through "discussion [of] the falsehood and fallacies" and "the processes of education"—"not enforced silence." *Id.* at 419 (quoting *Whitney v. California*, 274 U.S. 357, 377 (1927) (Brandeis, J., concurring)). Here, the ideas are not "offensive or disagreeable." Rather they are on important matters of public concern that are the subject of current discussion and debate – race, gender, sexuality, and diversity, equity and inclusion. Rather than foster free expression, free ideas and free belief, through HB 1193, the State has cast an unconstitutional "pall of orthodoxy" in public schools. *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967)).

By prohibiting "engage[ment]" that "increas[es] awareness and understanding of issues related to race, sex, color, gender identify, sexual orientation, and national origin," Section 3(b)'s

incorporation of Section 2(d), and also Section 3(i), discriminate on the basis of content. But they also discriminate on the basis of viewpoint by allowing teachers to explain how issues of economics, class, religion, and political party play a role in shaping society, but not issues related to race, sex, color, gender identify, sexual orientation, and national origin, thus expressing the view that the prohibited subjects play no role at all. Just as "[i]t discriminates on the basis of viewpoint to permit school property to be used for the presentation of all views about family issues and child rearing except those dealing with the subject matter from a religious standpoint," *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 393 (1993), it discriminates on the basis of viewpoint to permit classes to present all views about history and sociology except those relating to race, sex and gender. Indeed, in *Rosenberger,* the Court explained that "[i]f the topic of debate is, for example, racism, then exclusion of [targeted] views on that problem is . . . offensive to the First Amendment . . . ." 515 U.S. at 831. Surely it is just as offensive to exclude the subject of racism altogether when the topic is problems in American history or American society.

Sections 3(b)'s incorporation of 2(e), Section 3(f), and 3(g) explicitly single out the State's prohibited concepts and other disfavored ideas – "transgender ideology, gender-neutral pronouns, deconstruction of heteronormativity, gender theory, sexual privilege," as well as diversity, equity, and inclusion – and banned any viewpoints on those concepts that the State disfavors. These provisions make an "authoritative selection" as to which ideas are permissible, and which must be censored based on viewpoint. *See Keyishian*, 385 U.S. at 603 (1967). By prohibiting instruction that "engage[s]" or "promote[s]" particular views, the law "effects a sweeping restriction" that covers any "advoca[cy] [of] a philosophical position that rests upon" those views. *Rosenberger*, 515 U.S. at 836.

a.  <u>Professors have First Amendment rights against viewpoint discrimination.</u>

University professors have a right to speak free of viewpoint discrimination.  Indeed, "[a]cademic freedom, though not a specifically enumerated constitutional right, long has been viewed as a special concern of the First Amendment." *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 312 (1978)*; see also In re Dinnan*, 661 F.2d 426, 430 (5th Cir. 1981) ("Time after time the Supreme Court has upheld academic freedom in the face of government pressure.").  Nearly 50 years ago, this Circuit recognized that precedent "leave[s] no room for the view that . . . First Amendment protections should apply with less force on college campuses than in the community at large." *Bazaar v. Fortune*, 476 F.2d 570, 572, 580 (5th Cir. 1973), *modified on reh'g*, 489 F.2d 225 (5th Cir. 1973).

The First Amendment harms inflicted by HB 1193 are particularly clear "in the social sciences, where few, if any, principles are accepted as absolutes[,] . . . [and t]eachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die." *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957). Plaintiffs MAE, UCW, Barbara Phillips, James Thomas, Dawn Zimmerer and Karen Aderer, and Declarants Cliff Johnson and Jaime Harker, as instructors or administrators in social science fields and organizations with members in those fields, will therefore be uniquely harmed. *See* Ex. 2 (Phillips Decl. ¶ 2-3) (law); Ex. 6 (Johnson Decl. ¶ 2-4) (law); Ex. 7 (Harker Decl. ¶ 2-3) (English and gender studies); Ex. 8 (Thomas Decl. ¶ 2-4) (sociology); Ex. 14 (Zimmerer Decl. ¶ 2-3) (librarian); Ex. 15 (MAE Member B Decl. ¶ 2) (K-12 English).  But the law goes further than the social sciences and into biology and medical school courses and other scientific disciplines where issues of sex and other prohibited subjects are relevant.  *See* Ex. 5 (Orey Decl. ¶ 1-2) (quantitative analysis in political science). Whether in the

sciences or social sciences, the law can impact research studies if the study relates to the banned contents and viewpoints.  While Section 5(b) creates an exception for "[s]cholarly research," it is unclear whether and how that exception will apply.  *See* Ex. 5 (Orey Decl. ¶ 4).

By dictating state-endorsed and state-proscribed views on controversial issues, the challenged provisions of HB 1193 preclude Plaintiffs and other educators  from serving as "exemplars of open-mindedness and free inquiry," *Wieman v. Updegraff*, 344 U.S. 183, 196 (1952) (Frankfurter, J., concurring), and instead forces them to speak with one mind—the Mississippi legislature's mind—in order to avoid disciplinary action and private lawsuits.

All views proscribed by the Act, whether they are widely condemned or broadly supported, are protected speech. The enforced "absence of such voices"—particularly on college and university campuses—"would be a symptom of grave illness in our society," *Sweezy*, 354 U.S. at 251.

> b.  <u>Students have a corresponding right to receive the speech of their professors and teachers.</u>

By prohibiting educators like Plaintiffs from teaching disfavored concepts, HB 1193 also denies students the right to learn from and openly discuss those viewpoints.

The Supreme Court has long held that the First Amendment protects not only the right to speak but also to receive speech.  "The right of freedom of speech and press . . . embraces the right to distribute literature, and necessarily protects the right to receive it." *Martin v. Struthers*, 319 U.S. 141, 143 (1943) (citation omitted).  Students, in particular, have a right to access information in schools.

This, too, applies with special force in the higher education context. As the Eleventh Circuit recently held, the "chief mission [of universities] is to equip students to examine arguments critically and, perhaps even more importantly, to prepare young citizens to participate in the civic and political life of our democratic republic." *Speech First*, *Inc. v. Cartwright*, 32 F.4th 1110, 1128 (11th Cir. 2022); *see also Arce v. Douglas*, 793 F.3d 968, 988 (9th Cir. 2015) (recognizing that K-12 students' "First Amendment right to receive information" was implicated by an Arizona law targeting a Chicano Studies curriculum).

Students can be prepared for participation in democratic society only if they are "trained through wide exposure to that robust exchange of ideas which discovers truth 'out of a multitude of tongues, (rather) than through any kind of authoritative selection.'" *Keyishian*, 385 U.S. at 603 (citation omitted). The challenged provisions deny students that training—indeed, it denies them the opportunity to sharpen their minds by engaging in debate with differing viewpoints—and instead prevents them from learning about certain subjects and certain viewpoints. *See* Ex. 6 (Johnson Decl. ¶ 4); Ex. 5 (Orey Decl. ¶ 5, 7); Ex. 9 (JiBol Decl. ¶ 5-7) (explaining importance of being able to discuss at school how JiBol's children have a white mother and black father to other 3-to-6-year-olds); Ex. 10 (Boler Decl. ¶ 6-8) (library science student); Ex. 11 (Donley Decl. ¶ 8-9) (law student); Ex. 12 (Cobbs Decl. ¶ 8-9) (law student); Ex. 15 (MAE Member B Decl. ¶ 13) (law would limit K-12 English to test-prep drills and sanitized content unconnected to students' lives). Declarant Cliff Boler left his library science graduate program at the University of Southern Mississippi because of his fear of violating the law and its negative impacts on his studies. Ex. 10 (Boler Decl. ¶ 2, 5).

While these rights apply with particular force at the college level, they also apply in K-12 education. The Supreme Court in *Meyer v. Nebraska,* 262 U.S. 390 (1923) struck down a state

law prohibiting students in eighth grade or lower from learning a foreign language, holding that this violated the rights of teachers and students.   In *Epperson v. Arkansas,* 393 U.S. 97 (1968), the Supreme Court struck down a law prohibiting the teaching of evolution in K-12 public schools as well as public colleges and universities.  Although the Court relied on the Establishment Clause of the First Amendment as the grounds for its holding, it nevertheless emphasized the duty of federal courts "to apply the First Amendment's mandate in our educational system where essential to safeguard the fundamental values of freedom of speech and inquiry."  *Id.* at 104.

In *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, the Supreme Court held:

> *First Amendment rights*, applied in light of the special characteristics of the school environment, *are available to teachers and students.* It can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate. This has been the unmistakable holding of this Court for almost 50 years.

393 U.S. 503, 506 (1969) (Emphasis added).  There, the Supreme Court concluded that the Des Moines schools violated the First Amendment rights of two high school students and one junior high student by suspending them after they work black armbands to school to protest the Vietnam War.   In the course of its ruling, the Court explained:

> In our system, students may not be regarded as closed-circuit recipients of only that which the State chooses to communicate. They may not be confined to the expression of those sentiments that are officially approved.  In the absence of a specific showing of constitutionally valid reasons to regulate their speech, students are entitled to freedom of expression of their views.

*Id.* at 511.

Of course, in K-12 schools, teachers have less freedom to control the curriculum and the subject matter of classes than they do at the college level.  But once state authorities choose the course and prescribe the general subject matter, it cannot censor classroom discussion related to

26

that subject matter.   If the course is Mississippi history and the subject matter includes the civil war, the State cannot prohibit teachers and students from talking about the role slavery and race played in causing the war.  *See* Miss. Coll. & Career Readiness Standards for Soc. Stud., at 39 ("Analyze Mississippi's role in the Civil War," including "Outline the cause and effects of slavery that led Mississippi to secede from the Union in 1861 and subsequently enter the Civil War.").  As the Court said in *Tinker,* students "may not be confined to the express of those sentiments that are officially approved."  *Id.*

And while the Supreme Court has said that the rights to free speech of teachers and students encompass the classroom, they also encompass extracurricular activities.  "The principle of these cases is not confined to the supervised and ordained discussion which takes place in the classroom."  *Id.* at 512.   The Supreme Court recently reaffirmed that "the First Amendment's protections extend to 'teachers and students,' neither of whom 'shed their constitutional rights to freedom of speech or expression at the schoolhouse gate.'" *Kennedy v. Bremerton*, 142 S. Ct. 2407, 2423 (2022) (quoting *Tinker*, 393 U.S. at 506).  The Court in *Bremerton* not only reaffirmed *Tinker's* reasoning but also recognized that the free speech rights of public-school teachers exist on campus even outside of classroom hours, which confirms those rights for students as well.

c.  <u>Student groups have the right to funding free of viewpoint discrimination.</u>

In *Rosenberger,* the Supreme Court held that a university funding policy violated the First Amendment because it "cast disapproval on particular viewpoints." 515 U.S. at 836. There, a student group followed university procedures to request funding for its newspaper, "*Wide Awake: A Christian Perspective at the University of Virginia.*" *Id.* at 826. Its funding request was denied based on guidelines prohibiting funding for activities that "primarily promote[] or manifest[] a particular belie[f] in or about a deity or an ultimate reality." *Id.* at 825. The Supreme Court explained that that the denial of funding—and the guidelines themselves—violated the First Amendment, because they "risk[ed] the suppression of free speech and creative inquiry in one of the vital centers for the Nation's intellectual life, its college and university campuses." *Id.* at 836.

Here student group WiSE seeks to help women, LGBTQ people and others succeed in the STEM fields. WiSE is unsure if it will be able to receive state funds and hold campus events in the future since its activities are directed primarily at women. *See* Ex. 1 (WiSE Decl. ¶ 3-4). The challenged provisions seem to put student funding for groups like WiSE and FLARE at risk. *Id.*; Ex. 13 (FLARE Decl. ¶ 2-3) (law may prohibit FLARE's activities and existence). Indeed, authorities at the University of Mississippi told faculty members that because of the new law, their department could no longer provide financial support to the Oxford Pride Week. *See* Ex. 7 (Harker Decl. ¶ 6). Additionally, Mississippi State University restructured FLARE and changed its funding source in an attempt to comply with the law and remove FLARE's receipt of any state funds. Ex. 13 (FLARE Decl. ¶ 2).

d. <u>HB 1193 fails strict scrutiny</u>

"[R]estrictions based on content must satisfy strict scrutiny, and those based on viewpoint are prohibited*." Minn. Voters All. v. Mansky*, 138 S.Ct. 1876, 1885 (2018). The Act fails strict scrutiny, as it is not "narrowly tailored to achieve a compelling government interest." *Ashcroft v. ACLU*, 542 U.S. 656, 656 (2004). To the extent the government's objective is prohibiting discriminatory practices, that cannot be achieved by silencing a set of disfavored viewpoints. *See Rosenberger*, 515 U.S. at 828–29 ("The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction."); *see also Pernell v. Fla. Bd. of Governors of the State Univ. Sys.*, 641 F.Supp.3d 1218, 1276 (N.D. Fla. 2022) ("As this Court noted above, simply because the State of Florida says it wants to reduce racism or sexism in public universities does not give the State of Florida a safe harbor in which to enact rank viewpoint-based restrictions on protected speech.").

Further, the state could simply pass a law preventing schools from engaging in discriminatory practices without prohibiting educators and students from discussing particular subjects and particular views.   A state may not, in the guise of fighting discrimination, single out disfavored subjects and viewpoints and prohibit their expression or endorsement, taking sides on matters of public controversy. That is precisely what the challenged provisions do.

2.    *The Challenged Provisions Are So Vague, Confusing, And Contradictory That They Violate The First And Fourteenth Amendments*

The challenged provisions also violate the First and Fourteenth Amendments because the vagueness of their undefined restrictions and the confusion added by the act's purported exceptions render teachers, administrators, and students unable to distinguish what is permissible from what is not.  *See* Ex. 1 (WiSE Decl. ¶ 6) (unable to plan for Fall 2025 conference and

fundraise because of vagueness); Ex. 5 (Orey Decl. ¶ 3-4) (unclear if he can teach quantitative studies showing racial and gender disparities); Ex. 7 (Harker Decl. ¶ 6) (University entities cancelled certain participation in Oxford Pride events because of vagueness); Ex. 10 (Boler Decl. ¶ 3-4) (unclear if academically sound library science studies and accreditation can remain under law); Ex. 11 (Donley Decl. ¶ 5, 7-8) (unclear if she can get robust legal education and whether student organizations can get funding under the law)).  The Supreme Court has held that vague, content-based regulation on speech "raises special First Amendment concerns because of its obvious chilling effect on free speech." *Reno v. ACLU,* 521 U.S. 844, 871-72 (1997). The First Amendment needs "breathing space," so government efforts to restrict speech must provide specific guidance as to impermissible speech. *Howard Gault Co. v. Tex. Rural Legal Aid, Inc.*, 848 F.2d 544, 559 (5th Cir. 1988).  The Supreme Court has warned that, particularly in the education context, "[t]he danger of the [the] chilling effect upon the exercise of vital First Amendment rights must be guarded against by sensitive tools which clearly inform teachers what is being proscribed." *Keyishian*, 385 U.S. at 604.

A law is unconstitutionally vague where it: (1) "fail[s] to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits;" or (2) "authorize[s] and even encourage[s] arbitrary and discriminatory enforcement." *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999).   "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined," because "vague laws may trap the innocent by not providing fair warning." *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972). Vague laws burdening speech create uncertainty which "inevitably lead[s] citizens to 'steer far wider of the unlawful zone' . . . than if the boundaries of the forbidden areas were clearly marked." *Id*. (citation omitted).

In *Local 8027 v. Edelblut,* 2024 U.S. Dist. LEXIS 94052 (D.N.H. 2024), *appeal pending,* the court struck down as unconstitutionally vague four prohibited concepts in a New Hampshire statute that are almost identical to the first four divisive concepts in Section 2(e), which are prohibited through Section 3(b), of the Mississippi statute challenged here. As that court stated:

> One of the most difficult interpretive challenges the Amendments present is that they fail to address their intended target directly. Supporters of the Amendments have made no secret of the fact that their aim is to restrict what teachers can say about what plaintiffs call DEI initiatives. . . . But rather than take on issues like structural racism, implicit bias, and affirmative action directly, the Amendments employ general terms such as teaching that one race is superior to another, that individuals are inherently racist, and that individuals should not be subject to adverse treatment because of their race. While these banned concepts may appear straightforward at first glance, their ambiguity comes to light when put into practice.

*Id.* at 23-24 (citation omitted). The court added:

> All told, the banned concepts speak only obliquely about the speech that they target and, in doing so, fail to provide teachers with much-needed clarity as to how the Amendments apply to the very topics that they were meant to address. This lack of clarity sows confusion and leaves significant gaps that can only be filled in by those charged with enforcing the Amendments, thereby inviting arbitrary enforcement.

*Id.* at 31. The court also explained:

> [T]eachers can face discipline for violating the Amendments by conveying banned information to a student without any proof that they have knowingly crossed the line that separates permissible and prohibited speech. Because teachers can be found to have crossed that indistinct line without any finding of scienter, the vagueness of the Amendments is compounded rather than mitigated.

*Id.* at 40. Accordingly, the court concluded:

> The Amendments are viewpoint-based restrictions on speech that do not provide either fair warning to educators of what they prohibit or sufficient standards for law enforcement to prevent arbitrary and discriminatory enforcement. Thus, the Amendments violate the Fourteenth Amendment to the U.S. Constitution.

*Id.* at 50.

These same problems exist with respect not only to the "divisive concepts" described in Section 2(e) of HB 1193 but exist with respect to the other challenged provisions as well as described earlier in this memo. The vagueness of these provisions is exacerbated by the absence of an explicit scienter requirement in the statute.

**B.    The Plaintiffs Will Suffer Irreparable Harm In The Absence Of An Injunction**

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury" for purposes of a preliminary injunction motion. *Elrod v. Burns*, 427 U.S. 347, 373-374 (1974). *See also, Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981) (same). As the Fifth Circuit has explained, where a constitutional right is "'either *threatened* or [is] in fact being impaired', . . . this conclusion mandates a finding of irreparable injury." *Id.* at 338 (emphasis added, citation omitted). Here, the act by its very terms threatens the plaintiffs' constitutional rights to free speech and therefore irreparable harm is established.

Moreover, as stated earlier, the act requires that schools "cure" any alleged violation of the free speech bans it imposes. The act provides no explanation of what is required to "cure" a violation but leaves open the possibility that educators and students could be disciplined for any alleged violations, including potential termination for the educators and expulsion for the students. The organizational and individual plaintiffs — composed of educators, students, and the parent of a student — will be irreparably harmed in the absence of temporary and preliminary relief. Summer school is underway and the fall semester will commence in August. A temporary restraining order and a preliminary injunction preventing enforcement of the challenged provisions are necessary to protect their rights so they do not unnecessarily censor themselves

and they are not unconstitutionally disciplined, terminated, or expelled while this Court reviews the merits of this case.

### C.    The Defendants Will Suffer No Harm From Temporary And Preliminary Relief

A temporary restraining order and a preliminary injunction will simply preserve the status quo pending the Court's resolution of the merits.  Mississippi's public universities, colleges, and schools will continue to operate as before without the potential disruption and confusion posed by the free speech restrictions in the act.  Indeed, the confusion exists not simply for the plaintiffs and the other educators and students in Mississippi's public schools, but also for the defendants themselves as they approach the unenviable task of enforcing the contradictory and sometimes senseless provisions of the act.

### D.    The Public Interest Will Be Served By An Injunction

For the reasons just mentioned, the public interest will be served by an injunction that preserves the status quo and eliminates the confusion and uncertainty for thousands of Mississippi public school educators, parents, and students while this case is pending.   Moreover, "the public interest [is] not disserved by an injunction preventing . . . implementation [of an unconstitutional statute.]"  *Ingebretsen on Behalf of Ingebretsen v. Jackson Pub. Sch. Dist.*, 88 F.3d 274, 280 (5th Cir. 1996).

## III.    CONCLUSION

For the foregoing reasons, this Court should issue a temporary restraining order enjoining the enforcement of Sections 3(b), 3(f), 3(g), and 3(i) of H.B. 1193 pending consideration of the motion for preliminary injunction,  and upon final consideration of that motion, issue a preliminary injunction enjoining enforcement of those same provisions of the act.

Dated: June 18, 2025                              Respectfully submitted,

| | |
|---|---|
| s/ Robert B. McDuff | s/ Joshua Tom |
| ROBERT B. MCDUFF | Joshua Tom |
|  MS Bar No. 2532 |  MS Bar. No 105392 |
| Paloma Wu | McKenna Raney |
|  MS Bar No. 105464 |  MS Bar No. 106330 |
| MISSISSIPPI CENTER FOR JUSTICE | Ayanna Hill |
| 210 E. Capitol Street, Ste 1800 |  MS Bar No. 106590 |
| Jackson, MS 39201 | American Civil Liberties Union of |
| 601-259-8484 | Mississippi Foundation, Inc. |
| RMCDUFF@MSCENTERFORJUSTICE.ORG | P.O. Box 2242 |
| PWU@MSCENTERFORJUSTICE.ORG | Jackson, MS 39225 |
| | Phone: (601) 354-3408 |
| s/ Amir Badat | JTOM@ACLU-MS.ORG |
| Amir Badat | MRANEY@ACLU-MS.ORG |
|  MS Bar No. 106599 | AHILL1@ACLU-MS.ORG |
| Badat Legal PLLC | |
| P.O. Box 15 | |
| Tougaloo, MS 39174 | |
| Phone: 601-462-9592 | |
| AMIR.BADAT@GMAIL.COM | |
| | |
| Counsel for Plaintiffs | |

## <u>CERTIFICATE OF SERVICE</u>

I, Joshua Tom, hereby certify that on June 18, 2025, I filed the forgoing document with the Clerk of the Court using the ECF system which sent notification of such filing to all parties on file with the Court.

/s/ Joshua Tom_____

Joshua Tom, MSB # 105392