**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

**MISSISSIPPI ASSOCIATION OF**
**EDUCATORS, et al.**                                                    **PLAINTIFFS**

**VS.**                                              **CIVIL ACTION NO. 3:25-cv-00417-HTW-LGI**

**BOARD OF TRUSTEES OF STATE**
**INSTITUTIONS OF HIGHER LEARNING,**
**et al.**                                                               **DEFENDANTS**

---

**MEMORANDUM OF AUTHORITIES IN SUPPORT OF DEFENDANTS RESPONSE IN**
**OPPOSITION TO PLAINTIFFS' MOTION FOR**
**PRELIMINARY INJUNCTION [ECF #11]**

---

**INTRODUCTION**

Few disagree that discrimination, whether based on race, gender, religion, national origin, identity, or viewpoint, has no place in publicly funded schools. The Mississippi Legislature enacted House Bill No. 1193 (the "Act" or the "Mississippi Law") with the specific goal of eradicating such discrimination from the learning institutions it funds.

The Plaintiffs ask this court to enter a preliminary injunction prohibiting the enforcement of the Act claiming that it is unconstitutional on its face under the First and Fourteenth Amendments to the United States Constitution but fail to make any showing that the Act prohibits a substantial number of unconstitutional applications as compared to constitutional applications. Though the Plaintiffs include six counts[1] in their Amended Complaint, the relief they seek is based solely on their argument that the Act is facially invalid under the First Amendment to the United States Constitution as an impermissible restraint on speech. Their failure to provide any evidence

---

[1] Counts Five and Six of the Amended Complaint assert Equal Protection and additional Due Process claims that are not addressed in the Motion for Preliminary Injunction. ECF# 11, 22.

or argument essential to any such claim is fatal. For this reason alone, Plaintiffs cannot meet their burden of proof to show a substantial likelihood of success on the merits.

Even were that not so, the Plaintiffs' motion is largely based on remote fears about what third-parties *might* do in reaction to the Act while failing to satisfy the legal tests and analysis applicable to their claims. This is not nearly enough to establish the necessary elements for a preliminary injunction.

Alternatively, if this Court grants the motion for preliminary injunction, in whole or in part, that order must not extend any further than necessary to afford the Plaintiffs with standing (if there are any) with complete relief. In a decision handed down on June 27, 2025, the Supreme Court made it abundantly clear that federal district courts cannot grant injunctive relief beyond the parties before the court. The same holds true here and precludes an injunction against all enforcement or adherence to the Act. Only those applications which would directly impact the Plaintiffs with standing in this case may legally be enjoined.

For these reasons and those set forth herein, Plaintiffs' motion for preliminary injunction should be denied.

## **BACKGROUND**

On June 29, 2023, the Supreme Court handed down its opinion in *Students for Fair Admissions, Inc. v. Harvard* making clear that both the U.S. Constitution and Title VI of the Federal Civil Rights Act prohibit discrimination based on race. 600 U.S. 181. On January 21, 2025, newly inaugurated President Donald Trump signed an Executive Order 14173 titled "Ending Illegal Discrimination and Restoring Merit-Based Opportunities". 2025 WL 523310 at *8635, 90 Fed. Reg. 8633  (Jan. 21, 2025). This order instructs the Secretary of Education to "issue guidance to all State and local educational agencies that receive Federal funds, as well as all institutions of

higher education that receive Federal grants or participate in Federal student loan assistance program under Title IV of the Higher Education Act . . . regarding the measures and practices required to comply with Students for Fair Admissions, Inc. v. President and Fellows of Havard College, 600 U.S. 181 (2023)". *Id.*

A week later, President Trump signed an Executive Order 14190 titled "Ending Radical Indoctrination in K-12 Schools." 90 Fed Reg. 8853 (Jan. 29, 2025). The Executive Order states: "My Administration will enforce the law to ensure that recipients of Federal funds providing K-12 education comply with all applicable laws prohibiting discrimination in various contexts and protecting parental rights, including Title VI of the Civil Rights Act of 1964 (Title VI) . . ." *Id.* It further instructs the Secretary of Education and others to provide a plan to effectuate the Executive Order and includes prohibiting the use of federal funds for "illegal and discriminatory treatment and indoctrination in K-12 schools . . ." *Id.*

On February 14, 2025, the U.S. Department of Education's Acting Assistant Secretary for Civil Rights issued a "Dear Colleague letter" ("DCL") that set forth several requirements for schools receiving federal funding going forward. *See* Ex. A, DCL.[2] These requirements include taking steps to ensure that "their policies and actions comply with existing civil rights laws," and forbidding the use of "proxies" to "circumvent prohibitions on the use of race." *Id.* The State Defendants received or were otherwise made aware of the "Dear Colleague Letter" at or near the time it was issued. *See* Ex. B at ¶ 5, Exh. 3, Declaration of C. Prestwood; Ex. D at ¶ 5, Exh. 2 Declaration of K. Wiggins. K-12 and post-secondary schools in Mississippi receive substantial

---

[2] Enforcement of certain aspects of the DCL (and associated documents) were stayed by a New Hampshire Federal District Court on April 24, 2025. *See  National Education Ass'n v. United States Dep't. of Educ.*, No. 25-CV- 091; 2025 WL 1188160 (D.N.H. 2025). Given the Supreme Court's recent decision in *Trump v. CASA, Inc.*, limiting a federal district court's ability to enter a nationwide injunction, the actual reach of the New Hampshire district court's order is subject to question. *See* No. 24A884, 2025 WL 1773631 at *6, __U.S. __ (June 27, 2025).

funding from the federal government. *See* Ex. C at ¶¶ 3-5, Exh. 1 Declaration of K. Smith; Ex. D at ¶ 4, Exh. 1, Declaration of K. Wiggins; Ex. E at ¶¶ 4-5, Exh. 1, Declaration of L. Karmacharya.

Approximately two months after the "Dear Colleague Letter" was issued, the Act challenged in this action was signed into law. ECF# 1 at ¶ 8. The stated purpose of the Act is set forth in Section 1:

> The purpose of this act is to prohibit public schools and public postsecondary educational institutions from taking certain actions and engaging in discriminatory practices. This act seeks to ensure that employment, academic opportunities and student engagement are based solely on individual merit, qualifications and academic performance, without consideration of an individual's race, sex, color, national origin, or expressed opposition to, or refusal to affirm or participate in, diversity, equity and inclusion.

ECF# 11-14 at Sector 1.

All requirements and prohibitions in the Act are imposed on institutions, not individuals, for the purpose of preventing discrimination. It accomplishes this goal by prohibiting educational institutions from conditioning employment, admission, or the award of a contract on compulsory training that focuses on "race, sex, color, gender identity, sexual orientation, or national origin." ECF# 11-14 at Sections 2.(d), 3.(g), 3.(i). It further prohibits any adverse action against an individual student, faculty member, employee, or contractor as a result of their opinions or beliefs regarding race, sex, color, gender identity, sexual orientation, or national origin (ECF# 11-14 at Sections 3.(d), 3.(e), 3.(h)) and prohibits programs/positions/offices to effectuate such discriminatory or adverse actions (ECF# 11-14 at Sections 3.(a), 3.(b), 3. (c), 3. (f)). Finally, the Mississippi Law provides a method for individuals to seek relief in the event they are subjected to discriminatory adverse actions by an institution. ECF# 11-14 at Sections 7-9.

Indeed, the only mention of students, teachers, school employees, or any other individual is protective in nature. Section 3 of the Act requires that the Board of Trustees of State Institutions

of Higher Learning ("IHL"), the Mississippi Community College Board ("MCCB"), the Mississippi State Board of Education ("MBE"), and the Mississippi Charter School Authorizer Board ("MCSAB") "shall ensure that each *institution, college and public school*, as applicable, shall not" discriminate against students, teachers, employees, or contractors in several enumerated ways. EFC# 11-14 at Section 3 (emphasis added). At the same time, the Act is designed to protect individual rights by providing a mechanism for "any student enrolled at an institution, college or public school, any faculty, employee or staff member of an institution, college or public school, or any parent, guardian or next friend of a minor who has allegedly been *harmed by the institution, college or public school's failure to comply*" to file a complaint. ECF#11-14 at Section 3(5) (emphasis added).

In the words of the Fifth Circuit's Judge James C. Ho, "Schools should educate—not indoctrinate." *Oliver v. Arnold*, 19 F.4th 843, 845 (5th Cir. 2021) (J. Ho, concurring). This, along with ensuring that hiring and admission are fair and legal is the Act's goal. Plaintiffs' fears about what individual institutions might do in misinterpreting those goals should be rejected.

## **ARGUMENT**

As an initial matter, the State Defendants filed a Motion to Dismiss and Response to Motion for Temporary Restraining Order with supporting briefs on June 23, 2025. ECF# 17, 20. [3] The State Defendants will not unnecessarily repeat those arguments here but incorporate those arguments by

---

[3] At the time these papers were filed, the original four state boards named as defendants were the only named defendants. Since, Plaintiffs have amended their complaint to add the individual members of the original defendant boards in their official capacities and the Mississippi Attorney General in her official capacity. ECF# 22. These newly joined defendants, adopt and incorporate the initial Motion to Dismiss and Response to TRO in a manner which corresponds to their respective boards. The Attorney General also adopts and incorporates all arguments raised in these prior filings. The new defendants are filing a motion to dismiss the Amended Complaint simultaneously with this response. The State Defendants adopt and incorporate any applicable arguments raised in the aforementioned motion to dismiss here.

reference here as well as the arguments to be raised in a forthcoming motion to dismiss in response to the Plaintiffs' Amended Complaint.

A party seeking a preliminary injunction must demonstrate each of the following: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction is not issued; (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted; and (4) that the grant of an injunction will not disserve the public interest. *Big Tyme Investments, L.L.C. v. Edwards*, 985 F.3d 456, 463-64 (5th Cir. 2021).

The four above-listed "requirements are not balanced, but rather each one must be met before the court can grant such a drastic remedy as a . . . preliminary injunction." *Butler v. Jackson Police Dep't*, Civil Action No. 3:13CV82TSL-JMR, 2013 WL 6048164, at *2 (S.D. Miss. Nov. 14, 2013) (citing *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985)). The burden is on the party seeking injunctive relief to establish all four elements. *Carlisle v. Elite Trucking Servs., LLC*, Civil No. 1:16-CV-257-JCG, 2016 WL 9223832, at *1 (S.D. Miss. Nov. 4, 2016). If the moving party "fails to carry its burden on any one of the four elements . . ., the Court must deny the request for injunctive relief." *Miller v. Miss. Res., LLC*, Civil Action No. 5:17-cv-41-DCB-MTP, 2017 WL 2772097, at *2 (S.D. Miss. June 26, 2017). "The decision to grant a preliminary injunction is to be treated as the exception rather than the rule." *Miss. Power & Light Co.*, 760 F.2d at 621.

Here, Plaintiffs' motion should be denied because they have not established all four required elements.

## I.    PLAINTIFFS ARE UNLIKELY TO PREVAIL ON THE MERITS.

### A.  All Plaintiffs have failed meet their burden under *Moody v. NetChoice, LLC.*

Though apparent on the face of the Amended Complaint, the Plaintiffs stated unequivocally in the TRO Hearing that their claims constitute a facial, rather than an as-applied, challenge to the Act. Even so, the Plaintiffs primarily rely on authorities considering "as applied" challenges[4] that do not address the heavier burden required of a facial challenge under the First Amendment. By failing to even mention their burden, much less meet it, the Plaintiffs have not established a substantial likelihood of success on the merits.

A facial challenge to a duly enacted law necessarily relies on "'speculation' about the law's coverage and its future enforcement." *See Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024). Because such challenges, "'threaten to short circuit the democratic process' by preventing duly enacted laws from being implemented in constitutional ways. . . . [The United States Supreme Court] has therefore made facial challenges hard to win." *Id.* Put simply, facial challenges are *supposed* to be difficult to prove.

---

[4] For example, *Keysian v. Bd. Of Regents*, addressed the claims of college professors who were told their employment was being terminated when they refused to sign a certificate confirming that they were not Communists. 385 U.S. 589, 592 (1967). Likewise, *Rosenburger v. Rector and Visitors of University of Va.*, considered the First Amendment claims of the student founder of a magazine focused on religious issues which was denied reimbursement for publication expenses available to similar non-religious student publications. 515 U.S. 819, 825-26. *See also Tinker v. Des Moines Indep. Cmty Sch Dist.*, 393 U.S. 503, 504 (1969) (action by students sent home from school for wearing black armbands to protest the Vietnam war); *Elrod v. Burns*, 427 US 347, 350 (1976) (action by public employees who were terminated or threatened with termination for belonging to a particular political party); *Kennedy v. Bremerton*, 597 U.S. 507, 512-14 (2022) (action by high school football fired after he knelt for a silent prayer on the filed after a game.); *Lamb's Chapel v. Ctr. Moriches Union Free School Dist.*, 508 U.S. 384, 387-88 (action by religious organization denied after-hours permission to use school facilities to use religious film); *Martin v. City of Struthers, Ohio*, 319 U.S. 141, 142 (1943) (action by member of Jehovah's Witnesses appeal conviction under anti-solicitation ordinance); *Meyer v. Nebraska*, 262 U.S. 390, 396-97 (1923) (teacher appeals conviction of Nebraska law prohibiting the teaching of foreign languages to younger students); *Sweezy v. New Hampshire*, 354 U.S. 234, 244-45 (1957) (considering due process claim of teacher held in contempt to answer questions regarding Communist Party affiliation); *Texas v. Johnson*, 491 U.S. 397, 402 (1989) (affirming Texas Supreme Court's reversal of conviction for violation of flag-burning statute "as-applied" without reaching facial challenge); *Wieman v. Udegraff*, 344 U.S. 183, 192 (1952) (invalidating injunction prohibiting payment to public employees who did not sign a statutorily-required loyalty oath).

In *Moody*, the Supreme Court delineated a rigorous analysis to assess whether a plaintiff has "carr[ied]" the demanding "burden" that governs facial challenges. *Id.* at 723, 744. Initially, Plaintiffs must establish the law's "full set of applications." *Id.* at 718, 725-26. The Plaintiffs must demonstrate "which of the law['s] applications" (if any) "violate" the Constitution. *Id.* at 725-26. Finally, Plaintiffs must demonstrate that the constitutionally impermissible applications are pervasive enough to "substantially outweigh" constitutional ones in order to succeed on a facial challenge. *Id.* at 724. The burden on the Plaintiffs is considerable, but they chose to bear it by mounting a facial challenge to the Act. This Court must, therefore, hold them to that burden and not "disregard the requisite inquiry." *Id.* at 744.

Recently, the Fifth Circuit vacated a preliminary injunction prohibiting the enforcement of a Mississippi statute aimed at protecting children from harmful online material because the district court failed to apply *Moody's* rigorous analysis. *NetChoice, L.L.C. v. Fitch*, 134 F.4th 799, 808 (5th Cir. 2025) (remanding to district court to consider requisite analysis under *Moody*). In so doing, the Court held that *Moody* requires a full analysis of the law's unconstitutional applications compared to its constitutional applications to determine whether the former "substantially outweigh" the latter. *Id.* at 807-08. This requirement is not satisfied by generalities. *Id.* at 808-09. Rather, there must be an analysis of the "'full range of activities the law[] cover[s],' as required by *Moody*." *Id.* at 808.

Here, the Plaintiffs do not cite *Moody* nor do they make any attempt to identify the full scope of the Act and demonstrate that any unconstitutional applications substantially outweigh its constitutional applications. At most, they posit hypotheticals about which they claim to be confused.

For example, Plaintiffs argue that Section 2(e)(vi) "*can be interpreted* to prohibit discussion of, as well as support of, the principal of collective responsibility . . . that is a legitimate subject for study and discussion . . . in a history, sociology, philosophy, or law class . . ." ECF# 12 at p. 10. Plaintiffs' equivocation reveals that they acknowledge other interpretations are possible, yet they offer no comment or discussion on what those other interpretations might be. Nor do they attempt to establish that their proffered interpretation is likely and, if so, how that interpretation would necessarily violate the First Amendment. For reasons discussed below, it is neither. But assuming they are correct, the Plaintiffs also fail to establish that their proffered unconstitutional interpretation "substantially outweighs" any alternative constitutional constructions. These failures are fatal to their claim under both *Moody* and *NetChoice*. For this reason, alone, Plaintiffs are unlikely to prevail on the merits of their claims.

## B. Plaintiffs failed to establish that the Act has any application to their respective First Amendment Rights.

As noted above, the Act does not regulate or prohibit individual speech. Rather, it regulates public institutions. Even were that not so, the Plaintiffs have failed to establish that the First Amendment actually prohibits the restraints they fear will flow from enforcement of the Act.

### 1. The First Amendment generally does not apply to public employees in their official capacity.

Even if they had made some effort to satisfy *Moody* (and they did not), certain of the Plaintiffs (or their members) do not enjoy First Amendment protection when they are on the job. Many of the Plaintiffs are teachers or organizations representing teachers ("Teacher Plaintiffs")[5]. Generally, the First Amendment does not apply to a public employee's expressions made "pursuant to official responsibilities." *Garcetti v. Cebellos*, 547 U.S. 410, 411 (2006). "Restricting speech

---

[5] This group includes: Mississippi Association of Educators, Barbara Phillips, James Thomas, United Campus Workers Southeast Local 3821, Karen Aderer, and Dawn Zimmerer.

that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created." *Id.*

Prior to the U.S. Supreme Court's decision in *Garcetti*, courts considered the free speech rights of public employees by examining whether "the interest of the worker 'as a citizen commenting upon matters of public concern' outweigh the interest of the state 'as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Williams v. Dallas Independent School Dist.*, 480 F. 3d 689, 691-92 (5th Cir. 2007) (citing *Pickering v. Bd. Of Educ.*, 591 U.S. 563, 568 (1968)). Now, the initial focus is not on the content of the speech, but on the "role the speaker occupied when he said it." *Id.* At 692.

Without question, the Plaintiffs ask this court to enjoin a statute that does not, in any way, impact their ability to speak as private citizens. Rather, the challenged legislation simply seeks to prohibit institutional discrimination in accordance with federal law. *See, supra*. If it has any impact at all on what the Teacher Plaintiffs say, it applies only to their speech as public employees to the extent it violates the intent of the statute to prohibit *institutional* discrimination.

As with *Moody*, the Plaintiffs fail to address *Garcetti* in their brief. The Defendants anticipate that they may attempt to rely on an exception to *Garcetti* for academic freedom recognized by some circuits in their rebuttal. Any such argument should be rejected.

While the U.S. Supreme Court acknowledged that "academic freedom" *may* require further consideration under *Garcetti*, it did not create an explicit exemption or alternative analysis for academic freedom, leaving this question open for lower courts to consider. *See* Judith Areen, *Government As Educator: A New Understanding of First Amendment Protection of Academic Freedom and Governance*, 97 Geo. L.J. 945, 946–47 (2009) ("the majority agreed to leave

undecided for now whether *Garcetti* signals the end of constitutional protection for academic freedom."). Of the courts who have applied a *Garcetti* "carve out" for academic freedom, it has been applied at the University level. *See Heim v. Daniel*, 81 F.4th 212, 227–28 (2d Cir. 2023) (applying *Garcetti* "carve out" to university professor); *Mayer v. Monroe Cnty. Cmty. Sch. Corp*., 474 F.3d 477, 479 (7th Cir. 2007) ("the school system does not 'regulate' teachers' speech as much as it *hires* that speech. Expression is a teacher's stock in trade, the commodity she sells to her employer in exchange for a salary.") (emphasis in original); *Mpoy v. Fenty,* 901 F. Supp. 2d 144, 152 (D.D.C. 2012), *aff'd sub nom. Mpoy v. Rhee*, 758 F.3d 285 (D.C. Cir. 2014) ("there is substantial doubt that the *Garcetti* exception would even apply to elementary-school teachers."). Indeed, the Fifth Circuit did not hesitate to apply *Garcetti* to the First Amendment claim of a high school principal. *See Cavazos v. Edgewood Independent School Dist.*, 210 Fed. Appx. 414 (5th Cir. 2006).

Similarly, the Fifth Circuit applied *Garcetti* to a University research veterinarian who was fired after criticizing the treatment of lab animals. *See Gordon v. University of Texas Medical Branch*, 700 Fed. App'x. 350 (5th Cir. 2017). In May of this year, the Court applied *Garcetti's* "threshold layer" to a university professor who publicly criticized the concept of tenure. *Wetherbe v. Texas Tech. University Sys.*, 138 F.4th 296, 303 (5th Cir. 2025)[6].

However, when considering university-level classroom instruction, it is unclear whether the Fifth Circuit will ultimately apply the *Garcetti* threshold or recognize an academic freedom "carve out" at the university level. *See Buchanan v. Alexander*, 919 F. 3d 847, 853 (5th Cir. 2019) (applying pre-*Garcetti* analysis); *Trudeau v. University of North Texas*, 861 Fed. App'x 604, 609,

---

[6] *See also Powers v. Northside Ind. School Dist*., 951 F. 3d 298, 307 (5th Cir. 2020) (applying *Garcetti* threshold to elementary school principal and vice principal's First Amendment retaliation claims); *Williams v. Dallas Independent School Dist.*, 480 F.3d 689, 692 (5th Cir. 2007) (applying *Garcetti* threshold to High School Athletic Director's First Amendment retaliation claim).

n.5 (5th Cir. 2021) (noting that some Circuits apply the carve-out but determining that a university professor's First Amendment claim failed regardless of which test applied). Assuming that the Fifth Circuit will apply the "carve out" for academic freedom at the university level, the Teacher Plaintiffs, must still satisfy the requirements of *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968). *See Buchanan*, 919 F. 3d at 853; *Trudeau*, 861 Fed. App'x. at 609, n.5.

In *Buchanan*, the Fifth Circuit considered the First Amendment claims of a tenured professor in early childhood teacher education who was fired for using profanity and discussing her sex life in class. *Buchanan*, 919 F.3d at 851-52. The professor claimed that "academic freedom" protected her in-class speech and, as such, her termination violated her First Amendment Rights. *Id.* at 452. In analyzing this claim, the Fifth Circuit noted that the concept of "academic freedom" is not unlimited: "[s]tudents, teachers, and professors and not permitted to say anything and everything simply because the words are uttered in the classroom context." *Id.* at 852. With regard to the substance of the professor's claim, the Court looked to the *Pickering* analysis which requires a showing that: (1) the speech is on a matter of public concern and (2) the professor's "interests in the prohibited speech outweigh the College's interests." *Id.* at 853. Because the professor's use of profanity and discussions of her sex life and her students' sex lives "were clearly not related to the training of Pre-K-Third grade teachers . . ." her speech was not protected by the First Amendment. In so doing, the Court noted that "speech that does not serve an academic purpose is not of public concern." *Id.*

As with *Garcetti*, the Teacher Plaintiffs neither cite nor discuss the *Pickering* factors in their brief. Their failure to meet their burden under either of the applicable tests is fatal.

### 2.    The Act does not impact legitimate academic freedom.

As noted above, the stated purpose of the Act is to prohibit institutions from engaging in discriminatory practices, not to suppress speech or academic pursuits. ECF# 11-14 at Section 1. The Legislature included several exceptions to ensure that the Act does reach beyond its purpose. Two of these exceptions are of particular relevance to the Teacher Plaintiffs' concerns.

First, Section 5(b) provides that the Act "shall not be construed to apply to and/or prohibit . . . [s]cholarly research or a creative work by students, faculty, employee or staff at an institution, college, *or the dissemination of that work* . . ." ECF#11-14 at Section 5(b) (emphasis added). The Plaintiffs argue that this exception is unclear about whether it prohibits classroom discussion of such work. Plaintiffs' Brief at p, 14. By expressly exempting the *dissemination* of scholarly and creative work the Legislature accounts for classroom instruction and discussion of the work as well.

Second, Section 5(j) of the Act exempts actions taken to comply "with any applicable academic accreditation standards or requirements." ECF# 11-14 at Section 5(j). The Plaintiffs argue that applicable accreditation standards require institutions of higher learning to safeguard academic freedom. Plaintiffs' Brief at p. 16. The State Defendants agree. Moreover, applicable accreditation standards place the primary responsibility for curriculum development on the faculty and requires that "no outside person, board, or religious or legislative body should be in a position to interfere . . . with the operations of the institution." *See* Ex. B at ¶¶ 2-3, Exhs. 1-2, Declaration of C. Prestwood. This exemption, without question, should allay concern about intrusion of the Act into "academic freedom."

Apparently, the Plaintiffs recognize the protective effect of this exemption and argue that its application "would wipe out the bans on free speech that are challenged in this lawsuit."

Plaintiffs' Brief at p. 16. But the Act does not aim to ban speech, its purpose is to ban discrimination.

A bedrock principle of statutory construction mandates that "a statute is to be read as a whole . . ." *King v. St. Vincent's Hosp.,* 502 U.S. 215, 221(1991). "Words are not pebbles in alien juxtaposition; they have only a communal existence; and not only does the meaning of each interpenetrate the other, but all in their aggregate take their purport from the setting in which they are used. . . ." *Id.* The words of a statute must be read in context with "the whole statutory text, considering the purpose and context of the statute . . ." *Cascabel Cattle Co., L.L.C. v. United States*, 955 F.3d 445, 451 (5th Cir. 2020).

The purpose of the Act could not be clearer:

> *[T]o prohibit* public schools and public postsecondary educational *institutions from taking* certain *actions and engaging in discriminatory practices*. . . [and] to ensure that employment, academic opportunities and student engagement is based solely on individual merit, qualifications and academic performance, without consideration of an individual's race, sex, color, national origin, or expressed opposition to, or refusal to affirm to participate in, diversity, equity and inclusion.

EFC# 11-14 at Section 1 (emphasis added). Every prohibition and exception in the Act must be read in light of its stated purpose.

When the purpose of the Act is properly considered, the accreditation exemption makes perfect sense. The Act is intended to prohibit and prevent institutional discrimination, not individual speech and expression. Accordingly, the Plaintiffs' fears about potential harm to academic freedom are baseless.

### 3.  The First Amendment rights of students are limited

The remaining Plaintiffs are college students, student groups, and the parent of minor students enrolled in public school ("Student Plaintiffs"). As an initial matter, it is important to note that "the constitutional rights of students in public school are not automatically coextensive with

the rights of adults in other settings," *Morse v. Frederick*, 551 U.S. 393, 396–97, 127 S. Ct. 2618, 2621, 168 L. Ed. 2d 290 (2007) (citing *Bethel School Dist. No. 403 v. Fraser,* 478 U.S. 675, 682, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986)). The First Amendment rights of students "must be 'applied in light of the special characteristics of the school environment . . .'" *Id.*

The leading case on student speech is *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260 (1988), wherein the United States Supreme Court recognized that schools "are entitled to exercise greater control over . . . student expression" and are entitled to disassociate from student speech. As such, "[i]t is only when the decision to censor a school-sponsored publication, theatrical production, or other vehicle of student expression has *no valid educational purpose* that the First Amendment is so 'directly and sharply implicate[d],' . . . as to require judicial intervention to protect students' constitutional rights." *Hazelwood*, 484 U.S. at 273 (internal citations omitted) (emphasis added). Under *Hazelwood*, "educators do not offend the First Amendment by exercising editorial control over the style and content of student speech in school sponsored expressive activities so long as their actions are *reasonably related* to legitimate pedagogical concerns." *Id.* (emphasis added). *See also Bell v. Itawamba County School Bd.*, 799 F.3d 379, 398 (5th Cir. 2015) ("While school officials must offer facts to support their proscription of student speech, *this is not a difficult burden, and their decisions will govern if they are within the range where reasonable minds will differ . . .*") (emphasis in original).

The Student Plaintiffs do not address *Hazelwood*, *Morse*, or *Bell* in their motion much less show that the Act, to the extent it even regulates the Student Plaintiffs' speech (which on its face, it does not), is not "reasonably related" to the legitimate pedagogical concerns of preventing discrimination and preserving the ability to receive federal funds.

The Student Plaintiffs further claim that the Act somehow deprives them of the First Amendment right to hear speech they claim the Act will suppress. In so doing, the Student Plaintiffs appear to argue that they are entitled to dictate how public funds are utilized and to decide what the institutional curriculum should be. This is not the law.

In *Little v. Llano Co.*, the Fifth Circuit (sitting *en banc*) considered "right to hear" claims arising from the removal of certain books from a tax-payer funded library.  138 F.4th 834, 838 (5th Cir. 2025). Even though there is some precedent supporting a "right to hear" it does not extend to "a brave new right to receive information from the government in the form of taxpayer-funded library books." *Id.* at 836. The Court made clear that while, "[p]eople can protest what the government says, . . . they cannot sue to make the government say what they want. '[W]hen the government speaks for itself, the First Amendment does not demand airtime for all views.'" *Id.* at 8525 (citing *Shurtleff v. City of Bos.*, 596 U.S. 243, 247–48 (2022)). As a general rule, schools have the right to decide what is in the curriculum without offending a student's right to hear unless those decisions are "narrowly partisan or political." *Chiras v. Miller*, 432 F.3d 606, 620 (5th Cir. 2005).

The Student Plaintiffs focus on their right to hear but ignore that there is also a right not to be forced to listen to speech. In a decision handed down on June 27, 2025, the Supreme Court held that parents seeking to opt their children out of lessons focused on sexuality and gender were substantially likely to prevail on the merits of their case. *Mahmoud v. Taylor*, No. 24-297, __ U.S. __, 2025 WL 1773627 at *13 (June 27 2025).

Plaintiffs have not even alleged, must less proven, any "narrowly partisan or political" motivation for the Act. Nor have they demonstrated that the Act's institutional requirements are

not "reasonably related" to the legitimate pedagogical aim of preventing discrimination and the preservation of Mississippi's ability to receive federal education funds.

For these reasons, the Student Plaintiffs have not met their burden to establish a substantial likelihood of success on the merits.

## II.    THERE IS NO THREAT OF IRREPARABLE HARM.

Plaintiffs rely on *Elrod v. Burns*, 427 U.S. 347 (1974) for the proposition that any loss of First Amendment rights, "even for minimal periods of time, unquestionably constitutes irreparable injury." Plaintiffs' Brief at p, 32. *Elrod* considered the claims of Cook County Sherrif's Department employees who were either fired or threatened with being fired for their political affiliation. *Elrod*, 427 U.S. at 350-51. None of the Plaintiffs has demonstrated similar jeopardy as a result of the Act. In further support of this proposition, Plaintiffs cite *Deerfield Med. Ctr. v. City of Deerfield Beach*, which considered a City's denial of a conditional use permit for an abortion clinic under its zoning laws. 661 F.2d 328, 331-332 (5th Cir. 1981). Here again, there are few, if any, similarities between *Deerfield* (which did not consider First Amendment rights) and the present action.

Although not cited by Plaintiffs, there is authority that evidence of chilling is sufficient to establish injury or harm in a First Amendment challenge. *See Speech First, Inc. v. Fenves*, 979 F.3d 319, 330–31 (5th Cir. 2020), *as revised* (Oct. 30, 2020) ("[c]hilling a plaintiff's speech is a constitutional harm adequate to satisfy the injury-in-fact requirement."). This avenue offers no support to Plaintiffs Karen Aderer and United Campus Workers Southeast Local 3821 who have not offered any declaration, or any other proof, that their speech is chilled by the Act.[7] ECF# 11,

---

[7] It should be noted that "[a]t the preliminary injunction stage, . . . the plaintiff[s] *must* make a 'clear showing' that [they are] 'likely' to establish each element of standing." *Murthy v. Missouri*, 603 U.S. 43, 58 (2024). *See also Barber v. Bryant*, 860 F.3d 345, 352 (5th Cir. 2017) ("Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported . . . with the manner and degree of evidence required at the successive stages of litigation.").

13. While the anonymous member of the Mississippi Association of Educators declares that she won't be allowed to teach material she has in the past, she does not state that *she* intends to self-censor because of the Act. EFC# 11-13. Finally, Plaintiffs Barbara Phillips and Dawn Zimmerer opine that the Act will chill speech, but do not state that *they* intend to self-censor because of the Act. ECF# 11-6, 11-12.

Even if all of the Plaintiffs had offered evidence of chilling, the Supreme Court has determined (in the context of standing) that self-censorship does not constitute a traceable and redressable injury where plaintiffs inflict harm "on themselves based on their fears of hypothetical future harm that is not certainly impending." *Murthy v. Missouri*, 603 U.S. 43, 46 (2024). This is especially true where, as here, the actual harm feared is at the hands of a non-party to the action. *Id.* at 45.

At bottom, the Act neither regulates nor threatens the Plaintiffs' First Amendment rights. As such, they cannot establish the threat of irreparable harm.

## III.    BALANCING OF THE HARMS/PUBLIC INTEREST FAVORS DEFENDANTS.

Where the government is a party, "the balance-of-equities and public-interest factors 'merge.'" *Texas v. Cardona*, 743 F. Supp. 3d 824, 896 (N.D. Tex. 2024) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). In that event, "[t]he Court must weigh whether 'the threatened injury outweighs any harm that may result from the injunction to the non-movant' and whether 'the injunction will not undermine the public interest.'" *Id.* (citing *Valley v. Rapides Parish Sch. Bd.*, 118 F.3d 1047, 1051, 1056 (5th Cir. 1997)).

The Trump Administration has made clear its intent to withhold federal funds from those who fail to comply with its interpretation of Title VI and *Students for Fair Admissions, Inc. v. Harvard*. *See* Ex. A, DCL. *See also* Executive Order 14173 2025 WL 523310, 90 Fed. Reg. 8633

(Jan. 21, 2025); Executive Order 14190, 90 Fed Reg. 8853 (Jan. 29, 2025). For many Mississippi schools, loss of federal funding would be as financially devastating as the loss of State funding. *See* Ex. C at ¶¶ 4-5, Exh. 1 Declaration of K. Smith; Ex. D at ¶ 4, Exh. 1, Declaration of K. Wiggins; Ex. E at ¶ ¶4-5, Exh. 1, Declaration of L. Karmacharya. For example, the Columbus School District received more than 50% of its 2023-2024 funds from the federal government. Ex. D at ¶ 4, Exh. 1, Declaration of K. Wiggins. As reported in the FY 2026 budget request, 26.89% of Hinds County Community College's funding was federal in FY 2024. Ex. C at Exh. 1 Declaration of K. Smith; State Charter Schools receive anywhere from 20% (on the low end) to nearly 90% (on the high end) for the federal government with an average of 31% per school. Ex. E at ¶ 4, Exh. 1, Declaration of L Karmacharya.

Courts have recognized that the potential loss of federal education funding constitutes a substantial harm in the context of considering a request for preliminary injunction. *See Carroll Indep. Sch. Dist. v. United States Dep't of Educ.*, 741 F. Supp. 3d 515, 526 (N.D. Tex. 2024); *see also Cardona*, 743 F. Supp. 3d at 896. The potential loss of federal funds and the impact that could have on Mississippi schools is a real threat – far more real than the speculation offered by Plaintiffs about what *might* happen if the Act is misinterpreted by an individual school.

## IV.    IN THE ALTERNATIVE, ANY INJUNCTION SHOULD BE LIMITED.

The United States Constitution mandates that injunctive relief must be "tailored to redress" a "particular injury." *Gill v. Whitford*, 585 U.S. 48, 73 (2018). And equity requires that injunctive relief be no broader than "necessary to provide complete relief *to the plaintiffs*." *See Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (internal quotation marks omitted) (emphasis added). "The purpose of a preliminary injunction is always to prevent irreparable injury." *Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974).

This point was just underscored by the Supreme Court in a decision handed down on June 27, 2025. *Trump v. CASA, Inc.*, No. 24A884, 2025 WL 1773631 at \*6, \_\_U.S. \_\_ (June 27, 2025). In its opinion, the Supreme Court examined the equitable jurisdiction of courts recognized at the founding, noting that the "'general rule in Equity [was] that all persons materially interested [in the suit] [were] to be made parties to it.'" *Id.* at \*6 (citing J. Story, Commentaries on Equity Pleadings § 72, p. 74 (2d ed. 1840) (Story)). "Injunctions were no exception . . ." *Id.* The Court observed that "to allow all persons subject to the statute to be treated as parties to a lawsuit 'would confound the established order of judicial proceedings.'" *Id* at \*7 (citation omitted). The Court then turned to its previous rulings that limit judicial interference "with enforcement of contested statutes or ordinances *except with respect to the particular federal plaintiffs*." *Id.* (emphasis added) (citing *Doran v. Salem Inn, Inc.,* 422 U.S. 922, 931 (1975); *Gregory v. Stetson*, 133 U.S. 579, 586 (1890) ("It is an elementary principle that a court cannot adjudicate directly upon a person's right without having him either actually or constructively before it. This principle is fundamental[.]")). To avoid confusion in the application of its decision, the Court was careful to distinguish between "complete relief and "universal relief" noting that the former is "a narrower concept." *Id.* at \*11 ("While party-specific injunctions sometimes 'advantag[e] nonparties,' . . . they do so *only* incidentally.") (internal citation omitted) (emphasis added).

If this Court grants a preliminary injunction (and it should not), its order should be limited to the named plaintiffs and defendants. Consistent with the authorities cited above, any preliminary injunction should be narrowly tailored to enjoin enforcement of the Mississippi Law against the Plaintiffs by the State Defendants. It should *not* be so broad as to apply to non-parties. Any broader relief would exceed the bounds of this Court's jurisdiction under Article III and the limitations of equitable relief.

## **CONCLUSION**

For all these reasons, the Court should deny Plaintiffs' motion for preliminary injunction outright for failure to meet their burden under applicable law, including, *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024), and *NetChoice, L.L.C. v. Fitch*, 134 F.4th 799 (5th Cir. 2025). Alternatively, any relief should be narrowly tailored to the parties joined to this action as mandated by *Trump v. CASA, Inc.*, No. 24A884, 2025 WL 1773631 at *6, __U.S. __ (June 27, 2025).

THIS the 2nd day of July, 2025.

Respectfully submitted,

LYNN FITCH, IN HER OFFICIAL CAPACITY
AS ATTORNEY GENERAL OF MISSISSIPPI;
GEE OGLETREE, IN HIS OFFICIAL CAPACITY
AS PRESIDENT OF THE BOARD OF
TRUSTEES OF STATE INSTITUTIONS OF
HIGHER LEARNING; STEVEN CUNNINGHAM,
AMY ARRINGTON, DONALD CLARK, JR.,
ORMELLA CUMMINGS, JERRY L. GRIFFITH,
JIMMY HEIDELBERG, TERESA HUBBARD,
BRUCE MARTIN, HAL PARKER, GREGG
RADER, AND CHARLIE STEPHENSON, ALL
IN THEIR OFFICIAL CAPACITIES AS
MEMBERS OF THE BOARD OF TRUSTEES OF
STATE INSTITUTIONS OF HIGHER
LEARNING; JOHN PIGOTT, IN HIS OFFICIAL
CAPACITY AS CHAIR OF THE MISSISSIPPI
COMMUNITY COLLEGE BOARD; CHERYL
THURMOND, VIDET CARMICHAEL, DONNIE
CAUGHMAN, BUBBA HUDSPETH, DOLLY
MARASCALCO, JOHNNY MCRIGHT, LUKE
MONTGOMERY, WILL SYMMES, AND
DIANNE WATSON, ALL IN THEIR OFFICIAL
CAPACITIES AS MEMBERS OF THE
MISSISSIPPI COMMUNITY COLLEGE BOARD;
GLEN EAST, IN HIS OFFICIAL CAPACITY AS
CHAIR OF THE MISSISSIPPI STATE BOARD
OF EDUCATION; MATT MILLER, LANCE
EVANS, WENDI BARRETT, MATT MAYO,
BILL JACOBS, RONNIE MCGEHEE, MIKE
PRUITT, BILLYE JEAN STROUD, AND MARY

21

WERNER, ALL IN THEIR OFFICIAL
CAPACITIES AS MEMBERS OF THE
MISSISSIPPI STATE BOARD OF EDUCATION;
MARCY SCOGGINS, IN HER OFFICIAL
CAPACITY AS CHAIR OF THE MISSISSIPPI
CHARTER SCHOOL AUTHORIZER BOARD;
AND JAY CARNEY, SANDRA MCKIERNON,
ERIN MEYER, BEN MORGAN, CANDACE
ROBINS, AND JENNIFER JACKSON
WHITTIER, ALL IN THEIR OFFICIAL
CAPACITIES AS MEMBERS OF THE
MISSISSIPPI CHARTER SCHOOL
AUTHORIZER BOARD, DEFENDANTS

By:    LYNN FITCH, ATTORNEY GENERAL
       STATE OF MISSISSIPPI

By:    s/Lisa A. Reppeto
       LISA A. REPPETO (MSB #99978)
       Special Assistant Attorney General

REX M. SHANNON III (MSB #102974)
LISA A. REPPETO (MSB #99978)
STATE OF MISSISSIPPI
OFFICE OF THE ATTORNEY GENERAL
CIVIL LITIGATION DIVISION
Post Office Box 220
Jackson, Mississippi  39205-0220
Tel.:  (601) 359-4184
Fax:  (601) 359-2003
rex.shannon@ago.ms.gov
lisa.reppeto@ago.ms.gov

ATTORNEYS FOR DEFENDANTS

## CERTIFICATE OF SERVICE

I, Lisa A. Reppeto, Special Assistant Attorney General and attorney for the above-named defendants, do hereby certify that I have this date caused to be filed with the Clerk of the Court a true and correct copy of the above and foregoing via the Court's ECF filing system, which sent notification of such filing to all counsel of record.

THIS the 2nd day of July, 2025.

s/Lisa A. Reppeto
LISA A. REPPETO