IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
Northern Division

**MISSISSIPPI ASSOCIATION OF
EDUCATORS, ET AL,**

      *Plaintiffs*,　　　　　　　　　Civil No. 3:25cv00417-HTW-LGI

v.

**LYNN FITCH, ET AL.,**

*Defendants*.

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' RESPONSE TO NON-IHL DEFENDANTS' AND ATTORNEY GENERAL'S MOTION TO DISMISS [ECF #39] AND IHL DEFENDANTS' JOINDER IN MOTION TO DISMISS [ECF #41]

The challenged provisions of HB 1193 prohibit every student and every educator in a public educational institution in the State of Mississippi from "engag[ing] in . . . any formal or informal education, seminars, workshops or institutional programs that focus on increasing awareness or understanding of issues related to race, sex, color, gender identity, sexual orientation or national origin" as well as other "divisive concepts" and forms of prohibited speech.  HB 1193 §§ 3(b) (incorporating 2(d) and (e), 3(f), 3(g), and 3(i).  These viewpoint and content-based restrictions unconstitutionally burden the rights of educators and students to freely "engage in" the exchange of ideas about the banned subjects, all of which lie at the heart of the First Amendment. Also, much of the confusing language of these and related provisions is unconstitutionally vague in violation of the Fourteenth Amendment. Because the non-IHL defendants and the Attorney General (hereafter AG) play a role in the enforcement of these prohibitions, and because Plaintiff United Campus Workers Southeast Local 3821 ("UCW") has Article III standing, the Court should deny Defendants' motion to dismiss for lack of subject matter jurisdiction.

## **ARGUMENT**

The motion to dismiss raises five arguments: (1) Plaintiffs' amended complaint fails to allege that the harms caused by the challenged provisions of HB 1193 are fairly traceable to the non-IHL defendants for purposes of Article III standing; (2) an injunction against the non-IHL defendants does not redress the injuries caused by the challenged provisions for purposes of Article III standing; (3) claims against the Mississippi Charter School Authorizer Board ("MCSAB") should be dismissed because no plaintiff has standing to sue the board members of MCSAB; (4) the amended complaint does not adequately allege Plaintiff UCW's associational and/or organizational standing for purposes of Article III standing, and (5) the amended complaint fails to adequately allege that the AG is a proper defendant under *Ex parte Young*.

### I.      Plaintiffs have standing as to the Non-IHL Defendants.

The Supreme Court's "cases have established that the irreducible constitutional minimum of standing contains three elements": injury in fact, causation, and redressability. *Lujan v. Defenders of Wildlife*, 504 U. S. 555, 560, (1992); *Diamond Alt. Energy, LLC v. EPA*, 145 S. Ct. 2121 (2025). For purposes of their motion to dismiss, the non-IHL Defendants do not contest that Plaintiffs have alleged an "injury in fact" for purposes of Article III standing. However, their motion does contest causation (also known as traceability) and redressability.

#### A.      Plaintiffs' harms are traceable to the Non-IHL Defendants.

The non-IHL Defendants argue that the Plaintiffs' alleged harms "can only be fairly traceable to the public community colleges and/or schools at which Plaintiffs (or their children) are enrolled, employed or engaged in organizational activity." [ECF # 40, p. 16]. Citing cases for the proposition that traceability cannot exist when the injury depends on the unfettered choices made by independent actors not before the court who have broad discretion, the non-IHL

Defendants seem to contend that they have no responsibility or role in the enforcement of the challenged provisions.

1.  Contrary to the non-IHL Defendants' portrayal, Section 3(b) of HB 1193 requires them, as members of their respective statewide boards, to "ensure that each institution, college and public school, as applicable, shall not" violate any of Section 3's bans, including Sections 3(b), 3(f), 3(b), and 3(i), which are the challenged bans. Obviously, the legislature would not have required that the board members "ensure" compliance unless they could exercise their expansive authority over educational matters to do so.

Section 6 requires the public schools, institutions, and colleges to submit to the statewide boards, including the non-IHL Defendants, an annual report summarizing all formal complaints and the dispositions of those investigations and violations. Moreover, if a public school, institution, or college fails to submit a report, it must provide a written explanation to the statewide board "explaining its failure to comply." The statewide boards, including the non-IHL Defendants, are then required to submit a report to the State Legislature that compiles all of the individual reports and makes recommendations for any proposed changes to the act. Section 6 also states that the legislature may call a representative of any of the statewide boards, including the non-IHL defendants, to a public hearing regarding the board's compliance with this section.

Sections 7(1)) and 7(2)(a) require the IHL Board to "adopt a complaint process, investigative procedures, and all other policies and procedures for appropriately investigating violations of this act" and the Mississippi Community College Board, the State Board of Education, and the Mississippi Charter School Authorizer Board to adopt "a model" of the same processes, policies and procedures. Section 7(2)(b) requires that within ninety days of the adoption by the latter three state educational boards of "model rules," "every local school board, governing

3

board of a charter school, and board of trustees for junior and community colleges shall adopt policies and procedures for appropriately investigating violations of this act," and "[t]he State Board of Education ["MS BOE"], as the governing board for state-operated schools, shall adopt such rules for these schools."  Using these policies and procedures, IHL, local boards and MS BOE investigate and adjudicate complaints. *Id*. at Section 7(3) and 7(6).  It is the adoption of the model rules and procedures by the non-IHL boards that triggers the responsibility of the local school boards to adopt their own rules and procedures.  Without that statutory trigger, they would not adopt their own rules and procedures and would not investigate and adjudicate complaints.

Section 8(1) requires the relevant statewide boards to "withhold the disbursement of . . . state funds" that it distributes to local schools and districts where there has been an "uncured" second or subsequent violation of the act.

These responsibilities satisfy the legal requirements for both traceability and redressability sufficient to demonstrate standing against the non-IHL defendants.

2.      The non-IHL Defendants rely on the wrong standing analysis to support their dismissal from this suit. "When an injury flows from an allegedly unconstitutional law, the individuals charged with the enforcement of that law are at least part of the cause of the injuries, satisfying the minimal traceability requirement." *K.P. v. LeBlanc*, 627 F.3d 115, 123 (5th Cir. 2010*); Bay Area Unitarian Universalist Church v. Ogg*, No. 23-20165, 2025 U.S. App. LEXIS 8374, at *12 (5th Cir. Apr. 9, 2025). With respect to causation (i.e. traceability), Article III imposes no stringent or inflexible standard. Indeed, "an indirect causal relationship will suffice" for standing, and plaintiffs may satisfy the requirement by alleging "a chain of causation between defendants' [conduct] and plaintiffs' injuries." *Est. of Parker v. Miss. Dep't of Pub. Safety*, 140 F.4th 226 (5th Cir. 2025) (citations omitted).  "It is often enough that the defendant's conduct was

4

one of multiple contributing causes. And 'the fact that the defendant is only one of several persons who caused the harm does not preclude a finding of causation sufficient to support standing.' Even an uncertain or indirect causal connection may suffice at the pleading stage." *Est. of Parker,* 140 F.4th 226 (5th Cir. 2025). "Even though Article III requires a causal connection between the plaintiff's injury and the defendant's challenged conduct, it doesn't require a showing of proximate cause or that 'the defendant's actions are the very last step in the chain of causation.'" *Deep S. Today v. Murrill*, No. 24-623-JWD-SDJ, 2025 U.S. Dist. LEXIS 80497, at *24 (M.D. La. Jan. 31, 2025) (quoting *Bennett*, 520 U.S. at 169).

Moreover, when a Plaintiff that alleges that a state statute or policy results in a First Amendment harm and sues individuals in their official capacities, the standing element of causation is relaxed and overlaps with *Ex Parte Young* issues. *Jackson v. Wright*, 82 F.4th 362, 369 (5th Cir. 2023) ("The traceability and *Ex parte Young* issues discussed above involve similar questions." citing, *Tex. Democratic Party v. Abbott*, 961 F.3d 389, 401 (5th Cir. 2020) (noting the "significant overlap between our standing and [*Ex parte*] *Young* analyses") (quotation omitted). The court in *Jackson* observed that for *Ex Parte Young* purposes "[a]ll that is required is a mere 'scintilla of "enforcement" by the relevant state official with respect to the challenged law.'" *Id*. at 369 (citing *City of Austin v. Paxton*, 943 F.3d 993, 1002 (5th Cir. 2019)). Given that the Fifth Circuit treats the Article III traceability standard in the same vein as the *Ex Parte Young* "scintilla of enforcement" principle, it's no wonder, as the Fifth Circuit noted in *Speech First*, that "[i]t is not hard to sustain standing for a pre-enforcement challenge in the highly sensitive area of public regulations governing bedrock political speech." 979 F.3d 319, 330-31. *See also*, *Allstate Ins. Co. v. Abbott*, 495 F.3d 151, 159 (5th Cir. 2007) (holding that when a plaintiff alleges an injury in fact stemming from a challenged state law and sues state officials using the *Ex Parte Young* exception

to the Eleventh Amendment, "causation and redressability" are easily met because the suit is "essentially" against the state.)

Thus, the only question once "injury in fact" is established is whether the state officials named as defendants under the *Ex Parte Young* exception have a "scintilla" of enforcement responsibilities. Here, the non-IHL defendants' responsibility to "ensure" compliance with the challenged ban, to report on compliance to the legislature, to adopt model rules that trigger the adoption of local rules that govern the investigation and adjudication process in each district, and to withhold state funds in the event of an uncured second violation, give them more than a "scintilla" of enforcement authority that meets the causation requirement.

3. Although not necessary, an additional factor corroborates causation. Public school students and educators like the plaintiffs are "an object of the action (or forgone action) at issue," and therefore "there is ordinarily little question that the action or inaction has caused [them] injury, and that a judgment preventing or requiring the action will redress it." *Diamond Alt. Energy, LLC v. EPA*, 145 S. Ct. 2121 (2025) (citing *Lujan*, 504 U. S., at 561-562, 112 S. Ct. 2130, 119 L. Ed. 2d 351); see also, *Texas v. EEOC*, 933 F.3d 433, 446 (5th Cir. 2019) ("if in a suit 'challenging the legality of government action,' 'the plaintiff is himself an object of the action . . there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it.'") Whether someone is "in fact an object of a regulation is a flexible inquiry rooted in common sense." *Texas v. EEOC*, 933 F. 3d at 446.

In *Duarte ex rel. Duarte v. City of Lewisville, Tex.,* 759 F.3d 514, 517 (5th Cir. 2014), the court held that a city ordinance prohibiting registered sex offenders from establishing residence near areas where children gather interfered with the lives of the family members of the sex offenders and, based on this "practical impact," the court rejected the argument that family

6

members were not the object of the ordinance and instead found that they had standing to challenge the regulation.

Although it is the institutions, colleges, and schools that are directly prohibited from violating the bans, it is the teachers and students who will actually violate the bans by discussing the prohibited subjects --- including issues related to race, sex, color, gender identity, sexual orientation, and national origin --- as part of their "formal and informal education" both inside the classroom and during extracurricular activities. Any mandatory "cure" of the violations will likely implicate those teachers and students. It is, therefore, the teachers and students, including the plaintiffs and members of the plaintiff organizations, who are, as a matter of common sense, the objects of the challenged provisions. This corroborates their standing.

    **B.    An injunction prohibiting the Non-IHL Defendants from enforcing compliance with the challenged provisions of HB 1193 in any way, and/or a declaration that the challenged provisions violate the First and Fourteenth Amendments would satisfy Article III's redressability requirement.**

As the Supreme Court has noted, causation and redressability, are usually "flip sides of the same coin." *FDA v. Alliance for Hippocratic Medicine*, 602 U. S. 367, 380 (2024). "If a defendant's action causes an injury, enjoining the action or awarding damages for the action will typically redress that injury." *Id.* at 381. And, as the Defendants concede, [ECF #40] "[t]he relief sought needn't completely cure the injury, it's enough if the desired relief would lessen it." *Id.* at 18, quoting *Dobbin Plantersville Water Supply Corp. v. Lake,* 108 F. 4th 320, 326 (5th Cir. 2024). The redressability requirement is met here.

However, relying primarily on *Falls v. DeSantis*, No. 4:22cv166-MW/MJF, 2023 U.S. Dist. LEXIS 87714, at \*16-17 (N.D. Fla. May 19, 2023), the Non-IHL Defendants argue that Plaintiffs fail to establish the redressability element of Article III standing because (1) at the time of the filing of the case, the non-IHL Defendants had yet to adopt any policies, procedures or

regulations, and (2) the local school boards and board of trustees for the community colleges are "primarily" responsible for enforcing the challenged provisions of HB 1193 and they would not be bound by an injunction entered against the non-IHL Defendants.

The district court in *Falls* applied the "redressability" requirement in a manner inconsistent with controlling Supreme Court and Fifth Circuit law; it imposed a degree of rigor and completeness of relief that controlling case law does not support. The Supreme Court's recent decision in *Diamond Alt. Energy, LLC v. EPA*, 145 S. Ct. 2121, 2025 U.S. LEXIS 2383 (2025) is instructive.  In *Diamond Alt. Energy*, fuel producers sued the EPA for allowing California to set fuel efficiency standards that required automakers to manufacture more electric vehicles and fewer gasoline powered vehicles. *Id*.  The Government Defendants disputed "redressability" because even if the regulation was invalidated automakers would not make more gasoline powered vehicles. *Id*. The EPA and California argued that California's regulations no longer have any impact because consumer demand for electric vehicles in a free market would still exceed what the California regulations mandate. *Id*.[1]

The Court rejected this argument and noted that "common-sense" suggests that if automakers didn't have to manufacture more electric vehicles this may likely result in the sale of more fuel. *Id.* at *33 ("In sum, this case does not present the unusual scenario where invalidating a challenged government restriction on businesses in a competitive market is not likely to have any effect. Here, it may not be certain, but it is at least "predictable" that invalidating the California regulations would likely result in the fuel producers ultimately selling more gasoline and other liquid fuels.")  Citing *Department of Commerce v. New York*, 588 U. S. 752, 758-759, 139 S. Ct. 2551, 204 L. Ed. 2d 978 (2019), the Court also rejected imposing a "heightened" redressability

---

[1] The Court also observed that the fact that the regulation applied to automakers and not fuel producers didn't deprive the fuel producers of standing.

8

standard for these type of cases by requiring a showing that the regulated party is willing to publicly oppose the regulation and/or align with the plaintiffs (i.e. those who are not directly regulated). *Id*. at *30 (noting that a heightened "proof of redressability" requirement of that kind would ultimately close the courthouse doors to many traditional challenges to agency action.); *see*, *Tex. Corn Producers v. United States EPA*, No. 24-60209, 2025 U.S. App. LEXIS 15566, at *20 (5th Cir. June 24, 2025) (holding that agriculture producers had standing to challenge fuel efficiency standards imposed on automakers because a decrease in the sale of fuel will likely decrease the sale of their agriculture products.) Consistent with the Supreme Court's rejection in *Department of Commerce v. New York* and more recently in *Diamond Alt. Energy, LLC* of a "heightened" redressability standard in favor of a "common sense" approach, redressability clearly exists here.

To reiterate, "[t]he relief sought needn't completely cure the injury, it's enough if the desired relief would lessen it." *Dobbin Plantersville Water Supply Corp. v. Lake,* 108 F. 4th 320, 326 (5th Cir. 2024). Surely it will lessen the injury if all state board members, including those on the non-IHL boards, are ordered to refrain from "ensur[ing]" under Section 3 that local schools and districts comply with the challenged bans. It will also lessen the injury if the non-IHL boards are ordered by the Court not to adopt pursuant to Section 7 – or to rescind if already adopted – any model policies and procedures for investigating and adjudicating any complaints involving the challenged provisions. This would lead to the local boards and districts being informed that the model policies *specifically exclude* the challenged provisions because the Court declared them unconstitutional. This would remove the statutory trigger for those districts to adopt policies for the challenged provisions. Many districts, and probably most, would then also exclude those provisions given that the state boards had done so because a federal court held them to be

9

unconstitutional. This would be reinforced when the non-IHL boards informed the local boards that they are not collecting reports about violations regarding the challenged provisions due to the federal court injunction. And finally, it will lessen the injury if the non-IHL boards are ordered not to withhold money from school districts with an uncured second violation of the challenged provisions.

II. **The Plaintiffs do not include anyone who works or attends a charter school and the Plaintiffs have no objection to dismissing the MCSAB Board Members Without Prejudice.**

Because the Plaintiffs do not include a student or educator in a charter school, the Plaintiffs have no objection to the dismissal of the members of the Mississippi Charter School Authorizer Board ("MCSAB"). The dismissal should be without prejudice in the event that one or more future plaintiffs with standing sue the members of that Board.

III. **The UCW Has Associational Standing to Assert Claims Against the Defendants.**

The United Campus Workers Southeast Local 3821 ("UCW") is a labor organization that represents the interests of 237 members at six of the universities under the umbrella of the IHL. [ECF #22, ¶ 13]. The Defendants argue that the Court should dismiss the UCW because the Amended Complaint contains no allegations that any part of the UCW's mission is related to enforcing members' First and/or Fourteenth Amendment rights. This argument fundamentally misunderstands the nature of a labor organization. The UCW (like every other labor union) is a First Amendment association. *Hitt v. Connell*, 301 F.3d 240, 245 (5th Cir. 2002) (noting that the First Amendment protects a public employee's right to associate with a union). The purpose of associating or joining a Union is to collectively advocate for improved working conditions, and one of the most important working conditions for UCW members is the right of academic

freedom.[2] [ECF #22, ¶ 90 alleging that UCW members consider all or some of these matters (i.e. teaching and discussion inside and outside the classroom of issues related to race, sex, color, gender identity, sexual orientation or national origin) "to be integral to their jobs, their academic freedom and the exercise of their rights to free speech as part of their jobs"]. The Amended Complaint clearly alleges that the challenged provisions of HB 1193 threaten the academic freedom of UCW's members, chill their freedom of speech, and change integral parts of their jobs. [ECF # 22, ¶¶ 88-90, 102].

Leaving aside that protecting members' academic freedom is one of the main objectives of the UCW, Count Six of the Amended Complaint asserts a claim that HB 1193 Section 8 unlawfully threatens the "property interest" UCW's members have in employment in the educational system by subjecting them to arbitrary and capricious collective punishment. [ECF #22, ¶ 123]. Protecting the interest of members in continued employment is an interest that falls squarely within the mission of any labor organization, including the UCW. Because interests the association seeks to vindicate on behalf of its members require "mere pertinence" to the association's purpose, the UCW's allegation that it is a labor organization representing the interest of its members who work at public universities in Mississippi coupled with the common knowledge of the purpose of labor unions is sufficient to satisfy this most undemanding of requirements.

---

[2] For example, on the UCW's website the following statement can be found: "Faculty Advocacy Network (FAN) is a space for UCW faculty of all stripes to convene and strategize for change on the issues that impact us all: academic freedom, tenure and job security, costs of education, public education funding and finance, shared governance, and more." *See*, Faculty Advocacy Network, https://ucw-cwa.org/faculty-advocacy-network. (Last visited July 14, 2025). Since the Defendants' motion is based on Rule 12(b)(1), the Court may consult material outside the four corners of the complaint to decide whether Article III standing is met.

### IV. Plaintiffs' Claims Against the Attorney General Fall Under the *Ex Parte Young* exception to the State's Eleventh Amendment Immunity.

When a Plaintiff asks for declaratory and/or injunctive relief from an alleged on-going violation of their constitutional rights, the issue is whether the officials they have sued are the proper defendants. *Book People Inc.*, 91 F4th at 334-335. In order to use the *Ex Parte Young* exception, a plaintiff must demonstrate that the state officer has "some connection" with the enforcement of the disputed act. *K.P. v. LeBlanc*, 627 F.3d 115, 124 (5th Cir. 2010). "The fact that the state officer, by virtue of his office, has some connection with the enforcement of the act, is the important and material fact, and whether it arises out of the general law, or is specially created by the act itself, is not material so long as it exists." *K.P. v. LeBlanc*, 627 F.3d at 124 (quoting *Ex Parte Young*, 209 U.S. at 157) (emphasis added).

Section 8(2) provides that before withheld funds are restored, the governing state board must certify that the violating entity has demonstrated full compliance with the provisions of HB 1193 and the Attorney General or a court of competent jurisdiction must affirm the certification. Section 9(b) specifically authorizes the Attorney General to file an application for writ of mandamus in the chancery court to compel compliance with its provisions if the university, college or public- school board has failed to cure a violation within the thirty (30) day curative period. HB 1193 § 9(b).

The Attorney General argues that neither of these provisions charge her with a *duty* to either affirm a governing board's certification or file an application for a writ of mandamus. [ECF #40, p. 26]. Instead, the Attorney General contends that since the exercise of these duties involve discretionary authority, the Plaintiffs cannot establish the requisite connection to enforcement under *Ex Parte Young* without "indicating some reasonable prospect of how that discretion is to be exercised." [ECF #40, p. 27]. According to the Attorney General, the Plaintiffs' amended

complaint has not made such a showing, and thus she is not amenable to suit in federal court under the Eleventh Amendment and the claims against her should be dismissed.

First, the Attorney General recognizes that if the statute imposes a *duty* to act, then the Plaintiffs satisfy her "connection to enforcement" for purposes of *Ex Parte Young*. Section 8(2) requires the Attorney General to act when presented with a certification that a violating entity has demonstrated full compliance with HB 1193 as a condition of having funds restored. The fact that a court of competent jurisdiction can also affirm the certification does not relieve the Attorney General from conducting a review to determine whether to affirm a certification. Unlike Section 9(b), there is no language in Section 8 suggesting that the Attorney General may simply decide not to take any action when presented with a certification of compliance.

Second, a history of prior enforcement is not required, especially in the pre-enforcement context that applies here. *See Calhoun v. Collier*, 78 F.4th 846, 851 (5th Cir. 2023). In a case involving the future enforcement of a newly enacted statute that plaintiff alleges chills protected speech, the plaintiff "has only to provide 'some scintilla' of an indication that a defendant official is willing to enforce the challenged statute in order that such ultra vires action may be reasonably anticipated and restrained." *Health Vision Ass's v. Abbott*, 2025 U.S. App. LEXIS 12651 * 15 (5th Cir., May 23, 2025). A district court may consider, in a case where plaintiffs allege "self-censorship" as a result of a statute's prohibitions, that the defendant with discretion to enforce a statute has not indicated an intent *not* to enforce the challenged law. *Id*. at * 19. The absence of a declaration that the defendant will not seek to enforce the law is at least a "scintilla of an indication" of likely future enforcement. *Id*.

Attorney General Fitch has also demonstrated a willingness to engage in litigation over the type of DEI issues identified in the challenged provisions of HB 1193. In particular, Attorney

General Fitch has issued numerous press releases regarding her efforts to challenge the inclusion of transgender athletes in female sports.[3] She also filed a lawsuit against the Biden Administration challenging a rule that required physicians to adopt anti-racism plans to counter structural barriers that have disadvantaged African Americans seeking medical services. *See*, *Colville et. al. v. Becerra*, 2023 U.S. Dist. LEXIS 52527 (S.D. Miss. March 28, 2023). Relevant to the issue of whether AG Fitch has demonstrated a willingness to litigate over the issues identified in HB 1193 as "divisive concepts" is that court's finding that the State Plaintiffs (including Mississippi) argued that they had standing to pursue claims challenging the "Anti-Racism" rule "because it interferes with their enforcement of their laws prohibiting racial discrimination, entitling them to special solicitude." *Id.* at *44. Her track record on these issues provides more than a "scintilla of an indication" that she is willing to exercise her enforcement powers to compel compliance with HB

---

[3] May 5, 2022 Press Release Announcing that Attorney General Lynn Fitch joined Dr. Amber Colville of Ocean Springs, Mississippi and Dr. Ralph Alvarado of Winchester, Kentucky, as well as the Attorneys General of Alabama, Arizona, Arkansas, Kentucky, Louisiana, Missouri, and Montana in filing suit in the U.S. District Court for the Southern District of Mississippi against a new federal rule penalizing physician reimbursement for not creating and implementing anti-racism plans for their practices.

August 18, 2022 Press Release Announcing that AG Fitch Signs The Women's Bill of Rights. The Press Release notes that "General Fitch has joined her fellow State Attorneys General in several lawsuits, amicus briefs, and letters to fight against the Biden Administration's efforts to mis-apply Supreme Court precedent and read an expansive definition of sex and sex discrimination into Title IX and other school programs that have leveled the playing field for girls in school athletics and academics for decades. The Administration's coordinated efforts would prohibit sex separated sports teams, showers and locker rooms, and more in schools.";

May 16, 2023 Press Release Regarding Growing Support For Women's Bill of Rights Ahead of Biden Administration's Expected Title IX Rule;

November 7, 2023 Press Release Stating that Attorney General Lynn Fitch announced the filing of an amicus brief last week in the Ninth Circuit Court of Appeals in support of a mother, Aurora Regino, who is challenging a California school district's policy of withholding information about a child's gender identity from parents.

1193. The AG is a proper party to this case pursuant to the *Ex Parte Young* exception to the State's Eleventh Amendment Immunity. The Court should deny Defendants' Motion to Dismiss.

Dated: July 16, 2025                                                          Respectfully submitted,

| | |
|---|---|
| *s/ ROBERT B. MCDUFF*<br>ROBERT B. MCDUFF<br> MS BAR NO. 2532<br>PALOMA WU<br> MS BAR NO. 105464<br>MISSISSIPPI CENTER FOR JUSTICE<br>210 E. CAPITOL STREET, STE 1800<br>JACKSON, MS 39201<br>PHONE: (601) 259-8484<br>RMCDUFF@MSCENTERFORJUSTICE.ORG<br>PWU@MSCENTERFORJUSTICE.ORG<br><br>AMIR BADAT<br> MS BAR NO. 106599<br>BADAT LEGAL PLLC<br>P.O. BOX 15<br>TOUGALOO, MS 39174<br>PHONE: (601) 462-9592<br>AMIR.BADAT@GMAIL.COM | *s/ JOSHUA TOM*<br>JOSHUA TOM<br> MS BAR. NO 105392<br>MCKENNA RANEY<br> MS BAR NO. 106330<br>AYANNA HILL<br> MS BAR NO. 106590<br>AMERICAN CIVIL LIBERTIES UNION OF MISSISSIPPI FOUNDATION, INC.<br>P.O. BOX 2242<br>JACKSON, MS 39225<br>PHONE: (601) 354-3408<br>JTOM@ACLU-MS.ORG<br>MRANEY@ACLU-MS.ORG<br>AHILL1@ACLU-MS.ORG<br><br>NICOLAS STANOJEVICH*<br>QUINN, CONNOR, WEAVER, DAVIES & ROUCO LLP<br>2 20TH STREET NORTH, SUITE 930<br>BIRMINGHAM, AL 35203<br>PHONE: (205) 870-9989<br>NSTANOJEVICH@QCWDR.COM<br>*ADMITTED PRO HAC VICE<br><br>COUNSEL FOR PLAINTIFFS |

## **CERTIFICATE OF SERVICE**

I certify that the foregoing has been filed on the ECF system which served all counsel of record on this 16th day of July, 2025.

*s/ Joshua Tom*
Joshua Tom
Co-counsel for Plaintiffs
