# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### NORTHERN DIVISION

MISSISSIPPI ASSOCIATION OF EDUCATORS, et al.                    PLAINTIFFS

v.                                          CIVIL ACTION NO. 3:25-cv-00417-HTW-LGI

BOARD OF TRUSTEES OF STATE
INSTITUTIONS OF HIGHER LEARNING, et al.                        DEFENDANTS

## ORDER GRANTING TEMPORARY RESTRAINING ORDER

BEFORE THIS COURT is the Plaintiffs'[1] Joint Motion [ECF #11] seeking both a Temporary Restraining Order (TRO) and a Preliminary Injunction to enjoin the enforcement of various provisions of House Bill 1193 ("HB 1193"). This Order addresses only the Plaintiffs' request for a TRO, a request emphasized during a hearing held on June 24, 2025. At that hearing, this Court did not receive any live testimony or conduct an evidentiary examination; rather, this Court heard arguments limited to counsels' presentations and the existing written record, consistent with the nature of a TRO proceeding.

---

[1] The Amended Complaint names the following Plaintiffs:
1. **Mississippi Association of Educators** ("MAE")
2. **Barbara Phillips** – Adjunct Professor of Law at the University of Mississippi School of Law
3. **James Thomas** – Associate Professor of Sociology at the University of Mississippi
4. **Dawn Zimmerer** – Administrative Librarian at Hinds Community College
5. **L.E. JiBol** – Parent of two public school students in Jackson Public Schools
6. **United Campus Workers Southeast Local 3821** ("UCW") – A union representing faculty, graduate students, and staff
7. **Madisyn Donley** – Third-year law student at the University of Mississippi School of Law
8. **Alexis Cobbs** – Third-year law student at the University of Mississippi School of Law
9. **Karen Aderer** – Lecturer in Social Work at the University of Southern Mississippi
10. **Fostering LGBTQ+ Advocacy, Resources, Environments** ("FLARE") – Student group at Mississippi State University
11. **Women in Science and Engineering** ("WISE") – Student group at the University of Southern Mississippi

1



The defendants herein are: the Board of Trustees of State Institutions of Higher Learning ("IHL"); Mississippi Community College Board; the Mississippi State Board of Education ("State Board of Education"); and the Mississippi Charter School Authorizer Board.

A TRO is an emergency, short-term measure designed to preserve the status quo until a comprehensive hearing can be held. See *Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers*, 415 U.S. 423, 439 (1974) (TROs serve to maintain the status quo until the court can hold a hearing on a preliminary injunction); *Atchison, Topeka & Santa Fe Ry. Co. v. Lennen*, 640 F.2d 255, 259 (10th Cir. 1981).

A Preliminary Injunction, by contrast, is a longer-term remedy designed to prevent irreparable harm during the pendency of litigation. See *University of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) (the purpose of a preliminary injunction is to prevent irreparable harm before the court can rule on the merits). While the TRO requires only a showing of immediate need for temporary relief, a preliminary injunction typically follows an adversarial hearing with fuller briefing and factual development.

Courts often analyze the two requests together when filed simultaneously, as the legal tests for both a TRO and Preliminary Injunction are similar. Plaintiffs must show, by a preponderance of the evidence: a substantial showing of likelihood of success; a likelihood of irreparable harm if the injunction is not granted; a balance of hardships favoring the moving party; and that the injunction serves the public interest. See *Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011); *Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 626 (5th Cir. 1996) (courts evaluate both TRO and preliminary injunction using the same four-prong test).

The procedural posture for each, however, differs. See, e.g., *Cousins v. School Bd. of City of Norfolk*, 503 F.2d 422, 426–27 (4th Cir. 1974) (discussing interplay between TRO and

2

preliminary injunction). The key procedural difference between a TRO and a Preliminary Injunction lies in the timing and process leading to the issuance of each. A TRO is typically granted on an emergency basis, sometimes without notice to the opposing party (*ex parte*), and often before the defendant has had an opportunity to respond. It is meant to preserve the status quo until a full hearing can be held. Because of its urgent nature, a TRO is short-lived and governed by stricter timing rules under Rule 65(b)[2] of the Federal Rules of Civil Procedure.

A Preliminary Injunction, on the other hand, comes only after notice to the opposing party and typically after a comprehensive evidentiary hearing. The parties can submit fuller briefing, offer witness testimony, and present robust legal arguments. As a result, the Preliminary Injunction carries more weight and lasts longer remaining in effect until the court enters a final judgment on the merits or dissolves the injunction. See *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (emphasized the standards of review applicable to TROs and Preliminary Injunctions); *PCI Transp. Inc. v. Fort Worth & W. R.R. Co.*, 418 F.3d 535, 545 (5th Cir. 2005) (addressing appellate standards when a TRO blends into a Preliminary Injunction ruling). See *Texas v. United States*, 809 F.3d 134, 150–55 (5th Cir. 2015) (affirming nationwide preliminary injunction following earlier TRO). **This Court's ruling today is limited to the TRO request. Regardless of the outcome here, the parties have announced they will return before this Court for a full evidentiary hearing on the Motion for Preliminary Injunction.**

---

[2] Rule 65(b)(1) of the Federal Rules of Civil Procedure allows a court to issue a temporary restraining order without notice to the opposing party only when "specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result ... before the adverse party can be heard in opposition," and when "the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required." Fed. R. Civ. P. 65(b)(1)(A)–(B).

3

As mentioned above, Plaintiff's request a TRO to enjoin enforcement of only certain provisions of HB 1193 codified April 17, 2025. These provisions, say Plaintiffs, violate the First[3] and Fourteenth[4] Amendments to the United States Constitution. Having reviewed the briefing, amended complaint, the law, and the record, this Court grants the requested temporary restraining order for the reasons set forth below.

## I.    BACKGROUND

HB 1193 imposes sweeping restrictions on Mississippi public institutions of education, prohibiting speech and programming related to so-called "divisive concepts." Plaintiffs challenge the following provisions:

- **Section 3(b)**: Bans engagement with "divisive concepts" as defined in Sections 2(d) and 2(e);

- **Section 3(f)**: Prohibits maintenance of programs that promote diversity, equity, inclusion ("DEI"), or endorse concepts such as gender identity and gender theory;

- **Section 3(g)**: Prohibits requiring any DEI training as a condition of enrollment, employment, or contracting;

- **Section 3(i)**: Prohibits any required activity that increases "awareness or understanding of issues related to race, sex, color, gender identity, sexual orientation or national origin."

The statute threatens withdrawal of all state funding after two violations (Section 8) and requires institutions to implement complaint and investigative mechanisms (Section 7).

---

[3] The First Amendment provides, in relevant part, that "Congress shall make no law ... abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble." U.S. Const. amend. I

[4] The Fourteenth Amendment provides that "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV.

Plaintiffs include faculty, students, a librarian, student organizations, and the parent of public school children[5], who all allege imminent constitutional harm from these provisions.

## II.    JURISDICTION

This Court has subject matter jurisdiction under 28 U.S.C. § 1331[6], as Plaintiffs raise constitutional claims under 42 U.S.C. § 1983[7]. Defendants argue that this Court lacks jurisdiction under the Eleventh Amendment[8] and Standing Doctrine[9]. At this preliminary stage, though, the Court finds that at least some claims fall within the exception to Eleventh Amendment immunity recognized in *Ex parte Young*, 209 U.S. 123 (1908), and that Plaintiffs have alleged sufficient imminent harm to satisfy Article III standing. See *Speech First, Inc. v. Fenves*, 979 F.3d 319, 330 (5th Cir. 2020).

### A.    Standing

To establish standing, a plaintiff must demonstrate: (1) an injury in fact that is concrete, particularized, and imminent; (2) that the injury is fairly traceable to the challenged conduct of the

---

[5] See footnote 1.

[6] Section 1331 provides that "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331

[7] Section 1983 provides, in relevant part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." 42 U.S.C. § 1983.

[8] The Eleventh Amendment provides that "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI.

[9] The Standing Doctrine dictates that a plaintiff must demonstrate (1) an injury in fact that is concrete, particularized, and imminent; (2) that the injury is fairly traceable to the challenged conduct of the defendant; and (3) that the injury is likely to be redressed by a favorable judicial decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).

defendant; and (3) that the injury is likely to be redressed by a favorable judicial decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).

Here, Plaintiffs include educators, students, student organizations, and a parent[10], all of whom allege direct harm from the enactment and expected enforcement of HB 1193. Faculty members attest that the law has chilled their classroom discussions and curtailed their ability to engage with students on matters of race, gender, and identity. Students and student groups claim that their programming and expressive activities have been disrupted or canceled in anticipation of institutional discipline. These "harms", say Plaintiffs, are not speculative harms; they are ongoing and directly tied to HB 1193's enforcement framework.

The First Amended Complaint contends that these harms are traceable to the conduct of the named state officials, who oversee the institutions subject to HB 1193 and are empowered to initiate investigations, enforce compliance, and recommend withdrawal of funding under the Act. Furthermore, the relief sought - temporary and permanent injunctions, say Plaintiffs, would redress the harm by halting the enforcement of the challenged provisions.

Accordingly, this Court concludes that Plaintiffs have Article III standing. See *Speech First, Inc. v. Fenves*, 979 F.3d 319, 330 (5th Cir. 2020) (holding that chilled speech caused by a credible threat of enforcement establishes standing in the First Amendment context).

### III.    LEGAL STANDARD

To obtain a temporary restraining order, Plaintiffs must demonstrate, by a preponderance of the evidence:

1.  A substantial likelihood of success on the merits;

2.  A substantial threat of irreparable injury absent the injunction;

---

[10] See footnote 1.

3. That the threatened injury outweighs any harm to Defendants;

4. That the injunction will not disserve the public interest.

See *Big Tyme Invs., LLC v. Edwards*, 985 F.3d 456, 463 (5th Cir. 2021); *Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir. 1987). The Fifth Circuit has held, though, that "none of the four requirements has a fixed quantitative value; rather, a sliding scale is utilized, which takes into account the intensity of each in a given calculus." See *Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011).

## IV.    ANALYSIS

### A. Likelihood of Success on the Merits

Plaintiffs argue that HB 1193 imposes content- and viewpoint-based restrictions on protected speech, violates the right of students to receive information, and is unconstitutionally vague.

### 1. First Amendment (Academic Freedom and Viewpoint Discrimination)

The Supreme Court has long recognized the "transcendent value of speech in the university setting." *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967). HB 1193's restrictions target specific viewpoints allegedly disfavored by the State—e.g., affirmative action, gender identity, collective responsibility—while permitting opposing viewpoints. This is the essence of unconstitutional viewpoint discrimination. *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995); *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 511 (1969). The Fifth Circuit likewise has recognized that faculty and students retain First Amendment protections. *Bazaar v. Fortune*, 476 F.2d 570, 574-75 (5th Cir. 1973); *In re Dinnan*, 661 F.2d 426, 430 (5th Cir. 1981).

7

2. **Overbreadth and Vagueness**

The statute prohibits the dissemination, endorsement, or engagement with "divisive concepts" and "gender identity". These terms are not given precise definitions within the statutory text, nor, according to Plaintiffs, do they have established legal meanings that would guide educators, administrators, or students in conforming their conduct.

For example, the law forbids the promotion of "divisive concepts" without clearly identifying what constitutes "promotion," or which views are considered "divisive." It bans programming that "increases awareness or understanding of race, sex, color, gender identity, sexual orientation, or national origin," which, say Plaintiffs, could encompass virtually all educational material in subjects such as history, sociology, gender studies, or literature. This, continue Plaintiffs, leaves institutional actors with no objective standards, fostering arbitrary enforcement and pervasive self-censorship. Such ambiguity, add Plaintiffs, not only deprives individuals of fair notice, but also empowers enforcers to apply the statute selectively. As the Supreme Court has made clear, "[A] law fails to meet the requirements of the Due Process Clause if it is so vague and standardless that it leaves the public uncertain as to the conduct it prohibits." *Giaccio v. Pennsylvania*, 382 U.S. 399, 402–03 (1966). The chilling effect is compounded in the academic context, where the fear of losing state funding compels institutions to over-correct in ways that suppress constitutionally protected speech censorship.

3. **Strict Scrutiny and Lack of Narrow Tailoring**

The application of strict scrutiny to laws that restrict speech is grounded in the principle that the government must not suppress ideas simply because they are controversial or unpopular. See *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992). Under this standard, the burden rests

squarely on the government to demonstrate both a compelling state interest and the narrow tailoring of the statute to that interest.

HB 1193 allegedly fails both prongs of this test. At this stage, the government has not advanced any interest of the highest order. Claims of ensuring ideological neutrality or avoiding divisiveness are not sufficient to justify suppressing protected speech. See *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967) ("The Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth out of a multitude of tongues."). In *Conant v. Walters*, 309 F.3d 629, 637–38 (9th Cir. 2002), the court emphasized that preserving the integrity of government messaging was not enough to silence individual speakers or programs.

Secondly, even if the State argues and comes forth with compelling interests, the State further must show that HB 1193's prohibitions are  narrowly tailored. The Act, accuse Plaintiffs, is riddled with vague terminology and sweeping mandates that fail to distinguish between permissible instruction and alleged indoctrination. Terms like "divisive concepts" are undefined, granting enforcers unbounded discretion. See *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972) (laws must give people of ordinary intelligence a reasonable opportunity to know what is prohibited).

The law's enforcement mechanism—withdrawal of funds, dissolution of student organizations, and employment consequences—exacerbates its chilling effect, emphasize Plaintiffs. The Supreme Court repeatedly has held that the government may not condition access to public benefits on the relinquishment of constitutional rights. See *Perry v. Sindermann*, 408 U.S. 593, 597 (1972).

In sum, rounding out their antagonism to the law, Plaintiffs declare that HB 1193 seemingly reflects neither precision nor restraint. Thus, in a metaphor of Plaintiff's position, it appears to be a legislative sledgehammer deployed where a scalpel might have sufficed and, seemingly, cannot survive in its blatantly offensive posture the constitutional scrutiny that applies to content-based restrictions on speech.

Accordingly, Plaintiffs say they have shown a substantial likelihood of success.

### B.   Irreparable Harm

Deprivation of First Amendment rights—even for minimal periods of time—constitutes irreparable harm. *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981). The First Amended Complaint illustrates, say Plaintiffs, concrete, ongoing injuries that go beyond abstract fears.. Student organizations including LGBTQ+ and Black student unions have had programming curtailed out of concern for institutional sanction.

Though HB 1193 became law in April 2025, the confusion it has caused is not static; it is compounding. Institutions have spent the intervening months attempting to interpret and implement the statute, often erring on the side of caution by canceling or defunding programming that arguably falls within its prohibitions. This prolonged period of uncertainty has deepened the chilling effect. As the statute's enforcement provisions—particularly the threat of funding withdrawal after two violations—have become more imminent, the pace and breadth of programmatic shutdowns have accelerated. The impact is not hypothetical.

This Court finds that each day the statute remains unclarified, undefined, and under a threat of open interpretation, exacerbates the suppression of protected speech. In the Fifth Circuit, as elsewhere, such injuries are presumed irreparable and weigh heavily in favor of preliminary relief.

10

## C. Balance of Harms

The balance of equities tilts in Plaintiffs' favor. Plaintiffs may face immediate and serious injuries: silencing of classroom speech, the curtailment of expressive activities by registered student organizations, and punitive consequences for faculty and students who engage in possibly protected expression.

In contrast, under a TRO, Defendants face only a temporary pause in enforcement of provisions that raise serious constitutional questions. This is not an injunction against the entire statutory scheme, but a focused restraint against those sections that may impinge on constitutionally protected activity. Moreover, Defendants' interest in enforcing the law cannot outweigh Plaintiffs' right to be free from unconstitutional censorship. *See Legend Night Club v. Miller*, 637 F.3d 291, 303 (4th Cir. 2011) (state suffers no harm from an injunction that prevents enforcement of an unconstitutional statute).

Plaintiffs submitted multiple affidavits outlining the challenged harms already underway and the claimed imminent injury that will follow continued enforcement of HB 1193. For example:

- **Ryan Langley**, President of "Fostering LGBTQ+ Advocacy, Resources, and Environments (FLARE)" at Mississippi State University, describes how administrators cited HB 1193 to remove FLARE from its diversity center home, cut its funding stream, and restructure the organization to prevent potential violations of the Act. Langley attests

that FLARE members are censoring their own speech out of fear of punishment and have canceled or altered programming[11].

- **Elizabeth Dawn Zimmerer**, a librarian at Hinds Community College, attests that provisions of HB 1193 already have chilled her ability to curate library content and book displays. She is uncertain whether promoting material for events like Black History Month or recommending titles related to race, gender, or identity violates the Act. Zimmerer fears job consequences and disciplinary action merely for performing core duties[12].

The submitted affidavits seek to establish that HB 1193's allegedly vague and punitive provisions have triggered immediate harm in the form of lost funding, as well as disrupting programming, silencing speech, and altering institutional structure. These do not sound in speculative injuries; but possibly direct and ongoing consequences of the Act's enforcement. Additional affidavits reinforce this conclusion:

- The Organization **Women in Science and Engineering** declares that due to the vague and unclear language of the law, it is unable to determine "what it can and cannot do in the future" and has suspended its annual fundraising efforts for its Fall women's conference, due to the uncertainty regarding the possibility of hosting such a conference[13].

- **Clifford Boler**, a former graduate student affiliated with the University of Southern Mississippi (USM) attests that he discontinued his graduate studies in library and

---

[11] Declaration of Ryan Langley, President of Fostering LGBTQ+ Advocacy, Resources, and Environments (FLARE) at Mississippi State University, Doc. 11-11.

[12] Declaration of Elizabeth Dawn Zimmerer, Hinds Community College Librarian, Doc. 11-12.

[13] Declaration of Brandy Williams, Director of Student Development at Tougaloo College, Doc. 11-1.

information sciences at USM because the language of HB 1193 conflicts with certain ethical codes of the American Library Association. This conflict, says Boler, led to his unenrollment at USM, and his forthcoming application to enroll in a different University's Library and Information Sciences program[14].

In this Court's eye, these accounts appear to reflect a broad, chilling effect across public institutions and community organizations. The affidavits detail not only imminent harm, but a possible widespread suppression of speech, programming, and institutional function. The evidence, at this stage, demonstrates a clear and ongoing deprivation of constitutional rights in a manner not compensable by money damages—thus warranting injunctive relief.

### D.    Public Interest

It is always in the public interest to prevent the violation of a party's constitutional rights. *Tex. Democratic Party v. Abbott*, 961 F.3d 389, 411 (5th Cir. 2020); *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 298 (5th Cir. 2012). Taking Plaintiffs' proof of harm at this preliminary stage as shown, the enforcement of HB 1193 threatens not only individual rights but the very fabric of academic institutions that serve as incubators for ideas and discourse. Universities are places where students learn to grapple with difficult concepts and instructors are free to explore scholarly ideas. The public benefits from robust academic freedom and the cross-pollination of diverse viewpoints. Suppressing constitutional speech through vague prohibitions and the specter of financial retribution does not serve the public good—it undermines it. An overbroad, constitutionally borderless law should be the target of a well-aimed injunction to

---

[14] Declaration of Clifford Boler, former University of Southern Mississippi graduate student, Doc. 11-8

promote, rather than impair, the interests of Mississippi citizens, the integrity of its institutions, and the constitutional principles on which this republic stands.

## V.    CONCLUSION

IT IS HEREBY ORDERED that Plaintiffs' Motion for a Temporary Restraining Order is GRANTED. The State of Mississippi and the above-named Defendants are temporarily ENJOINED from enforcing Sections 3(b), 3(f), 3(g), and 3(i) of HB 1193 pending further order of this Court.

This Temporary Restraining Order shall remain in effect until this Court renders its ruling on the Plaintiffs' Motion for Preliminary Injunction, unless extended for good cause.

## VI.    FURTHER PROCEEDINGS

Since this Court's hearing on Plaintiffs' Motion for Temporary Restraining Order (TRO) on June 24, 2025, this Court has received from both sides supplemental filings that aim to amplify the factual record and legal arguments in this matter.

On June 30, 2025, Plaintiffs filed a stipulation of dismissal as to several institutional defendants, thereby dismissing the Board of Trustees of State Institutions of Higher Learning, the Mississippi Community College Board, the Mississippi State Board of Education, and the Mississippi Charter School Authorizer Board. [ECF No. 32].

Thereafter, on July 2, 2025, the remaining Non-IHL Defendants—along with Lynn Fitch, in her official capacity as Attorney General of Mississippi—filed a Motion to Dismiss the Amended Complaint for Lack of Jurisdiction [ECF No. 39]; a Response in Opposition to Plaintiffs' request for preliminary injunctive relief [ECF No. 42]; and five supporting declarations.

Plaintiffs submitted rebuttal briefs on July 11, 2025 [ECF No. 11] and July 16, 2025 [ECF Nos. 48, 49, 50], completing the briefing on the preliminary injunction motion.

14

As noted above, a TRO is an emergency, short-term remedy granted to preserve the status quo pending a fuller adversarial hearing. The June 24 hearing on the TRO proceeded without live witness testimony, consistent with that limited purpose. A TRO is not a final adjudication; it may be modified or withdrawn upon the issuance of a preliminary injunction, or after findings inconsistent with such at a judicial adjudication on the merits.

A preliminary injunction, by contrast, demands a more searching judicial inquiry, typically involving live testimony, cross-examination, and formal evidentiary findings. Looking backwards, at the June 24th hearing, and its submissions and arguments, this Court was persuaded that a TRO should issue. The above Order reflects as much. The parties now have moved this litigation beyond the TRO stage, when the Court reasoned that, on the abbreviated information it had at that stage, Plainitffs' motion for a TRO had to be granted, and effectuated until the Court could hold a hearing on a preliminary injunction. See *Sierra Club v. FDIC*, 992 F.2d 545, 551 (5th Cir. 1993).

The Court now directs the parties to appear at a hearing on the Motion for a Preliminary Injunction on **Wednesday, July 23, 2025, at 9:30 A.M**. At that hearing, the Court expects to receive live testimony and conduct a more rigorous examination of the constitutional and jurisdictional issues raised. The parties should also be prepared to argue all other motions currently pending before this Court.

**SO ORDERED AND ADJUDGED this the 22nd day of July       , 2025.**

/s/HENRY T. WINGATE
UNITED STATES DISTRICT COURT JUDGE