IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
Jackson Division

MISSISSIPPI ASSOCIATION OF )
EDUCATORS, ET AL., )
           ) Civil No. 3:25-cv-00417-HTW-LGI
          *Plaintiffs*, )
v. )
           )
LYNN FITCH, ET AL., )
          *Defendants*. )
           )

## DECLARATION OF ASHLEY ROGERS

Pursuant to 28 U.S.C. § 1746, I, Ashley Rogers, make the following declaration under penalty of perjury:

1. My name is Ashley Rogers. I work as the Lead Teacher at McWillie Elementary School in Jackson, Mississippi. In this capacity, I am not teaching classes, but I am responsible for, and exercise supervisory and administrative authority over the teachers in the school. For example, I work with all of the teachers on lesson plans and other aspects of classroom content. To the extent our school is required to follow the bans in Section 3 of HB 1193 — and particularly the challenged bans in Sections 3(b), 3(f), 3(g), and 3(i) — I am responsible for ensuring that the teachers comply with the bans.

2. Prior to assuming this position, I was a classroom teacher At Green Elementary from 2008-2018 teaching 3rd and 5th grade and then taught 4th and 5th grade at Wells (formerly Power) APAC from 2018-2021.

3. In my supervisory capacity as part of my current job, I am occasionally engaged in discussions with teachers and students regarding problems that arise, corrective actions that need to be taken by those teachers and students, and occasional disciplinary actions.

1

To the extent HB 1193 is enforced, I will be the person responsible in the first instance for designing and implementing a "cure" under Section 7(6)(b) for any violations found by the school board.

4.  Section 3(b) of HB 1193 prohibits Mississippi public schools from "[e]ngag[ing] in divisive concepts as defined in Section 2(d) and (e) of this act." Section 2(d) defines "diversity training" to include "any formal or informal education, seminars, workshops or institutional program that focus on increasing awareness or understanding of issues related to race, sex, color, gender identity, sexual orientation or national origin."  Thus, Section 3(b) prohibits any "[e]ngage[ment] with "any formal or informal education that . . . increase[es] awareness or understanding of issues related to race, sex, color, gender identity, sexual orientation or national origin."

5.  I believe that "increasing awareness and understanding" is the central mission of schools. Education occurs primarily through classroom instruction and discussion, reading, extracurricular activities, and homework.  This provision regarding "any formal or informal education" appears to ban any classroom or extracurricular discussion of "race, sex, color, gender identity, sexual orientation or national origin," and any reading that might include any of those subjects.

6.  This particular ban, if enforced, would cover a wide range of the material that is now taught in public education in Mississippi and in my school.  For example, each winter, our Pre-Kindergarten students participate in a home/school connection project where they research an important role model for Black History Month. They dress as their chosen person to create a living museum and then teach their classmates what they learned. This project is monumental in teaching our young students the basic tenants of research and

presentation. Each spring, our 4th and 5th grade students complete an in-depth research project on a woman whose contributions to society have been great, although possibly overlooked. They create cereal boxes highlighting all of her accomplishments and then create a display for all of our students to observe and learn from. A growing percentage of our students come from first generation American families and throughout the year, their parents and grandparents are invited and encouraged to participate in ways that are reflective of their culture. We've had parents give cooking, sewing, and art demonstrations to broaden our students' exposure to the world that is beyond Jackson. . If enforced, this provision would require significant modifications of the classroom and extracurricular instruction at our school.

7. I believe the banned subjects are an important part of public education, and that teachers have a right to discuss them, subject to any appropriate age concerns.

8. Beyond a teacher's plans for classroom instruction, students often raise issues related to these banned subjects, and teachers have to respond.  This can happen inside or outside of the classroom. Because students don't live insular lives, their existence in and of itself is a matter of diversity. They have families of multiple races and ethnicities, have family members who are members of the LGBTQ+ community, and many have first-hand experience with racism, sexism, and classism. Telling them that these topics are off-limits is telling them that their very existence is off-limits. Teaching students that the very real components of their lives is "bad" to discuss is doing real and tangible harm to their academic, social, emotional, and behavioral development.  It is unclear to me whether a simple response to the student, and perhaps a brief discussion with the class about the issue, would constitute an "[e]ngage[ment]" about the banned subject that would violate

the law.  Indeed, this can happen in the context of bullying or name-calling based on race, sex, sexual orientation, gender identity, or national origin.  If a teacher responds and speaks about race or any other banned topic in the course of trying to correct the problem, it is unclear if they would be "engag[ing]" in that topic by "increasing awareness and understanding" about it.

9.  Teachers also frequently have conversations with students outside of the classroom that relate to the banned subjects. These informal conversations occur in the hallway, in the lunchroom, on the playground, and before or after school starts. For many students, they spend more time with their teacher(s) than any other adult in their lives. Teachers become their safest connection and therefore the first person they approach with difficult questions or upsetting stories. I cannot count the amount of times a student has approached with and began the conversation with "I haven't been able to tell anyone else this, but…" Teachers must remain safe havens for our students. Having to cut off a student because what they're talking about goes against this ban is cruel and unusual. These conversations are important parts of the educational experience because they create trust and mutual respect between teachers and students. It is not clear whether the law's unclear prohibitions would restrict teachers from having these conversations.

10. In addition to the lack of clarity surrounding prohibition on "[e]ngage[ment]" with these topics, the other bans in Sections 3(b), 3(f), 3(g), and 3(i) are vague and confusing in many respects.

11. Although the act prohibits schools from violating the bans, the schools are composed of teachers, administrators, and students.  Thus, it seems that any violations will have been

caused by teachers, administrators, or students, and any "cure" must be directed toward them.

12. If the challenged provisions are enforced, I will be responsible for ensuring compliance with them and helping to "cure" any violations that are found, even though I fervently believe that these subjects should be taught and discussed in schools.  Moreover, I will have to carry out these responsibilities even though in some respects, it is difficult to differentiate between actions that are permitted and those that are prohibited. The law does not explain what is required for a "cure," and I simply do not know what I should do to "cure" a violation, particularly when the violation involves actions that I believe are perfectly appropriate and responsible.  Also, I am concerned that those of us at the school — the teachers and administrators — will either self-censor the content of our discussions or will risk discipline for violating the challenged provisions.

13. I am also a parent to two children who are in the 1st and Montessori Pre-K 3 grades in the Jackson public schools.

14. I am concerned that the challenged provisions will prevent my children from learning and speaking about the banned topics in the classroom setting, during extracurricular activities, and in other contexts outside the classroom, like the hallway or lunchroom.  By censoring teachers and prohibiting particular subjects from being taught, the provisions will deny my children the right to learn about those subjects.

15. I fear my children and others may self-censor or may be reprimanded or punished if they ask questions or make comments about the banned topics, even though those topics have often been subjects discussed in public education in the state and in this country. My children love their aunt and her partner- two gay women who play a vital role in their

lives. When their aunts come to town to visit and take them to the pumpkin patch, would

they be told on Monday morning that they can't share with the class what they did that

weekend because it involves members of the LGBTQ+ community? I am horrified to

think that anyone would stop my children from sharing a loving story about how their

lives were enriched while in the company of gay women.

16. I am also concerned that the vague and inconsistent provisions in HB 1193 will make it

difficult for my children and me to differentiate what is prohibited from what is allowed

and which of their actions will violate the challenged provisions.

17. If any of the forty-one JPS schools incur a violation and later a second uncured violation,

then it appears all state funds shall be withheld.  This loss of funding would mean my

children could be sent home and I could be out of a job.

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.


Executed: July 31, 2025


_Ashley Rogers_
Ashley Rogers