**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

**MISSISSIPPI ASSOCIATION OF
EDUCATORS, et al.**                                                    **PLAINTIFFS**

**VS.**                                            **CIVIL ACTION NO. 3:25-cv-00417-HTW-LGI**

**BOARD OF TRUSTEES OF STATE
INSTITUTIONS OF HIGHER LEARNING,**
**et al.**                                                               **DEFENDANTS**

---

**DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

---

THE COURT, having reviewed the written submissions, considered the testimony offered

at the hearing on August 5-6, 2025 and the arguments presented by the parties, makes the following

Findings of Fact and Conclusions of Law:

**FINDINGS OF FACT**

On June 29, 2023, the Supreme Court handed down its opinion in *Students for Fair

Admissions, Inc. v. Harvard* making clear that both the U.S. Constitution and Title VI of the Federal

Civil Rights Act prohibit discrimination based on race. 600 U.S. 181. On January 21, 2025, newly

inaugurated President Donald Trump signed an Executive Order 14173 titled "Ending Illegal

Discrimination and Restoring Merit-Based Opportunities". 2025 WL 523310 at *8635, 90 Fed.

Reg. 8633  (Jan. 21, 2025). This order instructs the Secretary of Education to "issue guidance to

all State and local educational agencies that receive Federal funds, as well as all institutions of

higher education that receive Federal grants or participate in Federal student loan assistance

program under Title IV of the Higher Education Act . . . regarding the measures and practices

required to comply with 'Students for Fair Admissions, Inc. v. President and Fellows of Havard College', 600 U.S. 181 (2023)". *Id.*

A week later, President Trump signed an Executive Order 14190 titled "Ending Radical Indoctrination in K-12 Schools." 90 Fed Reg. 8853 (Jan. 29, 2025). The Executive Order states: "My Administration will enforce the law to ensure that recipients of Federal funds providing K-12 education comply with all applicable laws prohibiting discrimination in various contexts and protecting parental rights, including Title VI of the Civil Rights Act of 1964 (Title VI) . . ." *Id.* It further instructs the Secretary of Education and others to provide a plan to effectuate the Executive Order and includes prohibiting the use of federal funds for "illegal and discriminatory treatment and indoctrination in K-12 schools . . ." *Id.*

On February 14, 2025, the U.S. Department of Education's Acting Assistant Secretary for Civil Rights issued a "Dear Colleague letter" ("DCL") that set forth several requirements for schools receiving federal funding going forward. [ECF# 42-1][1] These requirements include taking steps to ensure that "their policies and actions comply with existing civil rights laws," and

---

[1] Enforcement of the DCL was stayed, in whole or in part, by courts in New Hampshire and Maryland. *See National Education Ass'n v. United States Dep't. of Educ.*, No. 25-cv-091; 2025 WL 1188160 at *31 (D.N.H. Apr. 24, 2025) (enjoining enforcement of DCL against entities receiving federal funding that employ or contract with the named plaintiffs or their members); *American Fed. of Teachers, et al. v. Dep't of Educ. et al.*, 25-cv-628, Dkt# 60 at pp. 46-47 (D. Md. Apr. 24, 2025) (staying enforcement of DCL under the Administrative Procedures Act). Conversely, courts in New Mexico and the District of Columbia have refused to enjoin the DCL. *See Bd. of Educ. for Silver Consol. Sch. v. McMahon*, No. 25-CV-586, 2025 WL 2017177 at *8–9 (D.N.M. July 18, 2025) (denying motion for preliminary injunction of the DCL finding that regulation of government speech does not implicate First Amendment and plaintiff failed to establish the DCL "is impermissibly vague in all its applications); *Nat'l Assn. for the Advancement of Colored People v. U.S. Dept. of Educ.*, 25-cv-1120, Dkt. 31 at ¶¶ 1, 3 (D.D.C Apr. 24, 2025) (finding lack of standing to challenge and failure to demonstrate a substantial likelihood of success on the merits to enjoin the DCL).

forbidding the use of "proxies" to "circumvent prohibitions on the use of race." *Id.* The State Defendants received or were otherwise made aware of the "Dear Colleague Letter" at or near the time it was issued. [ECF# 42-3 at ¶ 5, Exh. 2]. Some Mississippi schools receive substantial funding from the federal government. [ECF# 42-3 at ¶¶ 3-5, Exh. 1; ECF# 42-4 at ¶ 4, Exh. 1; ECF# 42-5 at ¶¶ 4-5, Exh. 1].

Approximately two months after the "Dear Colleague Letter" was issued, H.B. 1193 (the "Act") was signed into law. [ECF# 1 at ¶ 8]. The stated purpose of the Act is set forth in Section 1:

> The purpose of this act is to prohibit public schools and public postsecondary educational institutions from taking certain actions and engaging in discriminatory practices. This act seeks to ensure that employment, academic opportunities and student engagement are based solely on individual merit, qualifications and academic performance, without consideration of an individual's race, sex, color, national origin, or expressed opposition to, or refusal to affirm or participate in, diversity, equity and inclusion.

[ECF# 11-14 at Section 1]. Plaintiffs have not presented evidence to refute, by a preponderance of the credible evidence, the evidence submitted by Defendants at ECF #42-1 (2/14/25 USDOE "Dear Colleague Letter") and the declarations submitted by Defendants at ECF #42-2 (Decl. of Dr. Casey Prestwood), #42-3 (Decl. of Ray Kelly Smith IV), #42- 4 (Decl. of Kymberly Wiggins), and #42-5 (Decl. of Lisa Karmacharya, Ed.D.) demonstrating, among other things, the impact of the loss of federal funds on Mississippi K-12 schools  and community colleges.

All requirements and prohibitions in the Act are expressly imposed on institutions, not individuals, for the purpose of preventing discrimination. It accomplishes this goal by prohibiting educational institutions from conditioning employment, admission, or the award of a contract on compulsory training that focuses on "race, sex, color, gender identity, sexual orientation, or national origin." [ECF# 11-14 at Sections 2.(d), 3.(g), 3.(i)]. It further prohibits any adverse action

against an individual student, faculty member, employee, or contractor as a result of their opinions or beliefs regarding race, sex, color, gender identity, sexual orientation, or national origin [ECF# 11-14 at Sections 3.(d), 3.(e), 3.(h)] and prohibits programs/positions/offices effectuating such discriminatory or adverse actions [ECF# 11-14 at Sections 3.(a), 3.(b), 3. (c), 3. (f)]. Finally, the Act provides a method for individuals to seek relief against a regulated institution in the event they are subjected to discriminatory adverse actions prohibited by H.B. 1193. [ECF# 11-14 at Sections 7-9].

Indeed, the only mention of students, teachers, school employees, or any other individual in the Act is protective in nature. Section 3 of the Act requires that the Board of Trustees of State Institutions of Higher Learning ("IHL"), the Mississippi Community College Board ("MCCB"), the Mississippi State Board of Education ("MBE"), and the Mississippi Charter School Authorizer Board ("MCSAB") "shall ensure that each *institution, college and public school*, as applicable, shall not" discriminate against students, teachers, employees, or contractors in several enumerated ways. [EFC# 11-14 at Section 3] (emphasis added). At the same time, the Act is designed to protect individual rights by providing a mechanism for "any student enrolled at an institution, college or public school, any faculty, employee or staff member of an institution, college or public school, or any parent, guardian or next friend of a minor who has allegedly been *harmed by the institution, college or public school's failure to comply*" to file a complaint. [ECF#11-14 at Section 3(5)] (emphasis added).

The Plaintiffs are college-level professors[2] ("Teacher Plaintiffs"), college-level students[3] and the parents of K-12 students[4] ("Student Plaintiffs") who fear that the individual institutions where they teach or attend, none of which are parties to this action, will violate their First Amendment rights in an attempt to comply with certain provisions of the Act. [ECF# 11-1 at ¶ 3; ECF# 11-2 at ¶4; ECF# 11-6 at ¶¶ 5, 10;  ECF# 11-7 at ¶¶ 3, 7, 9; ECF# 11-9 at ¶¶ 2, 5, 7; ECF# 11-10 at ¶¶ 2, 5, 7; ECF# 11-11 at ¶¶ 1-2, 6; ECF# 11-12 at ¶¶ 6-7; ECF# 13-1 at ¶¶ 7-9; ECF# 66-1 at ¶¶ 12-13; ECF# 66-3 at ¶¶ 4, 6; ECF# 66-4 at ¶ 5; ECF# 66-6 at ¶¶ 3-4]. Specifically, the Plaintiffs claim they are unable to understand what is and is not prohibited by the Act. [ECF# 11-1 at ¶ 6; ECF# 11-2 at ¶ 4; ECF# 11-7 at ¶ 9; ECF# 11-11 at ¶ 7; ECF# 11-12 at ¶ 7; ECF# 66-1 at ¶ 11; ECF# 66-3 at ¶ 6; ECF# 66-4 at ¶ 6; ECF# 66-6 at ¶ 5] At the same time, Plaintiffs also claim that the Act prohibits the mere mention of race or sex and prevents teaching such topics as the Thirteenth Amendment and Rev. Martin Luther King's "I Have a Dream" speech. [ECF# 11-7 at ¶ 4] *See also,* August 5, 2025 testimony of Cliff Johnson.  What they did not do is present evidence

---

[2] This group includes: Mississippi Association of Educators, Barbara Phillips, James Thomas, United Campus Workers Southeast Local 3821, Karen Aderer, and Dawn Zimmerer. Plaintiffs have filed a motion seeking to add the Jackson Federation of Teachers as plaintiff in this action via a Second Amended Complaint that also identifies Phillips, Thomas, Zimmerer, and Aderer as putative class representatives. [ECF# 60; ECF# 60-1]. Defendants filed a response reserving all defenses but not opposing the motion. [ECF# 67]. As of this filing, plaintiffs have not filed their Second Amended Complaint.

[3] This group includes: Fostering LGBTQ+ Advocacy Resourced Environments, Women in Science and Engineering, Madisyn Donley, and Alexis Cobbs. Note proposed "new" plaintiffs who have not yet added to the suit as of the hearing. Plaintiffs have filed a motion seeking to file a Second Amended Complaint that also identifies Donley and Cobbs as putative class representatives. [ECF# 60; ECF# 60-1]. Defendants filed a response reserving all defenses but not opposing the motion. [ECF# 67]. As of this filing, plaintiffs have not filed their Second Amended Complaint.

[4] In the Amended Complaint, L.E. Jibol is the only member of this group. Plaintiffs have filed a motion seeking to add Joy Parikh, Greg Powell, Jakob Clark, Ashley Rogers, and James Thomas individually and as putative class representatives via a Second Amended Complaint. [ECF# 60; ECF# 60-1]. Defendants filed a response reserving all defenses but not opposing the motion. [ECF# 67]. As of this filing, plaintiffs have not filed their Second Amended Complaint.

to meet their respective burdens under *Garcetti v. Ceballos*, 547 U.S. 410 (2006), *Pickering v. Bd. of Educ. of Township High Sch. Dist. 205, Will County, Ill.*, 391 U.S. 563 (1968), or *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260 (1988), to show that their First Amendment rights are implicated by the challenged provisions of H.B. 1193.

As to their vagueness challenge, Plaintiffs did not present evidence to establish that no constitutional application of the challenged provisions of H.B. 1193 exists either in the hearing on August 5, 2025 or in their pre-hearing submissions. Similarly, Plaintiffs did not present evidence demonstrating the full set of applications, both constitutional and allegedly unconstitutional, of the Act's challenged provisions. More importantly, Plaintiffs did not present any evidence showing that any allegedly unconstitutional applications of the challenged provisions of the Act substantially outweigh the constitutional applications. Instead, the Plaintiffs simply assert confusion, but this testimony is internally inconsistent. On the one hand, the Plaintiffs' witnesses and declarants testified that they are unable to understand the meaning of certain provisions of H.B. 1193, while simultaneously asserting overwrought interpretations that would prevent any mention of historical events involving race, sex, and other general subjects.

Though this case presents a facial challenge to the disputed provisions which imposes a heavy evidentiary burden, the Plaintiffs have not conducted any discovery. Nor have they presented evidence regarding any constitutional application of the challenged provisions of the Act.

## **CONCLUSIONS OF LAW**

*Government Speech is not subject to the First Amendment.*

It is well established that "when the government speaks, it is not barred by the Free Speech Clause from determining the content of what it says." *Walker v. Texas Div., Sons of Confederate*

*Veterans*, 576 U.S. 200, 207 (2017). *See also*, *Little v. Llano Co.*, 138 F. 4th 834, 852 (5th Cir. 2025). On its face, the Act does not regulate anything other than government acts and messaging.

The Eighth Circuit has recently considered the constitutionality of an Arkansas statute that required the Arkansas Department of Education to review "its communications and materials to see if they 'promote teaching that would indoctrinate students with ideologies such as Critical Race Theory . . .' [and] prevent 'prohibited indoctrination.'" *Walls v. Sanders*, Civ. Action No. 24-1990 at ¶ 1, 2025 WL 1948450 at *1 (8th Cir. July 16, 2025). The law was challenged on First Amendment grounds by two teachers and two students claiming that the statute was unconstitutionally vague. *Id*. at *2. The trial court denied the teachers' request for an injunction because the messages targeted by the statute "was the government's speech, not the teachers', and any chill was not harming their speech rights." *Id.*

Conversely, the trial court granted the students' request for a preliminary injunction on the theory that the students had a viable "'right-to-receive-information' claim under the Free Speech Clause." *Id.* The Eighth Circuit reversed finding that "[s]tudents do not possess a supercharged right to receive information in public schools . . . Just as ordinary citizens cannot require the government to express a certain viewpoint or maintain a prior message, students cannot oblige the government to maintain a particular curriculum or offer certain materials in the curriculum based on the Free Speech Clause." *Id.* at *4. While the Eighth Circuit acknowledged that government speech is subject to *some* constitutional constraints, like the Establishment Clause, "the Free Speech Clause is not one of them." *Id.*

Like the Arkansas statute in *Walls*, H.B. 1193 regulates the action and messaging of public bodies. It is, therefore, government speech. As such, the First Amendment is not implicated. Even

were that not the case, the Plaintiffs here have not addressed the burdens that would apply to their claims if it did.

*Plaintiffs bear the burden of proof as to the essential preliminary injunction elements.*

A party seeking a preliminary injunction must demonstrate each of the following: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction is not issued; (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted; and (4) that the grant of an injunction will not disserve the public interest. *Big Tyme Investments, L.L.C. v. Edwards*, 985 F.3d 456, 463-64 (5th Cir. 2021).

The four above-listed "requirements are not balanced, but rather each one must be met before the court can grant such a drastic remedy as a . . . preliminary injunction." *Butler v. Jackson Police Dep't*, Civil Action No. 3:13CV82TSL-JMR, 2013 WL 6048164, at *2 (S.D. Miss. Nov. 14, 2013) (citing *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985)). The burden is on the party seeking injunctive relief to establish all four elements. *Carlisle v. Elite Trucking Servs., LLC*, Civil No. 1:16-CV-257-JCG, 2016 WL 9223832, at *1 (S.D. Miss. Nov. 4, 2016). If the moving party "fails to carry its burden on any one of the four elements . . ., the Court must deny the request for injunctive relief." *Miller v. Miss. Res., LLC*, Civil Action No. 5:17-cv-41-DCB-MTP, 2017 WL 2772097, at *2 (S.D. Miss. June 26, 2017). "The decision to grant a preliminary injunction is to be treated as the exception rather than the rule." *Miss. Power & Light Co.*, 760 F.2d at 621.

*The Plaintiffs did not establish any First Amendment Rights implicated by the Act.*

As noted above, the Act does not, on its face, regulate or prohibit individual speech. Rather, it regulates public institutions. To the extent the Plaintiffs may ultimately have a viable claim

related to the Act, any such claim would theoretically arise from the actions of public schools regulated by the Act who are not parties to this action. Assuming such claims can properly be raised here, the Plaintiffs have failed to establish that the First Amendment actually prohibits the restraints they fear will flow from enforcement of the Act.

*The First Amendment does not apply to public employees in their official capacity.*

The Teacher Plaintiffs are employed by various public schools in Mississippi and challenge the impact of the Act on their ability to teach subjects in the same manner as they have in the past. [ECF# 11-2 at ¶ 4; ECF# 11-6 at ¶ 7; ECF# 11-12 at ¶ 5; ECF# 66-1 at ¶ 7]. However, the First Amendment does not apply to a public employee's expressions made "pursuant to official responsibilities." *Garcetti v. Cebellos*, 547 U.S. 410, 411 (2006). "Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created." *Id.*

Prior to the U.S. Supreme Court's decision in *Garcetti*, courts considered the free speech rights of public employees by examining whether "the interest of the worker 'as a citizen commenting upon matters of public concern' outweigh the interest of the state 'as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Williams v. Dallas Independent School Dist.*, 480 F. 3d 689, 691-92 (5th Cir. 2007) (citing *Pickering v. Bd. Of Educ.*, 591 U.S. 563, 568 (1968)). Now, the initial focus is not on the content of the speech, but on the "role the speaker occupied when he said it." *Id.* at 692.

Without question, the Plaintiffs ask this court to enjoin a statute that does not, in any way, impact their ability to speak as private citizens. Rather, the challenged legislation simply seeks to prohibit institutional discrimination in accordance with federal law. *See, supra*. If the Act has any

impact at all on what the Teacher Plaintiffs say, it applies only to their speech as public employees to the extent it violates the Act's intent to prohibit *institutional* discrimination.

Contrary to the Plaintiffs' argument, the U.S. Supreme Court merely acknowledged that "academic freedom" *may* require further consideration under *Garcetti*, but did *not* create an explicit exemption or alternative analysis for academic freedom, leaving this question open for lower courts to consider. *See* Judith Areen, *Government As Educator: A New Understanding of First Amendment Protection of Academic Freedom and Governance*, 97 Geo. L.J. 945, 946–47 (2009) ("the majority agreed to leave undecided for now whether *Garcetti* signals the end of constitutional protection for academic freedom."). Of the courts who have applied a *Garcetti* "carve out" for academic freedom, it has only been applied at the University level. *See Heim v. Daniel*, 81 F.4th 212, 227–28 (2d Cir. 2023) (applying *Garcetti* "carve out" to university professor); *Mayer v. Monroe Cnty. Cmty. Sch. Corp.*, 474 F.3d 477, 479 (7th Cir. 2007) ("the school system does not 'regulate' teachers' speech as much as it *hires* that speech. Expression is a teacher's stock in trade, the commodity she sells to her employer in exchange for a salary.") (emphasis in original); *Mpoy v. Fenty,* 901 F. Supp. 2d 144, 152 (D.D.C. 2012), *aff'd sub nom. Mpoy v. Rhee*, 758 F.3d 285 (D.C. Cir. 2014) ("there is substantial doubt that the *Garcetti* exception would even apply to elementary-school teachers.").

Whether the Fifth Circuit will ultimately adopt the "carve out" remains unclear. For example, it did not hesitate to apply *Garcetti* to the First Amendment claim of a high school principal. *See Cavazos v. Edgewood Independent School Dist.*, 210 Fed. Appx. 414 (5th Cir. 2006). Similarly, the Fifth Circuit applied *Garcetti* to a University research veterinarian who was fired after criticizing the treatment of lab animals. *See Gordon v. University of Texas Medical Branch*, 700 Fed. App'x. 350 (5th Cir. 2017). In May of this year, the Court applied *Garcetti's* "threshold

layer" to a university professor who publicly criticized the concept of tenure. *Wetherbe v. Texas Tech. University Sys.*, 138 F.4th 296, 303 (5th Cir. 2025). *See also Powers v, Northside Ind. School Dist.*, 951 F. 3d 298, 307 (5th Cir. 2020) (applying *Garcetti* threshold to elementary school principal and vice principal's First Amendment retaliation claims); *Williams v. Dallas Independent School Dist.*, 480 F.3d 689, 692 (5th Cir. 2007) (applying *Garcetti* threshold to High School Athletic Director's First Amendment retaliation claim); *Elizondo v. Parks*, 431 Fed. App'x 299, (applying *Garcetti* threshold to university employee who made internal comments about, among other things, his reassignment and workload). *See also*, *Hays v. LaForge*, 113 F. Supp. 3rd 883, 896, 903 (N.D. Miss. 2015) (applying *Garcetti* threshold to university professor's claim that he was removed as division chair because, among other things, "he voiced strong opposition to various plans to slash the university curriculum . . .").

The Teacher Plaintiffs do not argue that their claims arise from any restraint on their speech as private citizens. Indeed, they cannot. Instead, they exclusively rely on the purported "carve-out" for academic freedom. The Defendants acknowledge that it is unclear whether the Fifth Circuit will ultimately apply the *Garcetti* threshold or recognize an academic freedom "carve out" at the university level. *See Buchanan v. Alexander*, 919 F. 3d 847, 853 (5th Cir. 2019) (applying pre-*Garcetti* analysis); *Trudeau v. University of North Texas*, 861 Fed. App'x 604, 609, n.5 (5th Cir. 2021) (noting that some Circuits apply the carve-out but determining that a university professor's First Amendment claim failed regardless of which test applied). However, even if the Fifth Circuit ultimately decides to apply the carve out for academic freedom at the university level, the Teacher Plaintiffs must still satisfy the requirements of *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968). *See Buchanan*, 919 F. 3d at 853; *Trudeau*, 861 Fed. App'x. at 609, n.5.

In *Buchanan*, the Fifth Circuit considered the First Amendment claims of a tenured professor in early childhood teacher education who was fired for using profanity and discussing her sex life in class. *Buchanan*, 919 F.3d at 851-52. The professor claimed that "academic freedom" protected her in-class speech and, as such, her termination violated her First Amendment Rights. *Id.* at 452. In analyzing this claim, the Fifth Circuit noted that the concept of "academic freedom" is not unlimited: "[s]tudents, teachers, and professors and not permitted to say anything and everything simply because the words are uttered in the classroom context." *Id.* at 852. With regard to the substance of the professor's claim, the Court looked to the *Pickering* analysis which requires a showing that: (1) the speech is on a matter of public concern and (2) the professor's "interests in the prohibited speech outweigh the College's interests." *Id.* at 853. The Court noted that "speech that does not serve an academic purpose is not of public concern." *Id.* Because the professor's use of profanity and discussions of her sex life and her students' sex lives "were clearly not related to the training of Pre-K-Third grade teachers . . ." her speech was not protected by the First Amendment. *Id.* at 854.

Similarly, *Trudeau* considered the First Amendment claim of a tenured communication studies professor who made several sexual comments in class. *Trudeau*, 861 F. App'x at 606 – 07. In support of his First Amendment claim, the professor argued that one of the books he assigned addressed "eroticism" and, as such, "he was required to 'talk about [sensual, erotic, or sexual themes] in his role as a teacher.'" *Id*. at 610. The Fifth Circuit rejected this argument finding that the professor failed to establish his sexual in-class statements were "germane to the subject matter . . ." *Id.* In its opinion, the Court acknowledged the open question of whether or not to apply the academic freedom carve out and declined to answer it. *Id.* at 609, n.5. Instead, the Court noted that "under either the *Pickering* or *Garcetti* test, a public employee must have spoken on a matter of

public concern, and, as we conclude that Trudeau did not, we need not consider which test to apply." *Id.*

The foregoing demonstrates that, even if the carve out applies, the Teacher Plaintiffs' claims will necessarily be a fact intensive inquiry that is not satisfied by the kind of blanket arguments raised by the Teacher Plaintiffs in this action. For example, a discussion of the 1969 Stonewall Riots in New York might have a legitimate academic purpose in a Contemporary American History class. Whereas it is hard to imagine any academic purpose for the same discussion in a vocational auto mechanics class, or a quantum physics class, or a course on tax accounting.  It is, therefore, not surprising that the Teacher Plaintiffs failed to address either *Garcetti* or *Pickering* in any meaningful way.

Regardless of whether the carve out applies, the Act's exceptions allow public institutions leeway to accommodate in-class instruction and comply with accreditation standards applicable to their particular institutions and curriculums. For example, Section 5(b) provides that the Act "shall not be construed to apply to and/or prohibit . . . [s]cholarly research or a creative work by students, faculty, employee or staff at an institution, college, *or the dissemination of that work . . .*" [ECF#11-14 at Section 5(b)] (emphasis added). Similarly, Section 5(j) of the Act exempts actions taken to comply "with any applicable academic accreditation standards or requirements." [ECF# 11-14 at Section 5(j)]. The Plaintiffs argue that applicable accreditation standards require institutions of higher learning to safeguard academic freedom. [ECF# 12 at p. 16]. The Defendants agreed with this statement and pointed out that this exception negates any concern that the Act will prohibit the exercise of academic freedom as recognized in our jurisprudence. [ECF# 43 at p. 13; ECF# 43-2 at ¶¶ 2-3, Exhs. 1-2].

Finally, a bedrock principle of statutory construction mandates that "a statute is to be read as a whole . . ." *King v. St. Vincent's Hosp.,* 502 U.S. 215, 221(1991). "Words are not pebbles in alien juxtaposition; they have only a communal existence; and not only does the meaning of each interpenetrate the other, but all in their aggregate take their purport from the setting in which they are used. . . ." *Id.* The words of a statute must be read in context with "the whole statutory text, considering the purpose and context of the statute . . ." *Cascabel Cattle Co., L.L.C. v. United States*, 955 F.3d 445, 451 (5th Cir. 2020).

The purpose of the Act could not be clearer:

> *[T]o prohibit* public schools and public postsecondary educational *institutions from taking* certain *actions and engaging in discriminatory practices.* . . [and] to ensure that employment, academic opportunities and student engagement is based solely on individual merit, qualifications and academic performance, without consideration of an individual's race, sex, color, national origin, or expressed opposition to, or refusal to affirm to participate in, diversity, equity and inclusion.

[EFC# 11-14 at Section 1] (emphasis added). Every prohibition and exception in the Act must be read in light of its stated purpose.

When the purpose of the Act is properly considered, the accreditation exemption makes perfect sense. The Act is intended to prohibit and prevent institutional discrimination, not individual speech and expression.

*Students are not entitled to compel Government speech.*

As an initial matter, it is important to note that "the constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings," *Morse v. Frederick*, 551 U.S. 393, 396–97 (2007) (citing *Bethel School Dist. No. 403 v. Fraser,* 478 U.S. 675, 682 (1986)). The First Amendment rights of students "must be 'applied in light of the special characteristics of the school environment . . .'" *Id.*

The leading case on student speech is *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260 (1988), wherein the United States Supreme Court recognized that schools "are entitled to exercise greater control over . . . student expression" and are entitled to disassociate from student speech. As such, "[i]t is only when the decision to censor a school-sponsored publication, theatrical production, or other vehicle of student expression has *no valid educational purpose* that the First Amendment is so 'directly and sharply implicate[d],' . . . as to require judicial intervention to protect students' constitutional rights." *Hazelwood*, 484 U.S. at 273 (internal citations omitted) (emphasis added). Under *Hazelwood*, "educators do not offend the First Amendment by exercising editorial control over the style and content of student speech in school sponsored expressive activities so long as their actions are *reasonably related* to legitimate pedagogical concerns." *Id.* (emphasis added). *See also Bell v. Itawamba County School Bd.*, 799 F.3d 379, 398 (5th Cir. 2015) ("While school officials must offer facts to support their proscription of student speech, *this is not a difficult burden, and their decisions will govern if they are within the range where reasonable minds will differ* . . .") (emphasis in original).

The Student Plaintiffs do not address *Hazelwood*, *Morse*, or *Bell* in their submissions to the Court nor have they demonstrated that the Act, to the extent it even regulates the Student Plaintiffs' speech (which on its face, it does not), is not "reasonably related" to the legitimate pedagogical concerns of preventing discrimination and preserving the ability to receive federal funds. Regardless, when the Act is read *in toto* and considering its stated purpose, it does not regulate student speech.

Similar to the student plaintiffs in *Walls*, the Student Plaintiffs claim that the Act deprives them of the First Amendment right to hear speech they fear will be suppressed. In so doing, the

Student Plaintiffs appear to argue that they are entitled to dictate how public funds are utilized and to decide what the institutional curriculum should be. This is not the law.

In *Little v. Llano Co.*, the Fifth Circuit (sitting *en banc*) considered "right to hear" claims arising from the removal of certain books from a taxpayer funded library. 138 F.4th 834, 838 (5th Cir. 2025). Even though there is some precedent supporting a "right to hear," it does not extend to "a brave new right to receive information from the government in the form of taxpayer-funded library books." *Id.* at 836. The Court made clear that while, "[p]eople can protest what the government says, . . . they cannot sue to make the government say what they want. '[W]hen the government speaks for itself, the First Amendment does not demand airtime for all views.'" *Id.* at 8525 (citing *Shurtleff v. City of Bos.*, 596 U.S. 243, 247–48 (2022)). As a general rule, schools have the right to decide what is in the curriculum without offending a student's right to hear unless those decisions are "narrowly partisan or political." *Chiras v. Miller*, 432 F.3d 606, 620 (5th Cir. 2005).

Plaintiffs have not even alleged, must less proven, any "narrowly partisan or political" motivation for the Act. Nor have they demonstrated that the Act's institutional requirements are not "reasonably related" to the legitimate pedagogical aim of preventing discrimination and the preservation of Mississippi's ability to receive federal education funds.

For these reasons, the Student Plaintiffs have not met their burden to establish a substantial likelihood of success on the merits.

*Plaintiffs have failed to meet their burden on the facial claim for "vagueness."*

Though apparent on the face of the Amended Complaint, the Plaintiffs stated unequivocally in the TRO Hearing that their claims constitute a facial, rather than an as-applied, challenge to the

Act. Even so, the Plaintiffs primarily rely on authorities considering "as applied" challenges[5] that do not address the heavier burden required of a facial challenge.

For the reasons addressed above, H.B. 1193 does not reach a substantial amount of constitutionally protected conduct under the First Amendment or otherwise. Therefore, to succeed on their facial vagueness claims, the Plaintiffs must demonstrate that the challenged provisions of the law are impermissibly vague in *all* of their applications. *See United States v. Uhlenbrock*, 125 F.4th 217, 224 (5th Cir. 2024) ("Under the proper procedure for analyzing a facial vagueness challenge, we first determine whether the [statute] reaches a substantial amount of constitutionally protected conduct. . . . If it does not, then we consider whether the statute is impermissibly vague in all of its applications.") (internal quotation marks omitted).

---

[5] For example, *Keysian v. Bd. Of Regents*, addressed the claims of college professors who were told their employment was being terminated when they refused to sign a certificate confirming that they were not Communists. 385 U.S. 589, 592 (1967). Likewise, *Rosenburger v. Rector and Visitors of University of Va.*, considered the First Amendment claims of the student founder of a magazine focused on religious issues which was denied reimbursement for publication expenses available to similar non-religious student publications. 515 U.S. 819, 825-26. *See also Tinker v. Des Moines Indep. Cmty Sch Dist.*, 393 U.S. 503, 504 (1969) (action by students sent home from school for wearing black armbands to protest the Vietnam war); *Elrod v. Burns*, 427 US 347, 350 (1976) (action by public employees who were terminated or threatened with termination for belonging to a particular political party); *Kennedy v. Bremerton*, 597 U.S. 507, 512-14 (2022) (action by high school football fired after he knelt for a silent prayer on the filed after a game.); *Lamb's Chapel v. Ctr. Moriches Union Free School Dist.*, 508 U.S. 384, 387-88 (action by religious organization denied after-hours permission to use school facilities to use religious film); *Martin v. City of Struthers, Ohio*, 319 U.S. 141, 142 (1943) (action by member of Jehovah's Witnesses appeal conviction under anti-solicitation ordinance); *Meyer v. Nebraska*, 262 U.S. 390, 396-97 (1923) (teacher appeals conviction of Nebraska law prohibiting the teaching of foreign languages to younger students); *Sweezy v. New Hampshire*, 354 U.S. 234, 244-45 (1957) (considering due process claim of teacher held in contempt for refusing to answer questions regarding Communist Party affiliation); *Texas v. Johnson*, 491 U.S. 397, 402 (1989) (affirming Texas Supreme Court's reversal of conviction for violation of flag-burning statute "as-applied" without reaching facial challenge); *Wieman v. Udegraff*, 344 U.S. 183, 192 (1952) (invalidating injunction prohibiting payment to public employees who did not sign a statutorily-required loyalty oath).

On its face, only government speech is regulated by the Act, as such, no First Amendment rights are implicated. For this reason alone, Plaintiffs' facial vagueness claims fail as a matter of law.

Even were that not so, the Plaintiffs still face a daunting challenge because a facial challenge to a duly enacted law necessarily relies on "'speculation' about the law's coverage and its future enforcement." *See Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024). Because such challenges, "'threaten to short circuit the democratic process' by preventing duly enacted laws from being implemented in constitutional ways. . . . [The United States Supreme Court] has therefore made facial challenges hard to win." *Id.* Put simply, facial challenges are *supposed* to be difficult to prove.

In *Moody*, the Supreme Court delineated a rigorous analysis to assess whether a plaintiff has "carr[ied]" the demanding "burden" that governs facial challenges. *Id.* at 723, 744. Initially, Plaintiffs must establish the law's "full set of applications." *Id*. at 718, 725-26. The Plaintiffs must demonstrate "which of the law['s] applications" (if any) "violate" the Constitution. *Id.* at 725-26. Finally, Plaintiffs must demonstrate that the constitutionally impermissible applications are pervasive enough to "substantially outweigh" constitutional ones in order to succeed on a facial challenge. *Id.* at 724. The burden on the Plaintiffs is considerable, but they chose to bear it by mounting a facial challenge to the Act. This Court must, therefore, hold them to that burden and not "disregard the requisite inquiry." *Id.* at 744.

On remand after the Supreme Court's decision, the Fifth Circuit made their expectations clear about what is required to meet the *Moody* burden. *NetChoice, LLC v. Paxton*, 121 F. 4th 494, 498 (5th Cir. 2024):

> A proper First Amendment facial challenge proceeds in two steps. The "first step"
> is to determine every hypothetical application of the challenged law. . . . The second

step is "to decide which of the law['s] applications violate the First Amendment, and to measure them against the rest." . . . If the "law's unconstitutional applications substantially outweigh its constitutional ones," *then and only then* is the law facially unconstitutional.

*Id.* (internal citations omitted) (emphasis added). The Court warned that "the district court cannot truncate its evaluation of those questions at the plaintiffs' behest." *Id.* at 499. Finally, the Court made crystal clear that "[i]t is the plaintiffs' burden to develop a factual record to support their request for facial injunctive relief against enforcement of a state statute." *Id.* at 500. The holding in *Paxton* was not an anomaly.

Recently, the Fifth Circuit vacated a preliminary injunction prohibiting the enforcement of a Mississippi statute aimed at protecting children from harmful online material because the district court failed to apply *Moody's* rigorous analysis. *NetChoice, L.L.C. v. Fitch*, 134 F.4th 799, 808 (5th Cir. 2025) (remanding to district court to consider requisite analysis under *Moody*). In so doing, the Court held that *Moody* requires a full analysis of the law's unconstitutional applications compared to its constitutional applications to determine whether the former "substantially outweigh" the latter. *Id.* at 807-08. This requirement is not satisfied by generalities. *Id.* at 808-09. Rather, there must be an analysis of the "'full range of activities the law[] cover[s],' as required by *Moody*." *Id.* at 808.

Here, the Plaintiffs do not cite *Moody* nor do they make any attempt to identify the full scope of the Act and demonstrate that any unconstitutional applications substantially outweigh its constitutional applications. Rather, they invite this court to ignore *Moody* based on a brief discussion in the United States Supreme Court's opinion in *Iancu v. Brunetti*, 588 U.S. 388 (2019) decided six years before *Moody* was decided.

In *Iancu*, the Supreme Court considered the constitutionality of a provision of the Lanham Act which posed an outright ban on the registration of "immoral or scandalous" trademarks. *Iancu*,

588 U.S. at 393-94. In a brief discussion at the conclusion of the majority opinion, the Court stated: "it seems unlikely we would compare permissible and impermissible applications if Congress outright banned 'offensive' (or to use some other examples, 'divisive' or 'subversive') speech." *Id.* at 399. But this statement was made in the context of a direct restriction on a private citizen's ability to register a trademark. A far different circumstance applies here where the challenged provisions apply to the government itself. By its terms, the Act does not regulate private speech. At least two courts have rejected similar arguments raised by student and teacher plaintiffs. *See L.M. v. Town of Middleborough, Massachusetts*, 103 F.4th 854, 883, n. 9 (1st Cir. 2024) (referring to *Iancu* and *Matal v. Tam*, 582 U.S. 218 (2017): "We see no reason to take up L.M.'s invitation to be, as far as we can tell, the first court to import recent decisions that clearly did not contemplate the special characteristics of the public-school setting into that setting."); *Durstein v. Alexander*, 527 F. Supp. 3d 858, 866 (S.D.W. Va. 2021) ("*Iancu*, however, is not instructive here. The Lanham Act, which regulates the registration of trademarks, necessarily regulates expression. *See B&B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138, 142, 135 S.Ct. 1293, 191 L.Ed.2d 222 (2015) ('The principle underlying trademark protection is that distinctive marks—words, names, symbols, and the like—can help distinguish a particular artisan's goods from those of others.'); *Matal v. Tam*, ─── U.S. ───, 137 S. Ct. 1744, 1760, 198 L.Ed.2d 366 (2017) ('Trademarks are private, not government, speech.')"). Put simply, *Iancu* offers no safe harbor for the Plaintiffs to avoid their burden.

Indeed, the Plaintiffs did not try to satisfy *Moody's* evidentiary requirement even though they implicitly acknowledge that constitutional applications exist. For example, Plaintiffs argue that Section 2(e)(vi) "*can be interpreted* to prohibit discussion of, as well as support of, the principal of collective responsibility . . . that is a legitimate subject for study and discussion . . . in

a history, sociology, philosophy, or law class . . ." [ECF# 12 at p. 10]. Plaintiffs' equivocation reveals that they acknowledge other interpretations are possible, yet they offer no comment or discussion on what those other interpretations might be. Nor do they attempt to establish that their proffered interpretation is likely and, if so, how that interpretation would necessarily violate the First Amendment. For reasons discussed above, it is neither. But assuming they are correct, the Plaintiffs also fail to establish that their proffered unconstitutional interpretation "substantially outweighs" any alternative constitutional constructions. These failures are fatal to their claim under *Moody, Paxton,* and *Fitch*.

For the reasons discussed above, Plaintiffs have not established a substantial likelihood of success on the merits. For this reason, alone, Plaintiffs are not entitled to a preliminary injunction.

*The Plaintiffs did not establish any legally cognizable harm.*

For the reasons discussed above, the Act neither regulates nor threatens the Plaintiffs' First Amendment rights. As such, they cannot establish the threat of irreparable harm.

*Balancing of the harms and public-interest factors favor denial.*

Where, as here, the government is a party, "the balance-of-equities and public-interest factors 'merge.'" *Texas v. Cardona*, 743 F. Supp. 3d 824, 896 (N.D. Tex. 2024) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). In that event, "[t]he Court must weigh whether 'the threatened injury outweighs any harm that may result from the injunction to the non-movant' and whether 'the injunction will not undermine the public interest.'" *Id.* (citing *Valley v. Rapides Parish Sch. Bd.*, 118 F.3d 1047, 1051, 1056 (5th Cir. 1997)).

The Trump Administration has made clear its intent to withhold federal funds from those who fail to comply with its interpretation of Title VI and *Students for Fair Admissions, Inc. v. Harvard*. [ECF# 43-1] *See also* Executive Order 14173 2025 WL 523310, 90 Fed. Reg. 8633  (Jan.

21, 2025); Executive Order 14190, 90 Fed Reg. 8853 (Jan. 29, 2025). For many Mississippi K-12 schools and community colleges, loss of federal funding would be as financially devastating as the loss of State funding. [ECF# 43-3 at ¶¶ 4-5, Exh. 1; ECF# 43-4 at ¶ 4, Exh. 1; ECF# 43-5 at ¶ ¶4-5, Exh. 1]. For example, the Columbus School District received more than 50% of its 2023-2024 funds from the federal government. [ECF# 43-4 at ¶ 4, Exh. 1]. As reported in the FY 2026 budget request, 26.89% of Hinds County Community College's funding was federal in FY 2024. [ECF# 43-3 at Exh. 1]. State Charter Schools receive anywhere from 20% (on the low end) to nearly 90% (on the high end) for the federal government with an average of 31% per school. [ECF# 43-5 at ¶ 4, Exh. 1]. Plaintiffs offered no evidence to refute these facts.

Courts have recognized that the potential loss of federal education funding constitutes a substantial harm in the context of considering a request for preliminary injunction. *See Carroll Indep. Sch. Dist. v. United States Dep't of Educ.*, 741 F. Supp. 3d 515, 526 (N.D. Tex. 2024); *see also Cardona*, 743 F. Supp. 3d at 896. The potential loss of federal funds and the impact that could have on Mississippi K-12 schools and community colleges is a real threat – far more real than the speculation offered by Plaintiffs about what *might* happen if the Act is misinterpreted by an individual school.

## **CONCLUSION**

For all these reasons, the Court finds that the Plaintiffs' have failed to meet their burden under applicable law. Accordingly, the preliminary injunction should be denied and the Temporary Restraining Order entered on July 20, 2025 [ECF# 51] dissolved.

THIS the 13th day of August 2025.

Respectfully submitted,

LYNN FITCH, IN HER OFFICIAL CAPACITY
AS ATTORNEY GENERAL OF MISSISSIPPI;
GEE OGLETREE, IN HIS OFFICIAL CAPACITY
AS PRESIDENT OF THE BOARD OF
TRUSTEES OF STATE INSTITUTIONS OF
HIGHER LEARNING; STEVEN CUNNINGHAM,
AMY ARRINGTON, DONALD CLARK, JR.,
ORMELLA CUMMINGS, JERRY L. GRIFFITH,
JIMMY HEIDELBERG, TERESA HUBBARD,
BRUCE MARTIN, HAL PARKER, GREGG
RADER, AND CHARLIE STEPHENSON, ALL
IN THEIR OFFICIAL CAPACITIES AS
MEMBERS OF THE BOARD OF TRUSTEES OF
STATE INSTITUTIONS OF HIGHER
LEARNING; JOHN PIGOTT, IN HIS OFFICIAL
CAPACITY AS CHAIR OF THE MISSISSIPPI
COMMUNITY COLLEGE BOARD; CHERYL
THURMOND, VIDET CARMICHAEL, DONNIE
CAUGHMAN, BUBBA HUDSPETH, DOLLY
MARASCALCO, JOHNNY MCRIGHT, LUKE
MONTGOMERY, WILL SYMMES, AND
DIANNE WATSON, ALL IN THEIR OFFICIAL
CAPACITIES AS MEMBERS OF THE
MISSISSIPPI COMMUNITY COLLEGE BOARD;
GLEN EAST, IN HIS OFFICIAL CAPACITY AS
CHAIR OF THE MISSISSIPPI STATE BOARD
OF EDUCATION; MATT MILLER, LANCE
EVANS, WENDI BARRETT, MATT MAYO,
BILL JACOBS, RONNIE MCGEHEE, MIKE
PRUITT, BILLYE JEAN STROUD, AND MARY
WERNER, ALL IN THEIR OFFICIAL
CAPACITIES AS MEMBERS OF THE
MISSISSIPPI STATE BOARD OF EDUCATION;
MARCY SCOGGINS, IN HER OFFICIAL
CAPACITY AS CHAIR OF THE MISSISSIPPI
CHARTER SCHOOL AUTHORIZER BOARD;
AND JAY CARNEY, SANDRA MCKIERNON,
ERIN MEYER, BEN MORGAN, CANDACE
ROBINS, AND JENNIFER JACKSON
WHITTIER, ALL IN THEIR OFFICIAL

CAPACITIES AS MEMBERS OF THE
MISSISSIPPI CHARTER SCHOOL
AUTHORIZER BOARD, DEFENDANTS

By:    LYNN FITCH, ATTORNEY GENERAL
       STATE OF MISSISSIPPI

By:    s/Lisa A. Reppeto
       LISA A. REPPETO (MSB #99978)
       Special Assistant Attorney General

REX M. SHANNON III (MSB #102974)
LISA A. REPPETO (MSB #99978)
STATE OF MISSISSIPPI
OFFICE OF THE ATTORNEY GENERAL
CIVIL LITIGATION DIVISION
Post Office Box 220
Jackson, Mississippi  39205-0220
Tel.:  (601) 359-4184
Fax:  (601) 359-2003
rex.shannon@ago.ms.gov
lisa.reppeto@ago.ms.gov

ATTORNEYS FOR DEFENDANTS

## <u>CERTIFICATE OF SERVICE</u>

I, Lisa A. Reppeto, Special Assistant Attorney General and attorney for the above-named defendants, do hereby certify that I have this date caused to be filed with the Clerk of the Court a true and correct copy of the above and foregoing via the Court's ECF filing system, which sent notification of such filing to all counsel of record.

THIS the 13th day of August 2025.

<u>s/Lisa A. Reppeto</u>
LISA A. REPPETO