# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## NORTHERN DIVISION

**JACKSON FEDERATION OF
TEACHERS, et al.[1]**                                                    **PLAINTIFFS**

**vs.**                                        **CAUSE No.: 3:25-CV-417-HTW-LGI**

**LYNN FITCH, et al.**                                                    **DEFENDANTS**

---

## ORDER

---

This case presents a challenge to Mississippi House Bill 1193 ("HB 1193"), which itself takes aim at the presence of "diversity, equity and inclusion" ("DEI") initiatives and so-called "divisive concepts" in public schools in the State of Mississippi.  Upon proof, this Court finds HB 1193 at odds with the First Amendment[2] (as applied to the States through the Fourteenth Amendment[3]) and the public interest of this State, and that its enforcement will cause irreparable

---

[1] For a complete description of the parties, *see infra* § II.

[2] U.S. Const. am. I:

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances.

[3] U.S. Const. am. XIV states, in relevant part:

> … No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

> … The Congress shall have power to enforce, by appropriate legislation, the provisions of this article.

This suit sails under 42 U.S.C. § 1983, which states, in relevant part:

> Every person who, under color of any statute … of any State or Territory …, subjects, or causes to be subjected, any citizen of the

injury to the named plaintiffs and the classes they represent.  As such, class-wide and statewide, this Court hereby **grants** the challengers' request for, and so orders, a **preliminary injunction**, by which the defendants are enjoined from enforcing select sections of HB 1193, pending the final resolution of this matter.

## I.    HISTORY OF THE LITIGATION

This suit was filed by a set of plaintiff-challengers against a set of defendant-state-institutions in June 2025.  ECF No. 1.  The initial complaint sought injunctive and declaratory relief and made no intimation it purported to portend a class action.  *Id.*

After informing this Court it intended to do so, the plaintiff-challengers, within two weeks, made a motion for a Temporary Restraining Order ("TRO") and a preliminary injunction, appended with various evidentiary declarations.  The motion for TRO was filed to block the enforcement of certain provisions of HB 1193 pending a preliminary injunction hearing (and, later, trial).  ECF No. 11; *see also* ECF No. 13 (supplemental motion for a temporary restraining order).

The defendant-state-institutions moved to dismiss for a lack of subject-matter jurisdiction; specifically, this motion was based upon sovereign immunity[4] of the defendant-state-institutions, and lack of Article III standing[5] on the part of the plaintiff-challengers.  ECF No. 17.

---

United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ….

[4] U.S. Const. am. XI:

The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

[5] *See infra.*

The plaintiff-challengers then filed a First Amended Complaint, as a matter of course, which, inter alia, altered the parties at issue, including a variety of named, defendant-state-officials. ECF No. 22.  This First Amended Complaint supplanted the initial Complaint, mooting the defendant-state-institutions' motion to dismiss (ECF No. 17), which this Court, thus, now **DENIES**.

This Court, then, on June 24, held a motion hearing, with an eye towards the plaintiff-challengers' motion for a TRO.  Despite this limited scope, the defense received notice, appeared through counsel, and had an opportunity to be heard.

The parties stipulated to the dismissal of the initial defendant-state-institutions, ECF No. 32; nonetheless, the defense filed a renewed motion to dismiss for want of jurisdiction, again bringing challenges based on standing and immunity.  ECF No. 39.  Magistrate Judge LaKeysha Greer Isaac stayed discovery in this matter on July 9, 2025.  ECF No. 44.  Certain defendants filed an answer on July 14, 2025.  ECF No. 47.

On July 20, this Court entered a TRO, which it replaced with a revised, corrected version shortly thereafter, blocking the defense from enforcing certain challenged provisions of HB 1193. ECF No. 53.  This Court extended same by fourteen days on August 1.  ECF No. 64.

Meanwhile, the plaintiff-challengers moved again to amend their Complaint.  ECF No. 60. Their proposed Second Amended Complaint seeks again to alter the parties, this time to add allegations to support a putative class action as to certain putative classes of plaintiff-challengers. ECF No. 60-1.  The plaintiff-challengers also filed a Supplemental Motion For a Preliminary Injunction.  ECF No. 66.

This Court held an evidentiary hearing on the Motion For a Preliminary Injunction. Defendants, again, had due notice, and were afforded a chance to be heard.  The hearing began on

August 5 and continued into August 6. This Court heard argument from the parties. The plaintiff-challengers called three witnesses, who duly swore an oath and provided testimony:

- Dr. James Thomas (a plaintiff in this suit), a sociology professor at the University of Mississippi ("Ole Miss") and a father to two children who attend Mississippi public schools;

- Amy Coronado, a student pursuing a Ph.D. at the University of Southern Mississippi and the treasurer of Women in Science and Engineering (or "WiSE") (another plaintiff in this suit), a longstanding student organization; and

- Cliff Johnson, a clinical professor of law at Ole Miss's law school and the director of the MacArthur Justice Center tied to same.

The defense offered no testimony, conducted some limited cross-examination, and relied on their papers and arguments.

At the hearing, the defense announced and affirmed non-opposition as to two pending motions, which this Court finds well-taken and now **GRANTS**: the plaintiff-challengers' motion to file a Second Amended Complaint (ECF No. 60); and the Mississippi Association of Educators' Motion to Withdraw from the litigation (ECF No. 45). As such, the proposed Second Amended Complaint is now **the operative pleading**, and its parties are **the operative parties** (although the plaintiff-challengers still are instructed to refile the Second Amended Complaint as a new docket entry). As the defense conceded at the hearing, this necessitates the denial for mootness of the renewed Motion to Dismiss for want of jurisdiction (ECF No. 39), which this Court indeed so **DENIES**.

## II.    PARTIES

In view of the above, the parties now take the following form, pursuant to the Second Amended Complaint. The plaintiff-challengers are:

- Professors and educators, including the Jackson Federation of Teachers, United Campus Workers Southeast Local 3821, Barbara Phillips, James Thomas, Dawn Zimmerer, Greg Powell, and Karen Aderer;

- Some of the aforementioned parties as proposed representatives for a putative class of "All educators at postsecondary public educational institutions and K-12 public schools in Mississippi;"

- College-level students, including Fostering LGBTQ+ Advocacy Resources Environments, WiSE, Madisyn Donley, and Alexis Cobbs;

- The parents of K-12 students, including L.E. Jibol, Joy Parikh, Jakob Clark, and Ashley Rogers (as well as James Thomas and Greg Powell, again, in his capacity as a parent); and

- Some of the aforementioned parties as proposed representatives for a putative class of "All students and parents or guardians of minor students at postsecondary public educational institutions and K-12 public schools in Mississippi."

The defendants are, all in their official capacities:

- The Attorney General of Mississippi: Lynn Fitch;

- The President and Members, respectively, of the Board of Trustees of State Institutions of Higher Learning ("IHL"): Gee Ogletree and Steven Cunningham, Amy Arrington, Donald Clark, Jr., Ormella Cummings, Jerry L. Griffith, Jimmy Heidelberg, Teresa Hubbard, Bruce Martin, Hal Parker, Gregg Rader, and Charlie Stephenson;

- The Chair and Members, respectively, of the Mississippi Community College Board: John Pigott and Cheryl Thurmond, Videt Carmichael, Donnie Caughman, Bubba Hudspeth, Dolly Marascalco, Johnny Mcright, Luke Montgomery, Will Symmes, and Dianne Watson;

- The Chair and Members, respectively, of the Mississippi State Board of Education: Glen East and Matt Miller, Lance Evans, Wendi Barrett, Matt Mayo, Bill Jacobs, Ronnie Mcgehee, Mike Pruitt, Billye Jean Stroud, and Mary Werner; and

- The Chair and Members, respectively, of the Mississippi Charter School Authorizer Board: Marcy Scoggins and Jay Carney, Sandra Mckiernon, Erin Meyer, Ben Morgan, Candace Robins, and Jennifer Jackson Whittier.

### III.    JURISDICTION

Federal courts, like this Court, are courts of limited jurisdiction. While the defense's prior challenges to jurisdiction have been mooted by superseding pleadings, this Court retains an unflagging obligation to assure itself of its jurisdiction in any case it hears.

First, this Court examines whether it has **subject-matter jurisdiction** to hear this suit; and it does. As mentioned, this complaint sails under alleged violations of the First and Fourteenth Amendments to the United States Constitution, through the vehicle of Congress's proclamation in 42 U.S.C. § 1983. *See supra.* As such, this case provides this Court with so-called federal question jurisdiction.[6]

Second, this Court examines whether **sovereign immunity** bars suit against the defendants; and it does not. The defense previously argued that the Attorney General of Mississippi is insulated from suit due to the Eleventh Amendment's prohibitions on suits against States. The plaintiff-challengers countered that it is appropriate to sue the Attorney General, as a state official, here, because of *Ex parte Young* precepts permitting suit against a state attorney general under certain circumstances. 209 U.S. 123, 158 (1908). The defense replied that this doctrine is inapplicable, arguing that HB 1193 only gives the Attorney General discretionary enforcement authority. HB 1193 states the Attorney General "may" file an action to compel compliance with HB 1193. This Court generally could not control the exercise of such discretion absent some "duty" on the Attorney General's part. *See Mi Familia Vota v. Ogg*, 105 F.4th 313, 328 (5th Cir. 2024).

As the Supreme Court has reasoned, though, "[t]he general discretion regarding the enforcement of the laws when and as [a state official] deems appropriate is not interfered with by an injunction which restrains the state officer from taking any steps towards the enforcement of an unconstitutional enactment, to the injury of complainant." *Young*, 209 U.S. at 159. Here, HB 1193 grants authority to the Attorney General to enforce its allegedly unconstitutional provisions, and the record preponderates in favor of the conclusion that the Attorney General is sufficiently

---

[6] 28 U.S.C. § 1331:

> The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.

connected to (and holds a demonstrated willingness to enforce) said provisions. *See Healthy Vision Ass'n v. Abbott*, 138 F.4th 385, 397–98 (5th Cir. 2025).

Third, this Court examines whether this matter satisfies the **justiciability** standards of Article III of the United States Constitution: that the plaintiff-challengers have standing to bring a challenge and seek a preliminary injunction, on a ripe issue, which is not moot, and which does not present a political question inappropriate for resolution by the judicial branch.[7]  The challenge is ripe, given the passage of HB 1193 and the harms arising from threat of enforcement.  The challenge is not moot because that threat persists, absent injunctive relief from this Court.  Finally, this case does not present an improper political question because it deals with a state statute alleged to legislate beyond the limits on state power from the First and Fourteenth Amendments.

With respect to **standing**, specifically, the plaintiff-challengers must demonstrate: (1) that they suffered an injury in fact, which is concrete, particularized, and actual or imminent; (2) that the injury is fairly traceable to (causally connected to) the challenged conduct of the defendants; and (3) that a favorable decision likely would redress said injury. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).  The plaintiff-challengers have a low burden in establishing such standing at early, pre-discovery stages like this action's current posture. *Cf. id.* at 561.  As this Court previously held, and hereby affirms, the standing elements are present here with respect to the plaintiff-challengers and their claims against the defendant-officials. *See* ECF No. 51 at 5–6. Indeed, the testimony this Court now has heard strengthens the idea that the imminent enforcement would cause teachers and students injury, which could be avoided by an injunction and other equitable judicial relief.

---

[7] U.S. Const. art. III, § 2, limits the judicial power to "Cases" and "Controversies."  The United States Supreme Court has interpreted this to include the above-listed requirements.

## IV.    HB 1193 AND ITS AIMS

The defense contends that HB 1193 arose in response to the United States Supreme Court's holding in *Students for Fair Admissions, Inc. v. President and Fellows of Harvard College*, which prohibited educational institutions from practicing racially discriminatory admissions practices, 600 U.S. 181 (2023); and guidance from the executive branch which threatened federal funding to schools which engage in what the administration deems discriminatory conduct.

HB 1193 begins with a statement of purpose, stating:

> The purpose of this act is to prohibit public schools and public postsecondary educational institutions from taking certain actions and engaging in discriminatory practices. This act seeks to ensure that employment, academic opportunities and student engagement are based solely on individual merit, qualifications and academic performance, without consideration of an individual's race, sex, color, national origin, or expressed opposition to, or refusal to affirm or participate in, diversity, equity and inclusion.

To that end, the defense argues, in its submissions to this Court, HB 1193:

> … prohibit[s] educational institutions from conditioning employment, admission, or the award of a contract on compulsory training that focuses on "race, sex, color, gender identity, sexual orientation, or national origin." [citing Sections **2(d)**, **3(g)**, **3(i)**;]

> … prohibits any adverse action against an individual student, faculty member, employee, or contractor as a result of their opinions or beliefs regarding race, sex, color, gender identity, sexual orientation, or national origin [citing Sections **3(d)**, **3(e)**, **3(h)**;]

> … prohibits programs/positions/offices effectuating such discriminatory or adverse actions [citing Sections **3(a)**, **3(b)**, **3(c)**, **3(f)**; and]

> … provides a method for individuals to seek relief against a regulated institution in the event they are subjected to discriminatory adverse actions prohibited by H.B. 1193. [citing Sections **7–9**].

Plaintiff-challengers argue that they do not seek to challenge HB 1193's prohibitions on unlawful discrimination; rather, they take issue with some of its additional prohibitions, such as:

> … list[ing] the following as a prohibited action: "Engage in divisive concepts as defined in Section 2(d) and (e) of this act" [citing Section **3(b)**, those concepts being:]
>
> …
>
>> i.      One (1) race, sex, color, or national origin is inherently superior to another race or sex;
>>
>> ii.     An individual, by virtue of his or her race, sex, color, national origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;
>>
>> iii.    An individual should be discriminated against or treated adversely solely because of [his or her] race, sex, color, or national origin;
>>
>> iv.     Members of one (1) race, one (1) sex, one (1) color, one (1) national origin cannot and should not attempt to treat others without respect to race, color, national origin or sex, gender identity, sexual orientation, or national origin;
>>
>> v.      An individual's moral character is necessarily determined by his or her race, color, sex, or national origin;
>>
>> vi.     An individual, by virtue of his or her race, color, sex or national origin, bears responsibility for actions committed in the past by other members of any class listed herein;
>>
>> vii.    An individual should feel discomfort, guilt, anguish or any other form of psychological distress on account of his or her race, color, sex, or national origin;
>>
>> viii.   Meritocracy or traits such as hard work ethic are racist or sexist, or were created by a particular class to oppress another class.
>
> … stat[ing] that it is unlawful to: "Maintain any programs, including academic programs or courses, or offices that promote diversity, equity and inclusion, endorse divisive concepts or concepts promoting transgender ideology, gender-neutral pronouns, deconstruction of heteronormativity, gender theory, sexual privilege or any related formulation of these concepts" [citing Section **3(f)**] [where] [t]here is no definition of "promote," "endorse,"

> "transgender ideology, gender-neutral pronouns, deconstruction of
> heteronormativity, gender theory, sexual privilege," or "related
> formulation of those concepts[;]"
>
> … prohibits "[r]equir[ing], as a condition of enrolling at, accepting
> employment with, or being awarded a contract at an institution,
> college or public school, or as a requirement of continuing
> enrollment, employment or contractual obligation at an institution,
> college or public school, any person to participate in diversity,
> equity and inclusion training" [citing Section **3(g)**; and]
>
> … describe[ing] one of the prohibited actions as follows: "Require
> any 'diversity training' as defined in Section 2 or any other policies
> or procedures that result in any formal or informal education,
> seminars, workshops or institutional program that focus on
> increasing awareness or understanding of issues related to race, sex,
> color, gender identity, sexual orientation or national origin." [citing
> Section **3(i)**].

The defense points, in rebuttal, to Section 5, which contains certain "carve out" exceptions

to the aforementioned law, which supposedly:

> allow public institutions leeway to accommodate in-class instruction
> and comply with accreditation standards applicable to their
> particular institutions and curriculums. For example, … the Act
> "shall not be construed to apply to and/or prohibit . . . [s]cholarly
> research or a creative work by students, faculty, employee or staff
> at an institution, college, or the dissemination of that work . . ."
> [citing Section **5(b)**; and]… exempts actions taken to comply "with
> any applicable academic accreditation standards or requirements."
> [citing Section **5(j)**].

HB 1193 delegates to the IHL Board, the Mississippi Community College Board, the State

Board of Education, the Mississippi Charter School Authorizer Board, and other bodies, tasks

regarding developing complaint processes, investigative procedures, and other policies. Section

**7(1)–(2)**. The act provides a wide variety of people who can act as complainants in blowing the

whistle on violations of HB 1193. Section **7(3)–(5)**. Upon a finding of a violation, the violating

institution must "cure all actions relating to the violation" within a 25-day window. Section

**7(6)(b)**. Penalties for violating the act can include the withholding of state funds to those

institutions until the violating entity "demonstrates full compliance with" HB 1193.  Section **8**.
The Attorney General of Mississippi may also file writs in courts to compel institutions to comply
with HB 1193 if an institution does not "cure" its "error" within a given period.  Section **9**.

## V.    HB 1193'S PASSAGE AND THE SUBSEQUENT ATTACK BY PLAINTIFFS

The Mississippi legislature passed HB 1193 in April 2025, during its 2025 legislative
session. Mississippi Governor Tate Reeves approved HB 1193, posthaste.   The plaintiff-
challengers brought this suit in June 2025, with the upcoming school year looming ahead.

## VI.    TRO'S AND THIS COURT'S GRANT OF SAME

A TRO is equitable relief: an emergency, short-term measure designed to preserve the
status quo until a comprehensive hearing can be held, in situations where its proponents can make
adequate showings on four different factors.  These factors are: (1) the plaintiffs' likelihood of
success on the merits; (2) irreparable harm absent the restraining order; (3) the balance of equities
and harms; (4) and the public interest.  *See* ECF No. 51 at 2–3.  Temporary restraining orders, are,
by their nature, temporary, typically lasting at most 28 days if extended by the court for good
cause.  *See* Fed. R. Civ. P. 65(b).

After viewing the briefs and evidentiary submissions, and after hearing argument, this
Court entered a TRO on July 20, 2025 (which it revised and corrected on July 23, 2025). This
Court enjoined the Defendants' enforcement of challenged portions of Section 3 of HB 1193.  Prior
to doing so, this Court weighed the aforementioned four principal factors that undergird a test for
temporary injunctive relief, and found such relief appropriate.  This Court thereafter promptly set
a date for the evidentiary hearing, at which it could hear from the parties as to whether a longer-
term pre-trial remedy would be appropriate.

## VII.    DIFFERENCE BETWEEN A TRO AND A PRELIMINARY INJUNCTION

While a TRO, as described above, is an emergency, short-term measure, a preliminary injunction commands or enjoins some conduct by the parties during the pendency of the litigation, until a final decision on the merits actually is reached. Because of this longer-term effect, a preliminary injunction may only be issued upon a greater degree of proof and process.

Specifically, the party adverse to the preliminary injunction must receive advance notice so that it may contravene the request for this relief. Typically, courts are hesitant to grant preliminary injunctions without an adversarial, evidentiary hearing with a greater degree of development than the typical request for a temporary restraining order. As such, this Court, after granting the TRO, held such an adversarial hearing, at which it heard arguments and witness testimony.

Like with a TRO, the Court must weigh four factors: (1) a substantial likelihood of success on the merits; (2) the irreparable injury to the movants if the injunction is denied; (3) whether the threatened injury outweighs any damage that the injunction might cause the defendant; and (4) the public interest. *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 452 (5th Cir. 1998). The movants, here the plaintiff-challengers, bear the burden of establishing these factors.

## VIII.    MAIN ARGUMENTS BY THE PLAINTIFFS

**Likelihood of Success on the Merits.** Plaintiffs contend that the challenged provisions of HB 1193 are unconstitutionally vague under the Fourteenth Amendment by failing to provide notice to enable ordinary people to make sense of its prohibitions. *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999). Plaintiffs warn of the possibility of arbitrary enforcement flowing from this. *Id.*

Characterizing HB 1193 as promulgating vague, content- and viewpoint-based restrictions, Plaintiffs warn of the chilling effect HB 1193 might have on First Amendment expression relating

to public education. *Reno v. ACLU*, 521 U.S. 844, 871-72 (1997); *Howard Gault Co. v. Tex. Rural Legal Aid, Inc.*, 848 F.2d 544, 559 (5th Cir. 1988). This specificity requirement, say Plaintiffs, is especially critical in the educational context. *Keyishian v. Bd. of Regents*, 385 U.S. 589, 604 (1967); *Local 8027 v. Edelblut*, 2024 U.S. Dist. LEXIS 94052, at *50 (D.N.H. 2024). Plaintiffs presented extensive evidence that educators and students are unable to determine what speech is permissible and impermissible under each of the challenged provisions. Defendants, argue Plaintiffs, meanwhile have failed to submit any evidence or make any cognizable argument rebutting Plaintiffs' contentions that the challenged provisions are vague.

**Irreparable Harm.** Generally, Plaintiffs argue that any, even temporary losses of First Amendment freedoms constitute irreparable harms under prevailing precedent. *See Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981); *Elrod v. Burns*, 427 U.S. 347, 373-374 (1974). Plaintiffs argue that they, and the putative classes they represent, will be harmed in this way both via self-censoring and facing risk of discipline under the law. Plaintiffs worry that HB 1193 leaves open the possibility that educators and students could be disciplined for any alleged violations, including potential termination for the educators and expulsion for the students, under the vague provision calling for violations to be "cure[d]."

Looming especially large is the possibility that the institutions lose their funding under HB 1193's Section 8. James Thomas, one of the plaintiff-witnesses and declarants, was gravely concerned about this possibility, not only with respect to his own institution Ole Miss, but with respect to his particular job and department, as well as the schools his children attend.

**Balance of the Harms.** Plaintiffs argue that the balance of harms hangs firmly in their favor, reasoning that Defendants will suffer no harm from a preliminary injunction. Plaintiffs point to the proposition that any state "interest in enforcing the law. . . . yields when the law at

issue violates the Constitution." *Campaign for S. Equal. v. Bryant*, 64 F. Supp. 3d 906, 951 (S.D. Miss. 2014), *aff'd*, 791 F.3d 625 (5th Cir. 2015).  Plaintiffs contend that the stated aims of combatting discrimination would not be improperly halted because Plaintiffs challenge the enforcement of only specific sections of HB 1193 dealing with vague unconstitutional prohibitions.

Plaintiffs dismiss Defendants' contention that Mississippi schools will lose federal funding for failure to comply with Title VI and *Students for Fair Admissions Inc. v. Harvard*, 600 U.S. 181 (2023) should HB 1193 be enjoined.  Plaintiffs point out that this argument is highly speculative and that Defendants fail to provide a credible explanation for how an injunction against the challenged provisions would occasion such a violation, nor how it would lead to the withholding of federal funds.  Plaintiffs cite three other cases where courts have preliminarily enjoined the United States Department of Education's "Dear Colleague" letter[8] to which Defendants cite.  *See Nat'l Educ. Ass'n v. Dep't of Educ.*, No. 25-091, Dkt. 74 (D.N.H. Apr. 24, 2025); *NAACP v. Dep't of Educ.*, No. 25-1120, Dkt. 30 (D.D.C. Apr. 24, 2025); *Am. Fed'n of Tchrs. v. Dep't of Educ.*, No. 25-628, Dkt. 60 (D. Md. Apr. 24, 2025).

**Public Interest.**  Plaintiffs argue that an injunction will serve the public interest by preserving the status quo and eliminates confusion, uncertainty, and potential discipline that thousands of Mississippi public school educators, parents, and students could otherwise face while this case is pending. Furthermore, "the public interest [is] not disserved by an injunction preventing . . . implementation [of an unconstitutional statute.]" *Ingebretsen on Behalf of Ingebretsen v. Jackson Pub. Sch. Dist.*, 88 F.3d 274, 280 (5th Cir. 1996).

---

[8] On February 14, 2025, the United States Department of Education's Acting Assistant Secretary for Civil Rights issued a "Dear Colleague letter" that set forth several requirements for schools receiving federal funding going forward.

### IX.    MAIN ARGUMENTS BY THE DEFENDANTS

**Likelihood of Success on the Merits.**  Defendants argue that Plaintiffs have not met their burden on likelihood of success on the merits with their vagueness theory by not meeting the showing supposedly required by *Moody v. NetChoice, LLC*,  603 U.S. 707, 723 (2024).  Under *Moody*, contend Defendants, Plaintiffs must establish the law's full set of applications, demonstrate which of the law's applications violate the Constitution, and demonstrate that the constitutionally impermissible applications are pervasive enough substantially to outweigh constitutional ones in order to succeed on a facial challenge.  Defendants argue that Plaintiffs' argument is undercut by "equivocation" by Plaintiffs as to how the law *could* be interpreted, thus, not meeting the high burden on a facial challenge.

Defendants also argue that this case does not implicate a cognizable First Amendment right because HB 1193 seeks to regulate only government speech, and the speech of public employees (such as educators) in their official capacity.  *See Garcetti v. Cebellos*, 547 U.S. 410, 411 (2006); *Williams v. Dallas Independent School Dist.*, 480 F. 3d 689, 691-92 (5th Cir. 2007) (citing *Pickering v. Bd. Of Educ.*, 591 U.S. 563, 568 (1968)).  Defendants concede that the Supreme Court intimated that concerns of "academic freedom" might require additional or alternative analysis, apart from the typical test for government employees' speech, but claims that the issue is insufficiently settled.

**Irreparable Harm / Balance of Harms / Public Interest.**  Defendants argue that they win on these points, adapting their likelihood of success arguments to contend that Plaintiffs can show no legally cognizable harm to their First Amendment rights.  On the other hand, Defendants argue that enjoining HB 1193, which they believe flowed from Title VI and *Students for Fair Admissions, Inc. v. Harvard*, and subsequent Executive Branch guidance, leaves the Mississippi

public schools at a grave risk of losing their federal funding (which federal funding the Defendants'
evidentiary submissions show is quite substantial).

Overall, Defendants contend that it is eminently clear that HB 1193 will not cause any of
the particular harms Plaintiffs predict.  In fact, Defendants' counsel, in argument, dismissed the
possibility that curriculums may need to avoid important historical and literary subjects dealing
with issues of race as unlikely as the sun falling from the sky.

## X.    HOLDING

This Court opts to grant Plaintiffs' request for a preliminary injunction.  Plaintiffs have
satisfied the required elements for such issuance and, most importantly, have convinced this Court
that in the absence of a preliminary injunction, they could suffer irreparable harm.

### A.  Scope of Injunction

Defendants disagree with Plaintiffs as to what the **reach** of the injunction should be.
Defendants want the injunction's prohibition to embrace only the named Plaintiffs herein; while
Plaintiffs want said embrace to be broader, that is, statewide (to prevent the Defendants from
enforcing the challenged provisions in all respects).  This Court sides with the Plaintiffs on this
issue, disfavoring an injunction of limited geographical and personal capacity.  In this Court's eye,
injunctions of this type should be all-or-nothing renditions.  *See Trump v. CASA, Inc.*, 145 S. Ct.
2540, 2562–63 (2025) (holding that the proper scope of injunctive relief is that which is "necessary
to provide complete relief to each plaintiff with standing to sue"); *id.* at 2567 (Kavanaugh, J.,
concurring) (noting that "plaintiffs who challenge the legality of a new federal statute or executive
action and request preliminary injunctive relief may sometimes seek to proceed by class action
under Federal Rule of Civil Procedure 23(b)(2) and ask a court to award preliminary classwide
relief that may, for example, be statewide, regionwide, or even nationwide," so long as the district
courts follow proper legal procedures in awarding such a remedy).

Defendants have declined to oppose Plaintiffs' second amendments to their complaint, which have added putative classes of plaintiffs (which classes this Court finds have standing as against the Defendants) embracing the teachers, professors, and students (both college students of-majority-age and through the parents of minor children) throughout the State of Mississippi. Something less than a statewide preliminary injunction would be insufficient to afford complete relief to these putative plaintiffs.

Even absent these class-action allegations, an injunction limited to the named plaintiffs would likewise be unsatisfying as to granting them complete relief: given the system- and institution-level rules and remedies throughout HB 1193; it would be impracticable, if not impossible, to carve out an injunction that is distinctly limited to the named plaintiffs. As an example, institutions may need to craft different classes, textbooks, and curricula to accommodate named Plaintiff teachers and students. Further, this Court finds that these named plaintiffs would, in great likelihood, be harmed and affected through HB 1193's enforcement to third-parties within the same state educational systems. For one example, Plaintiffs aptly point out that Plaintiff students would be deprived of the opportunity to interact with and learn from their fellow students at schools across the state, which is a significant part of education. Therefore, this Court's injunction shall control in a statewide fashion.

### B. Reasoning for Injunction

This Court generally incorporates by reference its discussion and analysis in its TRO. That said, this Court finds it appropriate to add some additional discussion.

This Court generally agrees with Plaintiffs' view of the challenged portions of HB 1193. It is unconstitutionally vague, fails to treat speech in a viewpoint-neutral manner, and carries with it serious risks of terrible consequences with respect to the chilling of expression and academic freedom. This Court further finds Plaintiffs' witnesses credible and accepts their testimony with

respect to the imminent dangers, uncertainty, and obvious difficulties in complying with the challenged portions of HB 1193 as presently enacted. Meanwhile, this Court finds the dearth of evidence on the defense side of this issue telling, notwithstanding the Plaintiff's burden on this matter; and this Court is not particularly swayed by Defendants' legal arguments.

On the point of **irreparable harm**, specifically, this statute, HB 1193, seeks to regulate the actions and messaging of public bodies. Its very wording proclaims as much—as it is aimed at controlling what the institutions (and their programs, trainings, and classes) "endorse" and "promote." Defendants note that the Act does not, on its face, regulate or prohibit individual speech; rather, it aims to regulate the public institutions. The regulations, though, almost assuredly would spill over to the public. Defendants implicitly admit as much:

> As noted above, the Act does not, on its face, regulate or prohibit individual speech. Rather, it regulates public institutions. **To the extent the Plaintiffs may ultimately have a viable claim related to the Act, any such claim would theoretically arise from the actions of public schools regulated by the Act** who are not parties to this action

Defendants' proposed findings of fact and conclusions of law, pages 8–9 (emphasis added).

As Plaintiffs and their witnesses were quick to point out, there are myriad ways that HB 1193's purported regulation of the institutions themselves may cast a broad malaise of self-censorship that would necessarily trickle down to classroom instruction, teacher-student engagement with curriculum, and the ability of students to associate with respect to certain affinity or subject-matter groups. For example, Amy Coronado feared that her student group, WiSE would not survive HB 1193. James Thomas, speaking as a parent, explained why he thought even books on subjects on Greek mythology and *Of Mice and Men* could be considered divisive and violative of HB 1193 under its sweeping definitions.

Also, conspicuously present is the Act's promised impact on "academic freedom" under the First Amendment, a point of keen interest to educators, teachers, and students. Oral testimony by Plaintiffs before this Court focused on this query: under the Act, what is the boundary for academic classroom discussions that touch on issues of race, sex, etc.

One witness wondered whether that line would forbid discussion on historical civil rights issues and developments which shaped our nation, such as studies on Dr. Martin Luther King, Jr., the Ku Klux Klan, the Fourteenth Amendment, Juneteenth, etc.

Although Defendants wish this Court to narrow its gaze to the roles of affected persons—whether the speech is public versus private—this Court has delved deeper and looked at the contours of speech prohibition, causing this Court to visit the concept of academic freedom.

Tellingly, on this matter of academic freedom, Defendants are loudly noncommittal. Defendants acknowledge that whether the Fifth Circuit will ultimately adopt an allowance for this engraftment on First Amendment protection "remains unclear." Defendants' proposed findings of fact and conclusions of law, page 10. (Indeed, *Garcetti* excluded from its holdings regarding academic scholarship or classroom instruction, which may implicate additional constitutional interests. 547 U.S. at 425.)

Defendants' recognition, alone, at this time, preaches that an injunction should issue when a key consideration is yet undetermined. This Court should pause when faced with an unsettled area with such dire possible consequences. Plaintiffs point out *Kennedy v. Bremerton*, 597 U.S. 507 (2022), where the Supreme Court recently reaffirmed that "the First Amendment's protections extend to 'teachers and students,' *neither of whom* 'shed their constitutional rights to freedom of speech or expression at the schoolhouse gate.'" 597 U.S. 207, 527 (quoting *Tinker v. Des Moines Independent Community School Dist.*, 393 U.S. 503, 506 (1969)) (emphasis added).

Plaintiffs' vagueness argument, according to their testimony, has caused educators to tremble over their occupational futures and the continuation of their employment and, maybe, the fate of their institutions themselves. Defendants, at the hearing, did not quiet those fears, only offering that those "properly" interpreting the substance of the Act would not jeopardize their personal welfare, nor that of their careers, nor that of their institutions, but providing no written guidance capable of shielding them.

This Court also is not convinced that the exceptions in Section 5 should provide Plaintiffs any solace in this matter. These provisions, particularly the one discussing accreditation standards, raise more questions than they answer and provide little comfort to the educators and students staring down HB 1193's barrel.

Relative to the vagueness challenge, Defendants summarized their argument thusly:

> Plaintiffs did not present evidence to establish that no constitutional application of the challenged provisions of H.B. 1193 exists either in the hearing on August 5, 2025 or in their pre-hearing submissions. Similarly, Plaintiffs did not present evidence demonstrating the full set of applications, both constitutional and allegedly unconstitutional, of the Act's challenged provisions. More importantly, Plaintiffs did not present any evidence showing that any allegedly unconstitutional applications of the challenged provisions of the Act substantially outweigh the constitutional applications. Instead, the Plaintiffs simply assert confusion, but this testimony is internally inconsistent. On the one hand, the Plaintiffs' witnesses and declarants testified that they are unable to understand the meaning of certain provisions of H.B. 1193, while simultaneously asserting overwrought interpretations that would prevent any mention of historical events involving race, sex, and other general subjects.

Defendants' proposed findings of fact and conclusions of law, page 6.

Essentially, Defendants argue that Plaintiffs have not made the showing supposedly necessary under *Moody v. NetChoice*. This Court disagrees. Plaintiffs, through declarations, testimony, and logical argumentation, have identified many concrete examples of books, historical

concepts, subjects, student organizations, and even fields of study that are arguably on the chopping block should HB 1193's content-based restrictions be enforced. Plaintiffs affirmatively stated that they could think of no constitutional applications of the challenged provisions. Defendants, on the other hand, while they carry no burden, did not offer competent evidence and argument as to constitutional applications adequately to rebut Plaintiffs' showing.

HB 1193's vagueness causes this Court pause for another reason: HB 1193, if it lives down to the fears it has generated, has a mouthful of sharp teeth which could inflict deep bites. Defendants have reminded us that:

> The Trump Administration has made clear its intent to withhold federal funds from those who fail to comply with its interpretation of Title VI and *Students for Fair Admissions, Inc. v. Harvard*. For many Mississippi K-12 schools and community colleges, loss of federal funding would be as financially devastating as the loss of State funding.

*Id.* at 21–22 (citations omitted). Defendants cite, in their evidence, to examples of large portions of school budgets deriving from federal sources. *Id.* Defendants point out that the potential loss of federal education funding constitutes a substantial harm in the context of considering a request for preliminary injunction. *Id.* at 22 (citing *Carroll Indep. Sch. Dist. v. United States Dep't of Educ.*, 741 F. Supp. 3d 515, 526 (N.D. Tex. 2024)). Defendants thus argue that "the potential loss of federal funds and the impact that could have on Mississippi K-12 schools and community colleges is a real threat." *Id.*

This point, though, leans the Court in further favor of injunctive relief. The flaws in the Act remind this Court of the dire, possible penalties that could engulf Mississippi's educational institutions receiving federal funds if an unconstitutional act is enforced. This enforcement, then, not only could chill their First and Fourteenth Amendment rights, but also could deplete their financial subsistence.

HB 1193, without more, at this point, must be enjoined.  Plaintiffs have shown this Court enough to warrant this relief.

## XI.    CONCLUSION

**IT IS THEREFORE ORDERED** that:

The named Defendants, as well as their officers, agents, servants, employees, and attorneys and other persons in active concert or participation with these individuals, who receive actual notice of this order, shall hereby be **PRELIMINARILY ENJOINED**, under Rule 65 of the Federal Rules of Civil Procedure, from enforcing Sections **3(b)**, **3(f)**, **3(g)**, and **3(i)** of HB 1193, and from taking any action in furtherance of the same sections under Sections **7**, **8**, and **9** of HB 1193, until an order is entered releasing this obligation, by this Court.

As such, Plaintiffs' motion for a preliminary injunction (ECF No. 11) and supplemental motion for preliminary injunction (ECF No. 66) are **GRANTED**.  Further: Plaintiffs' supplemental motion for a TRO is **DENIED** as moot.  Defendants' initial Motion to Dismiss for lack of jurisdiction (ECF No. 17) is **DENIED** as moot.  Defendants' renewed Motion to Dismiss (ECF No. 39) is **DENIED** as moot.  The Motion to Withdraw the Mississippi Association of Educators as a plaintiff (ECF No. 45) is **GRANTED** as unopposed.  Defendants' motion to clarify TRO (ECF No. 54) previously was **DENIED** and should be terminated from its pending status.  Plaintiffs' motion to file a second amended complaint (ECF No. 60) is **GRANTED** as unopposed.

The Clerk of Court is directed to **UNSTAY** this case such that it may proceed to discovery and further proceedings.  This Court informs the parties that this Court reserves its right to modify any of the findings herein, should this Court accept credible, future facts and applicable law.

SO ORDERED AND ADJUDGED this the  18th  day of       August      , 2025.

/s/ HENRY T. WINGATE
**UNITED STATES DISTRICT COURT JUDGE**