**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
Northern Division**

**JACKSON FEDERATION OF
TEACHERS,**

**BARBARA PHILLIPS, individually and on
behalf of a class of all others similarly
situated,**

**JAMES THOMAS, individually and as
next friend to minor children, and on
behalf of a class of all others similarly
situated,**

**DAWN ZIMMERER, individually and on
behalf of a class of all others similarly
situated,**

**L.E. JIBOL, individually and as next
friend to minor children, and on behalf of a
class of all others similarly situated,**

**UNITED CAMPUS WORKERS
SOUTHEAST LOCAL 3821,**

**MADISYN DONLEY, individually and on
behalf of a class of all others similarly
situated,**

**ALEXIS COBBS, individually and on
behalf of a class of all others similarly
situated,**

**KAREN ADERER, individually and on
behalf of a class of all others similarly
situated,**

**FOSTERING LGBTQ+ ADVOCACY,
RESOURCES, AND ENVIRONMENTS,**

**WOMEN IN SCIENCE AND
ENGINEERING,**

**Civil No. 3:25cv00417-HTW-LGI**

1

**JOY PARIKH, individually and as next friend to minor children, and on behalf of a class of all others similarly situated,**

**GREG POWELL, individually and as next friend to minor children, and on behalf of a class of all others similarly situated,**

**JAKOB CLARK, individually and as next friend to minor children, and on behalf of a class of all others similarly situated, and**

**ASHLEY ROGERS, individually and as next friend to minor children, and on behalf of a class of all others similarly situated,**

*Plaintiffs*,

**v.**

**LYNN FITCH, in her official capacity as Attorney General of Mississippi, GEE OGLETREE, in their official capacity as President of the Board of Trustees of State Institutions of Higher Learning, STEVEN CUNNINGHAM, AMY ARRINGTON, DONALD CLARK, JR., ORMELLA CUMMINGS, JERRY L. GRIFFITH, JIMMY HEIDELBERG, TERESA HUBBARD, BRUCE MARTIN, HAL PARKER, GREGG RADER, and CHARLIE STEPHENSON, all in their official capacities as Members of the Board of Trustees of State Institutions of Higher Learning, JOHN PIGOTT, in their official capacity as Chair of the Mississippi Community College Board, CHERYL THURMOND, VIDET CARMICHAEL, DONNIE CAUGHMAN, BUBBA HUDSPETH, DOLLY MARASCALCO, JOHNNY McRIGHT, LUKE MONTGOMERY, WILL SYMMES, and**

**DIANNE WATSON, all in their official capacities as Members of the Mississippi Community College Board, GLEN EAST, in their official capacity as Chair of the Mississippi State Board of Education, MATT MILLER, LANCE EVANS, WENDI BARRETT, MATT MAYO, BILL JACOBS, RONNIE McGEHEE, MIKE PRUITT, BILLYE JEAN STROUD, and MARY WERNER, all in their official capacities as Members of the Mississippi State Board of Education, MARCY SCOGGINS, in their official capacity as Chair of the Mississippi Charter School Authorizer Board, and JAY CARNEY, SANDRA McKIERNON, ERIN MEYER, BEN MORGAN, CANDACE ROBINS, and JENNIFER JACKSON WHITTIER, all in their official capacities as Members of the Mississippi Charter School Authorizer Board**

*Defendants*.

---

### SECOND AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND CLASS ACTION STATUS

1.     In an effort to censor certain disfavored topics and ideas, the Mississippi Legislature passed a law in 2025 that prohibits any educator in any public school in Mississippi, and apparently students as well, from "engag[ing]" in any action that "increas[es] awareness or understanding of issues related to race, sex, color, gender identity, sexual orientation or national origin."

2.     Under this law, known as House Bill 1193 of the 2025 legislative session, history teachers will be banned from discussing slavery, the Civil War, discrimination in the past and present, the civil rights movement, the women's suffrage and women's rights movements, the

LGBTQ rights movement, and many other aspects of American life and life throughout the world. Constitutional law professors must excise from their textbooks and lectures all references to the Fourteenth Amendment and cases about discrimination. Courses in family law, sociology, and biology must avoid discussions of differences and different treatment related to sex and gender identity. Teachers of English Literature must remove from their reading lists, and school librarians must remove from their shelves, works by authors like Richard Wright, Toni Morrison, William Faulkner, Rita Mae Brown, and many, many others.

3.      In addition, the law prohibits all public-school educators, and possibly students, from "engag[ing]" in a number of so-called "divisive concepts" relating to race, sex, color, gender identity, sexual orientation and national origin that would effectively ban discussion of certain viewpoints concerning affirmative action, unconscious bias, and collective responsibility.

4.      Moreover, at least one of these "divisive concepts" is stated in language so incoherent as to be almost meaningless. And many provisions of the overall law are so vague, confusing, and contradictory that it is difficult for administrators, teachers, and students to distinguish prohibited actions from permissible ones, making the law particularly susceptible to arbitrary and discriminatory enforcement. Adding to the confusion is a provision of the act that appears to create an exception to protect "freedom of speech pursuant to the First Amendment of the United States Constitution" but only so long as the First Amendment and other so-called "protected tenets" do not "conflict with the act."

5.      The prohibitions of the act come with open-ended and potentially severe consequences for any violations. Schools are required "to cure all actions relating to the violation," but the law provides no specifics on what constitutes a "cure." Given that most "violations" of the free speech restrictions are likely to come from teachers and students, and that

no language in the bill states otherwise, it is reasonable to conclude that teachers can be disciplined and even terminated and students can be disciplined and even expelled as part of a school's "cure." Moreover, if a school violates the law with respect to two or more specific violations, "the State of Mississippi shall withhold the disbursement" of "any and all funds appropriated by the Legislature" for the particular university, community college, junior college, or K-12 public school at issue. Without state funding, the school would likely close, all students would be sent home, and all teachers and all other employees would be terminated.

6.      The law calls for the relevant statewide boards of education to establish a formal complaint process for any student, parent, faculty member, staff member, or contractor to accuse any administrator, teacher, or student of saying the wrong thing about the wrong subject in violation of the free speech bans in this law, and a formal process for investigating the accused administrator, teacher, or student. This opens the door to a wave of ideological attacks by people who disagree with the political beliefs of others. School officials will be required to investigate these accusations to determine who said what to whom, what they meant, and whether each statement is a transgression of these broadly worded and vague free-speech prohibitions.

7.      This far-reaching and draconian law contains viewpoint-based and content-based restrictions and violates the First Amendment rights of educators and students to free speech and to speak and learn about the prohibited subjects, the First and Fourteenth Amendment rights of educators and students to engage in their jobs and their education without concern that they might violate some of the vague and incomprehensible provisions of the law, the Fourteenth Amendment equal protection rights of educators and students to speak and learn specifically about "issues related to race, sex, color, gender identity, sexual orientation or national origin," and the Fourteenth Amendment due process rights of students to go to school and employees to

work at schools without the funding being cut off because of two purported violations of this law that those students and employees did not commit.

8.  This case is brought by students, parents, educators, and organizations that collectively represent the interests of those whose constitutional rights are violated by this law. They seek declaratory relief and injunctive relief to prevent the enforcement of several provisions of HB 1193. The law took effect upon the Governor's signature on April 17, 2025.

## JURISDICTION AND VENUE

9.  This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 because this action arises under the First and Fourteenth Amendments to the United States Constitution, and under 42 U.S.C. § 1983.

10.  This Court has personal jurisdiction over the Defendants, who are governmental entities and officers of the State of Mississippi and are located within this District.

11.  Venue is proper in this Court under 28 U.S.C. §§ 1391(b)(1) and (2) because many Defendants are located in this District and a substantial part of the events or omissions giving rise to the claim occurred in this District.

## PARTIES

12.  Plaintiff Jackson Federation of Teachers ("JFT") is a labor union of 400 members composed of elementary and secondary teachers, educational support professionals, and retired educators in Rankin County, Madison County, and Hinds County. JFT's fundamental objective is to work for improved salaries, benefits, and working conditions for all education professionals, to achieve a spirit of cooperation among educators, school boards, parents and the public, and to improve the quality of education for public school students. JFT is headquartered in Jackson,

MS. The organization brings this case on behalf of itself and all of its members who are impacted by the challenged provisions.

13.    JFT has standing to pursue this action both in its own right and on behalf of its members. HB 1193 has forced JFT to divert its organizational resources to identify and counteract the Act's impermissibly vague restrictions, and it has frustrated JFT's mission of advocating for public school employees and for robust public education. Moreover, JFT members adversely affected by the Act would have standing to sue, the interests at stake in this suit are germane to JFT's purpose, and neither the claims asserted nor the relief sought requires participation of JFT's individual members to adjudicate the claims.

14.    As a labor union, JFT's mission and core business activities include advocating for improved employment conditions, ensuring fair treatment of its members, and protecting the rights and academic freedom of its members. The mission of JFT includes defending the constitutional rights and academic freedom of its members, rights which are infringed by the challenged provisions of HB 1193. As such, JFT defends educators facing disciplinary actions and termination to ensure that their members receive due process. Many of JFT's members engage in speech that will be or could be interpreted to be banned by the challenged provisions of HB 1193. JFT expects to expend time and capital through representation of its members in proceedings related to educator discipline or termination for violation of the challenged provisions of HB 1193. Its mission and purpose will be frustrated and its resources will be drained by these interventions on behalf of its members. These individual members themselves, who are directly subjected to the restrictions of HB 1193, fear that their participation in this lawsuit in their named, individual capacity could lead to exposure to negative attention or harassment, either from the general public or from their employers. JFT's members feel more

7

able to exercise their right to petition as members of organizational plaintiffs, particularly when they are suing to challenge government action. JFT will have to advise its members on how to navigate HB 1193 including whether they should continue to speak as before and risk discipline or self-censor.

15.    Plaintiff United Campus Workers Southeast Local 3821 ("UCW") is a union representing over 4,800 members across eight states, including 237 members in Mississippi. These members include faculty and graduate students on the campuses of the University of Mississippi, Mississippi State University, the University of Southern Mississippi, Mississippi University for Women, Jackson State University and Delta State University. The organization brings this case on behalf of itself and all of its members who are impacted by the challenged provisions.

16.    UCW has standing to pursue this action both in its own right and on behalf of its members, who are employed at both the community college and university level. HB 1193 has forced UCW to divert its organizational resources to identify and counteract the Act's impermissibly vague restrictions, and it has frustrated UCW's mission of advocating for public school employees and for robust public education. Moreover, UCW members adversely affected by the Act would have standing to sue, the interests at stake in this suit are germane to UCW's purpose, and neither the claims asserted nor the relief sought requires participation of UCW's individual members to adjudicate the claims.

17.    As a labor union, UCW's mission and core business activities include advocating for improved employment conditions and ensuring fair treatment of its members. The mission of UCW includes defending the constitutional rights and academic freedom of its members, rights which are infringed by the challenged provisions of HB 1193. The UCW (like every other labor

union) is a First Amendment association. The purpose of associating or joining a Union is to collectively advocate for improved working conditions, and one of the most important working conditions for UCW members is the right of academic freedom. As such, UCW defends faculty and staff facing disciplinary actions and termination to ensure that their members receive due process. UCW provides the Faculty Advocacy Network, which is a space for UCW faculty of all stripes to convene and strategize for change on the issues that impact all of them: academic freedom, tenure and job security, costs of education, public education funding and finance, shared governance, and more. Many of UCW's members engage in speech that will be or could be interpreted to be banned by the challenged provisions of HB 1193. UCW expects to expend time and capital through representation of its members in proceedings related to faculty and staff discipline or termination for violation of the challenged provisions of HB 1193. HB 1193 Section 8 unlawfully threatens the "property interest" UCW's members have in employment in the educational system by subjecting them to arbitrary and capricious collective punishment. Protecting the interest of members in continued employment is an interest that falls squarely within the mission of UCW as a labor organization. Its mission and purpose will be frustrated as well as its resources drained by these interventions on behalf of its members. Many of these individual members themselves, who are directly subjected to the restrictions of HB 1193, fear that their participation in this lawsuit in their named, individual capacity could lead to exposure to negative attention or harassment, either from the general public or from their employers. UCW's members feel more able to exercise their right to petition as members of organizational plaintiffs, particularly when they are suing to challenge government action. UCW will have to advise its members on how to navigate HB 1193 including whether they should continue to speak as before and risk discipline or self-censor.

18.     Fostering LGBTQ+ Advocacy, Resources, and Environments ("FLARE") is student group at Mississippi State University in Starkville, MS. It has over 150 members. It serves as a student support, affinity, and community outreach group. FLARE's mission is to create a culture of diversity, inclusion, and equity for the LGBTQ+ community and other marginalized communities through programs and events. The organization brings this case on behalf of itself and all of its members who are impacted by the challenged provisions.

19.     As a student organization, FLARE's mission and core business activities include advocating for improved support for the LGBTQ+ community on campus. As such, FLARE holds educational events to increase awareness of issues related to gender identity, gender, and sexual orientation, and social gatherings on campus to foster community with and support for the LGBTQ+ people. FLARE may have to change the nature of its activities and its speech around those activities, may lose its ability to use state funds for its programming, and may have its status as a registered student group revoked because of the challenged provisions of HB 1193. Its mission and purpose will be frustrated by the enforcement of these provisions.

20.     Women in Science and Engineering ("WISE") is a student group at the University of Southern Mississippi in Hattiesburg, MS. It has over 100 members and receives funds from the school's state funding. It serves as a mentoring, networking and community outreach group. It seeks to change the perception of what a scientist looks like including by expanding who participates in science, technology, engineering and mathematics ("STEM") fields. WISE's members are predominantly women, and some of its activities like its conferences are directed at women, but its membership, meetings and activities are open to all. The organization brings this case on behalf of itself and all of its members who are impacted by the challenged provisions.

21.    As a student organization, WiSE's mission and core business activities included expanding who participates in science, technology, engineering and mathematics ("STEM"), ensuring diversity and equity in STEM, and addressing pay and opportunity gaps for women pursuing STEM careers. As such, WiSE provides mentoring, networking, and community outreach on campus, including holding conferences and other events focusing on issues related to female students and scientists, LGBTQ people and others underrepresented in STEM, which may be or are banned by the challenged provisions. WiSE may have to cease activities (including campus fundraising, providing scholarships for STEM students, hosting conferences and other events), change its speech around those activities, may lose its ability to use state funds for its programming, and may have to change its name because of the challenged provisions of HB 1193. Its mission and purpose will be frustrated by the enforcement of these provisions.

22.    Plaintiff and Putative Class Representative Barbara Phillips brings this suit on behalf of herself and all others similarly situated. She is Adjunct Professor of Law at the University of Mississippi School of Law in Oxford, MS.

23.    Plaintiff and Putative Class Representative James Thomas brings this suit on behalf of himself, his children, and all others similarly situated. He is Associate Professor of Sociology at the University of Mississippi in Oxford, MS. He is a parent of two public school students who attend school in Oxford School District in Oxford, MS.

24.    Plaintiff and Putative Class Representative Karen Aderer brings this suit on behalf of herself and all others similarly situated. She is a Lecturer in Social Work at the University of Southern Mississippi in Hattiesburg, MS.

25.     Plaintiff and Putative Class Representative Dawn Zimmerer brings this suit on behalf of herself and all others similarly situated. She is Administrative Librarian for McLendon Library at Hinds Community College in Raymond, MS.

26.     Plaintiff and Putative Class Representative L.E. JiBol brings this suit on behalf of herself, her children, and all others similarly situated. L.E. is a parent of two public school students who attend Jackson Public Schools in Jackson, MS.

27.     Plaintiff and Putative Class Representative Madisyn Donley brings this suit on behalf of herself and all others similarly situated. She is a third-year law student at the University of Mississippi School of Law and a resident of Oxford, Mississippi.

28.     Plaintiff and Putative Class Representative Alexis Cobbs brings this suit on behalf of herself and all others similarly situated. She is a native of DeSoto County, Mississippi and a third-year law student at the University of Mississippi School of Law in Oxford, MS.

29.     Plaintiff and Putative Class Representative Joy Parikh brings this suit on behalf of herself, her children, and all others similarly situated. She is a parent of two public school students who attend Jackson Public Schools, in Jackson, Mississippi.

30.     Plaintiff and Putative Class Representative Greg Powell brings this suit on behalf of himself, his children, and all others similarly situated. He is a teacher in the Jackson Public School District. He is a parent of two public school students who attend Jackson Public Schools, in Jackson, Mississippi.

31.     Plaintiff and Putative Class Representative Jakob Clark brings this suit on behalf of himself, his child, and all others similarly situated. He is a parent of a public school student who attends school in the Rankin County School District in Rankin County, Mississippi.

32.    Plaintiff and Putative Class Representative Ashley Rogers brings this suit on behalf of herself, her children, and all others similarly situated. She is an educator in the Jackson Public School District. She is a parent of two public school students who attend Jackson Public Schools, in Jackson, Mississippi.

33.    Defendant Lynn Fitch is the Attorney General of Mississippi.

34.    Defendant Gee Ogletree is the President of the Board of Trustees of State Institutions of Higher Learning and the members of the Board are Steven Cunningham, Amy Arrington, Donald Clark, Jr., Ormella Cummings, Jerry L. Griffith, Jimmy Heidelberg, Teresa Hubbard, Bruce Martin, Hal Parker, Gregg Rader, and Charlie Stephenson. All are sued in their official capacities. The Board of Trustees of State Institutions of Higher Learning ("IHL") is the constitutional governing body of the Mississippi State Institutions of Higher Learning. IHL is responsible for policy and financial oversight of the eight public institutions of higher learning.

35.    Defendant John Pigott is the Chair of the Mississippi Community College Board ("Community College Board") and the members of the Board are Cheryl Thurmond, Videt Carmichael, Donnie Caughman, Bubba Hudspeth, Dolly Marascalco, Johnny McRight, Luke Montgomery, Will Symmes, and Dianne Watson. All are sued in their official capacities. The Community College Board consists of these ten members appointed by the Governor and coordinates efforts to enhance educational opportunities statewide by aiding in the advancement of the Mississippi community college system.

36.    Defendant Glen East is the Chair of the Mississippi State Board of Education ("State Board of Education") and the members of the Board are Matt Miller, Lance Evans, Wendi Barrett, Matt Mayo, Bill Jacobs, Ronnie McGehee, Mike Pruitt, Billye Jean Stroud, and Mary Werner. All are sued in their official capacities. The State Board of Education adopts rules and

regulations and sets standards and policies for the organization, operation, management, planning, budgeting and programs of the State Department of Education.

37.    Defendant Marcy Scoggins is the Chair of the Mississippi Charter School Authorizer Board and the members of the Board are Jay Carney, Sandra McKiernon, Erin Meyer, Ben Morgan, Candace Robins, and Jennifer Jackson Whittier. All are sued in their official capacities. The Mississippi Charter School Authorizer Board ("Charter School Board") is an independent state agency that holds exclusive chartering jurisdiction in Mississippi. The mission of the Charter School Board is to authorize and oversee charter schools.

**THE CHALLENGED LAW, HOUSE BILL 1193**

38.    Section 3 of HB 1193 sets forth the various actions prohibited by the new law. It provides: "The [Defendants] shall ensure that each institution, college and public school, as applicable, shall not:". It then lists several different actions, in Sections (a) through (i), that will be prohibited. Of these, this lawsuit challenges the prohibitions in Sections 3(b), 3(f), 3(g), and 3(i), which will be discussed in more detail.

39.    Section 5 of the act lists certain purported exceptions to the prohibitions. But several of those exceptions – contained in Sections 5(b), 5(c), 5(d), 5(h), 5(i) and 5(j) – are vague, confusing, and illusory. Although the exceptions do not restrict or punish speech, they contribute to the vagueness that infects the prohibitions in certain portions of Section 3.

40.    Although the requirements contained in Section 3 place the onus initially on the Defendants to ensure that each school adheres to the prohibitions, the consequences may be severe for educators and students accused of violating them. As explained in the discussions of Sections 7–9 of the act later in this Complaint, it appears that schools may penalize teachers, administrators, and students as part of their statutory mandate to "cure" any violations,

potentially leading to termination or expulsion or other discipline and perhaps to a judgment for money damages in chancery court. If there are two or more uncured violations in a particular school, its state funding must be withheld, which likely would require the school to close, the teachers to be discharged, and the students sent home without further education.

41.    This complaint speaks of "educators," which includes teachers, librarians, and administrators. To the extent that administrators, including Ashley Rogers and those who are members of Plaintiffs UCW, are responsible for designing and administering programming to faculty and students that could violate the free speech bans in the act, they are subject to discipline and even termination for any violations they cause. In addition, they are in the unusual position of being called upon to enforce the act's prohibitions on teachers, librarians, and students. This will violate their own free speech rights when forced to enforce speech restrictions they disagree with, and they are subject to discipline and termination if they fail to "cure" any alleged violations of the act.

## THE BANS

*The Prohibition of Awareness and Understanding of Issues Relating to Race, Sex, Color, Gender Identity, Sexual Orientation, and National Origin*

42.    The most striking of HB 1193's prohibited actions is in Section 3(b), which lists the following as a prohibited action: "Engage in divisive concepts as defined in *Section 2(d) and (e) of this act*[.]" (Emphasis added). Of these two Sections, 2(e) lists eight so-called "divisive concepts." The other Section, 2(d), is a definition of "diversity training" which is described as "any formal or informal education, seminars, workshops or institutional program that focus on increasing awareness or understanding of issues related to race, sex, color, gender identity, sexual orientation or national origin." In other words, the school shall not "engage in . . . increasing awareness or understanding of issues related to race, sex, color, gender identity, sexual

15

orientation or national origin." Of course, the very purpose of schools is to increase understanding and awareness.

43.    Similarly, Section 3(i) describes one of the prohibited actions as follows: "Require any 'diversity training' as defined in Section 2 or any other policies or procedures that result in any formal or informal education, seminars, workshops or institutional program that focus on increasing awareness or understanding of issues related to race, sex, color, gender identity, sexual orientation or national origin."

44.    Whether through the definition of "diversity training" in Section 2(d) or in the rest of the language about "policies and procedures," Section 3(i), like Section 3(b), prohibits "any formal or informal education, seminars, workshops or institutional program that focus on increasing awareness or understanding of issues related to race, sex, color, gender identity, sexual orientation or national origin." The difference is that Section 3(i) prohibits "[r]equir[ing]" a "focus on increasing awareness or understanding" of these issues, while Section 3(b) prohibits any sort of "engage[ment]" with the issues. Section 3(i) applies to any required courses, including required history, literature, and constitutional law courses, or any required readings in elective courses. And Section 3(b) applies to any courses, required or elective.

45.    These restrictions imposed by Section 3(b)'s incorporation of Section 2(d), and also imposed by Section 3(i), are based on content. Speech is prohibited regarding "issues related to race, sex, color, gender identity, sexual orientation, or national origin," but speech is permitted on other important issues. including economics and religion and political party and a host of other matters. This content restriction is not justified by any compelling state interest.

*The Prohibition on "Engagement" with Eight "Divisive Concepts"*

16

46.     As mentioned previously, Section 3's prohibitions include the actions set forth in

Section 3(b): "Engage in divisive concepts as defined in *Section 2(d) and (e)* of this act[.]"

(Emphasis added). The prior section of this complaint discussed Section 2(d). Section 2(e)

provides the following definition:

(e) "Divisive concepts" are concepts that:

(i)      One (1) race, sex, color, or national origin is inherently superior to another race or
         sex;

(ii)     An individual, by virtue of his or her race, sex, color, national origin, is inherently
         racist, sexist, or oppressive, whether consciously or unconsciously;

(iii)    An individual should be discriminated against or treated adversely solely because
         of their race, sex, color, or national origin;

(iv)     Members of one (1) race, one (1) sex, one (1) color, one (1) national origin cannot
         and should not attempt to treat others without respect to race, color, national
         origin or sex, gender identity, sexual orientation, or national origin;

(v)      An individual's moral character is necessarily determined by his or her race, color,
         sex, or national origin;

(vi)     An individual, by virtue of his or her race, color, sex or national origin, bears
         responsibility for actions committed in the past by other members of any class
         listed herein;

(vii)    An individual should feel discomfort, guilt, anguish or any other form of
         psychological distress on account of his or her race, color, sex, or national origin;
         or

(viii)   Meritocracy or traits such as hard work ethic are racist or sexist, or were created
         by a particular class to oppress another class.

47.     This provision is extremely broad, prohibiting any sort of "engage[ment]" with

any of the "divisive concepts." Each of the "divisive concepts" is framed as a viewpoint that is

banned by the act. Meanwhile, the act permits "engage[ment]" with certain viewpoints contrary

to the "divisive concepts." In other words, the act prohibits those viewpoints with which the legislature disagrees, while allowing other viewpoints.

48.      For example, Section 2(e)(viii)'s reference to "[m]eritocracy," which is not necessarily a racist concept, was often used in history in conjunction with the theory that other races were inferior to the white race and that segregation and exclusion of other races from certain professions, from government, from voting, from education, and from other arenas of public life were justified by "meritocracy." In that sense, "meritocracy" was used – and occasionally is still used today – as a racist concept. The same theory was used – and occasionally still is used – as a sexist concept to exclude women from many aspects of public life. But the prohibition on "engage[ment]" of this idea, contained in Section (viii), can be read to ban any sort of discussion of it, even in a history or sociology class.

49.      Similarly, Section 2(e)(ii) prohibits engagement with the idea that "[a]n individual by virtue of his or her race, sex, color, national origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously." This prohibition could apply to discussions of ideas such as implicit bias, whether in a sociology, psychology, medical school, or other class, while allowing engagement with the viewpoint that implicit bias does not exist.

50.      Section 2(e)(iii) bans engagement with the concept that "[a]n individual should be discriminated against or treated adversely solely because of their race, sex, color, or national origin." This can be read to prohibit discussion of, as well as support of, the concept of affirmative action to remedy prior discrimination, which has been and still is a feature of American law and public life.

51.      Other sections, particularly Section 2(e)(vi) – "[a]n individual, by virtue of his or her race, color, sex or national origin, bears responsibility for actions committed in the past by

other members of any class listed herein" – can be interpreted to prohibit discussion of, as well as support of, the principle of collective responsibility. The notion of collective responsibility and collective remedial action is a legitimate subject for study and discussion, including in a history, sociology, philosophy, or law class about Nazi Germany, apartheid in South Africa, racism and sexism in America, or discrimination in a host of countries around the world.

52.     These restrictions are based on content and viewpoint and are not justified by any compelling state interest.

53.     These "divisive concepts" also suffer from compounding layers of ambiguity. Each of them includes undefined words and phrases that do not make clear what topics would fall within the ban and would subject the school, its educators, and its students to liability under the act. Moreover, the vague and ambiguous language defining the "divisive concepts" will allow and empower arbitrary and discriminatory enforcement.

54.     For example, Section 2(e)(iv) states that speakers *cannot* "engage in" the idea of whether "[m]embers of one (1) race, one (1) sex, one (1) color, one (1) national origin *cannot and should not* attempt to treat others *without* respect to race, color, national origin or sex, gender identity, sexual orientation, or national origin." (Emphasis added). The triple-negative prohibition is completely incoherent and fails to provide any direction to educators and students as to what speech would subject them to liability.

55.     Whether individually or taken as a whole, the ban on engagement with these "divisive concepts," and the definitions of the "divisive concepts," can be read to encompass important matters of public concern and are restrictions on free speech, but also are so vague, confusing, and elastic that educators and students will be forced to guess what runs afoul of this law and what does not.

*The Prohibition on "Promot[ing]" Certain Ideas and "Endors[ing]" Certain Concepts*

56.    Section 3(f) states that it is unlawful to: "Maintain any programs, including academic programs or courses, or offices that promote diversity, equity and inclusion, endorse divisive concepts or concepts promoting transgender ideology, gender-neutral pronouns, deconstruction of heteronormativity, gender theory, sexual privilege or any related formulation of these concepts."

57.    Similar to Section 3(b), this section's prohibition singles out viewpoints "endors[ing]" the "divisive concepts" listed in Section 2(e), along with additional concepts "promoting" a host of undefined terms related to gender and sex "or any related formulation of these concepts." In addition, it bans viewpoints "promot[ing] diversity, equity and inclusion."

58.    These restrictions are based on content and viewpoint and are not justified by any compelling state interest.

59.    There is no definition of "promote," "endorse," "transgender ideology, gender-neutral pronouns, deconstruction of heteronormativity, gender theory, sexual privilege," or "related formulation of those concepts." If a constitutional law professor discusses the issue of affirmative action and speaks of it favorably, is the professor teaching a "course[] that promote[s] diversity, equity and inclusion"? If a teacher uses a student's preferred gender-neutral pronoun, discusses transgender rights in a history course, or sexual privilege in a sociology or psychology course, is the teacher "endorsing" those concepts? Or if freshman advisors consider warning female students about the possibility of date-rape, is that an "endorsement" of the "related formulation" of "sexual privilege"? These are among the many examples in this legislation of vague language that makes it difficult for educators and students to navigate the boundaries of the free-speech restrictions it imposes.

20

*The Prohibition on "Diversity, Equity, and Inclusion Training"*

60.    Section 3(g) prohibits "[r]equir[ing], as a condition of enrolling at, accepting employment with, or being awarded a contract at an institution, college or public school, or as a requirement of continuing enrollment, employment or contractual obligation at an institution, college or public school, any person to participate in diversity, equity and inclusion training."

61.    While Section 2(1)(a) defines "diversity, equity and inclusion" and Section 2(1)(d) defines "diversity training," there is no definition of "diversity, equity and inclusion training" in the act. It is therefore ambiguous what type of "training" would be permitted under the act and what would be prohibited.

62.    Even if one assumes that "diversity, equity and inclusion training" refers to any "training" on "diversity, equity and inclusion" as defined in Section 2(1)(a), the provision is still ambiguous due to the ambiguity in the definition of "diversity, equity and inclusion." Section 2(1)(a) defines that term to include:

(i)    Any effort to select or influence the composition of the faculty, staff, employee or student body by favoring applicants based on race, sex, color or national origin;

(ii)    Any effort to promote differential treatment of or provide special benefits to individuals in employment or admissions based on race, sex, color or national origin;

(iii)    Any effort to promote or promulgate policies and procedures designed or implemented to favor individuals based on race, color or national origin, except as otherwise permitted in state and federal law;

(iv)    Any effort to require trainings, programming, or activities designed and\or implemented to compel participants to change their beliefs with reference to race, color, national origin, gender identity or sexual orientation[.]

63.    Section 3(g) prohibits requiring "training" – another undefined term – on any such "effort" described in Section 2(1)(a). The convoluted language of this ban leaves little guidance to students and educators about what is permissible and what is not.

64.    For example, would a required constitutional law course that covers affirmative action be considered "training" on "[a]ny effort to select or influence the composition of the faculty, staff, employee or student body by favoring applicants based on race, sex, color or national origin"? Would a required course for a business major that covers how preferences for minority businesses can address systemic disparities be considered training on "[a]ny effort to promote or promulgate policies and procedures designed or implemented to favor individuals based on race, color or national origin"? Would a requirement that all psychology or social work majors take a course that addresses how implicit bias can disadvantage people of color be considered a "training" on "[a]ny effort to require trainings, programming, or activities designed and\or implemented to compel participants to change their beliefs with reference to race, color, national origin, gender identity or sexual orientation"? The statute fails to provide sufficient guidance on any of these questions, leaving students and educators confused and the school subject to potential liability.

**THE VAGUE, CONFUSING, AND ILLUSORY EXCEPTIONS**

65.    Section 5(d) states as an exception: "An activity of a registered student organization, guest speaker or performer at an institution, college or public school *as long as state funds are not used.*" Section 5 of the act lists certain things that the act "may not be construed to apply and/or prohibit." Although none of these provisions restricts or punishes speech, some of them are so vague, confusing, and illusory that they contribute to the uncertainty created by the language of the unconstitutional prohibitions in Section 3. And some provisions of Section 5 appear to confirm that the prohibitions of Section 3 apply to students.

*The Application of the Prohibition on Students,*
*Student Organizations, Guest Speakers, and*
*Performers in Certain Circumstances*

22

66.      Section 5(d) states as an exception: "An activity of a registered student organization, guest speaker or performer at an institution, college or public school *as long as state funds are not used.*" (Emphasis added). In other words, if state funds are used, a guest speaker, performer, or person attending an activity of a registered student organization is bound by the act and therefore cannot, for example, "engage in . . . increasing awareness or understanding of issues related to race, sex, color, gender identify, sexual orientation or national origin" as prohibited by Sections 3(b) and 2(d).

67.      The act does not make clear when "state funds are used." If the student organization or a guest speaker or performer makes a presentation in the school auditorium under the supervision of, or in the presence of, faculty and the school administration, who are paid by the state, it would seem that "state funds are . . . used" and the prohibitions apply. This may even cover student council meetings and programs, after-school activities of student clubs with a faculty supervisor, and a whole host of other student events. And even if faculty or staff is not present, the prohibitions could apply if the student organization, speaker, or performer, is in a campus building that was constructed with state funds, with utilities paid by state funds, and with the state-paid janitorial staff cleaning up afterwards. And maybe state funds are used if the student organization receives funding from the school and chooses to purchase refreshments for the event or reimburse a speaker's travel expense from its treasury. It is unclear which of these instances contravene the law.

68.      The vagueness of the law has already led the University of Mississippi to withdraw funding for the 2025 Oxford Pride Parade, citing efforts to comply with HB 1193. The University of Mississippi had first sponsored the Oxford Pride Parade in 2016.

69.     Beyond that, the prohibitions of the act appear to cover the actions of individual students. Given that Section 5(d) states that the act does not apply to the actions of "registered student organization[s]" when "state funds are not used," it appears that the restrictions of the act clearly do apply to unregistered student organizations. And given that the act applies to unregistered student organizations, it may well apply to individual students. There is no language in the act – including in the exceptions to the Act in Section 5 – stating that the prohibitions do not apply to students. All of this raises the distinct possibility that students are banned from, among other things, making statements in the classroom regarding "divisive concepts" or "issues related to race, sex, color, gender identity, sexual orientation or national origin" as prohibited by Sections 3(b) and 2(d).

*The Purported Exception for "Scholarly Research"*
*and "Creative Work"*

70.     Section 5's list of matters that the act "may not be construed to apply to and/or prohibit" includes Section 5(b), which creates an exception for "[s]cholarly research or a creative work by students, faculty, employee or staff at an institution, college or public school or the dissemination of that work." But what if the subject of the research or creative work is about, or touches on, one of the legislature's disfavored concepts that educators and students are prohibited from "engag[ing]" in? Can the scholarship or creative work be discussed in class? What if students in a particular class are assigned to conduct scholarly research or write a creative work on a subject of their own choice, and one or more students chooses one of the banned concepts pursuant to the alleged protection of Section 5(b)? Can the students discuss their work in the classroom in the same manner as other students who discuss their work? And can the teacher respond to the students' presentations or allow students to ask questions and engage in a classroom debate the same way they can with other subjects? Or is that prohibited

24

"engage[ment]"? Like other provisions of the act, this exception is vague and further confuses what is and what is not prohibited by the law.

71.    Moreover, given that the exception covers "scholarly research or a creative work by students," it implies that students are not otherwise excepted from the prohibitions in Section 3. Therefore, it is possible students could be subject to discipline for speech in or out of the classroom that do not qualify as "scholarly research or a creative work." For example, a student writing an article in a student newspaper that discusses a "divisive concept" or that "increas[es] awareness or understanding" of a disfavored topic banned by the state may violate the law.

*The Purported Exception for Complying*
*with State and Federal Law*

72.    Section 5(h) states that the act does not prohibit: "[a]n institution, college or public school from requiring or taking action against a student, employee, faculty, staff or contractor for failing to comply with federal or state law." Although the sentence is confusing, it appears to say that schools can require compliance with federal and state law. But what if federal or state law conflicts with the prohibitions of Section 3 of this act? Which law are institutions, administrators, teachers, and students supposed to follow?

73.    The problem is highlighted by the fact that some of the prohibitions of the challenged law conflict with existing provisions of Mississippi law. For example, while certain provisions of the act prohibit "enage[ment]" with certain subjects, discussion and support of certain concepts, and the use of state funds by student groups with respect to the those subjects and concepts, another provision of Mississippi law guarantees students the right to "engage" in political expression, to "organize" political groups or clubs, and to have "access to school facilities for assembling" for these groups "during and after the school day" to the same extent

students and student groups are allowed to engage in nonpolitical expression and activities. That statute, Miss. Code Ann. § 37-11-77, states:

> Students in public schools may engage in political activities or political or philosophical expression before, during and after the school day in the same manner and to the same extent that students may engage in nonpolitical activities or expression. Students may organize partisan or nonpartisan political groups, political clubs, political rallies, or other politically themed gatherings before, during and after school to the same extent that students are permitted to organize other noncurricular student activities and groups. Partisan and nonpartisan political groups must be given the same access to school facilities for assembling as is given to other noncurricular groups without discrimination based on the political content of the students' expression permitting public school student political expression.

74.    Similarly, Miss. Code Ann. § 37-11-79(1) prohibits public schools from denying access to meeting space on school grounds to students based on the content of their speech. "It shall be unlawful for any public school which has a limited open forum to deny equal access or a fair opportunity to, or discriminate against, any students who wish to conduct a meeting within that limited open forum on the basis of the political, philosophical, ideological or other content of the speech at such meetings."

75.    Thus, a student or student group who wishes to use school facilities to discuss "issues related to race, sex, color, gender identity, sexual orientation or national origin" or issues of affirmative action or collective responsibility, and a faculty sponsor of that group, will be in danger of violating Section 3(b), even though they are exercising rights protected by Miss. Code Ann. §§ 37-11-77 and 37-11-79(1).

76.    These conflicts add to the confusion for administrators, educators, and students, and make it difficult to determine what speech violates the law and what doesn't.

*The Purported Exception that Commands State*
*And Local Officials to Ignore the First Amendment*

77.    Among the other items listed in Section 5, Section 5(d) states that the act "may

not be construed to apply to and/or prohibit" "[a] policy to limit or restrict freedom of speech

pursuant to the First Amendment of the United States Constitution or Section 13 of the

Mississippi Constitution or academic course instruction that undermines the duty of a public

school, or public postsecondary educational institution to protect academic course instruction,

intellectual diversity and true expression *provided that none of these protected tenets conflict

with the act*." (Emphasis added). In other words, the prohibitions of the act prevail over "the First

Amendment of the United State Constitution [and] Section 13 of the Mississippi Constitution . . .

[and] the duty of a public school, or public postsecondary educational institution to protect

academic course instruction, intellectual diversity and true expression." The language of the act

is telling state and local officials, particularly education officials, that in the event of a conflict,

they must apply the act and ignore the First Amendment, Section 13, and the duty of a school to

protect course instruction and true expression.

*The Purported Exception for Complying with
Accreditation Standards and Requirements*

78.    Section 5(j) states that the act does not "[p]rohibit a public school or public

postsecondary education institution from complying with any applicable academic accreditation

standards or requirements." But many accreditation standards require respect for academic

freedom that is inconsistent with HB 1193's prohibitions on engagement with the legislature's

disfavored subjects and concepts.

79.    For example, all colleges and universities in Mississippi are accredited by the

Southern Association of Colleges and Schools Commission on Colleges. That organization's

manual states that institutions of higher learning must "preserv[e] and protect[] academic

freedom." The manual adds: "Academic freedom respects the dignity and rights of others while

fostering intellectual freedom of faculty to teach, research, and publish." Southern Association of Colleges and Schools Commission on Colleges, *Resource Manual for The Principles of Accreditation,* Section 6.4 (4th ed. 2024). Read literally, this accreditation standard would wipe out the bans on free speech that are challenged in this lawsuit. But teachers face a difficult choice of whether to rely on this exception and risk being disciplined and terminated or to comply with the unconstitutional restrictions on their free speech contained in the act.

80.    In addition, the University of Mississippi School of Law is accredited by the American Bar Association ("ABA") and must comply with its Standards and Rules of Procedure. ABA Standard 303c demands that: "A law school shall provide education to law students on bias, cross-cultural competency, and racism: (1) at the start of the program of legal education, and (2) at least once again before graduation. For students engaged in law clinics or field placements, the second educational occasion will take place before, concurrently with, or as part of their enrollment in clinical or field placement courses."

81.    Interpretation 303-6 of the ABA Standards provides further: "With respect to 303(a)(1) [addressing professional responsibility and the values of the profession], the importance of cross-cultural competency to professionally responsible representation and the obligation of lawyers to promote a justice system that provides equal access and eliminates bias, discrimination, and racism in the law should be among the values and responsibilities of the legal profession to which students are introduced."

82.    Interpretation 303-7 of the ABA Standards adds: "Standard 303(c)'s requirement that law schools provide education on bias, cross-cultural competency, and racism may be satisfied by, among other things, the following: (1) Orientation sessions for incoming students; (2) Lectures on these topics; (3) Courses incorporating these topics; or (4) Other educational

experiences incorporating these topics. While law schools need not add a required upper-division course to satisfy this requirement, law schools must demonstrate that all law students are required to participate in a substantial activity designed to reinforce the skill of cultural competency and their obligation as future lawyers to work to eliminate racism in the legal profession."

83.    It is entirely unclear how the "accreditation exception" will be applied by IHL in administrative proceedings or Mississippi chancery courts considering actions for damages. If professors at the University of Mississippi School of Law address in their classes matters of critical race theory, gender identity and the law, systemic racism in policing, or redlining by financial institutions in a manner consistent with ABA Standard 303c and ABA Interpretations 303-6 and 303-7, might they nonetheless run afoul of Mississippi law and be subject to discipline, dismissal, or a claim for civil damages?

## POLICIES AND PROCEDURES REQUIRED BY THE ACT

84.    Sections 7(1)–(2) require Defendants to adopt certain policies and procedures within ninety days of the effective date of the act:

(1) Within ninety (90) days of the effective date of this act, the Board of Trustees of State Institutions of Higher Learning shall adopt a complaint process, investigative procedures, and all other policies and procedures for appropriately investigating violations of this act.

(2) (a) Within ninety (90) days of the effective date of this act, the Mississippi Community College Board, the State Board of Education in conjunction with Mississippi School Board Association and the Mississippi Charter School Authorizer Board shall adopt a model complaint process, investigative procedures and all other policies and procedures for appropriately investigating violations of this act.

(b) Within ninety (90) days of adoption of model rules, every local school board, governing board of a charter school, and board of trustees for junior and community colleges shall adopt policies and procedures for appropriately investigating

violations of this act. The State Board of Education, as the governing board for
state-operated schools, shall adopt such rules for these schools.

85.    Although these policies and procedures are not due for 90 days after the act takes

effect, Section 11 states that "this act shall take effect and be in force from and after its passage."

Section 7(3) states that any complaint regarding a violation must be filed within "thirty (30) days

of the alleged violation." This raises the question of whether schools, teachers and students can

be penalized as the result of an alleged violation of the act prior to the adoption of the policies

and procedures.

86.    Moreover, nothing in these policies will ameliorate the unconstitutionality of the

provisions banning a wide array of legitimate speech at Mississippi schools. As required by

Sections 7(1)–(2), the policies and procedures will relate only to the process for submitting

complaints to schools about violations of those provisions and to investigating the teachers,

students, and administrators accused of saying the wrong words about the wrong things. They

will not resolve the ambiguities as to what speech would violate the provisions of the act and

what speech would be permissible. This requirement of formal policies and procedures for

people to accuse teachers, administrators, and students, and for the government to investigate

them, illustrates the pernicious and punitive nature of the free-speech witch hunt that will be

unleashed by this legislation.

**CONSEQUENCES FOR TEACHERS, ADMINISTRATORS, AND STUDENTS**

87.    Although the statute's requirements as contained in Section 3 are placed initially

on the boards to ensure that each school not engage in these matters, the consequences for

teachers, administrators, and students can be severe.

88.    Section 7 provides that the relevant board – whether one of the statewide

Defendant boards or a local school board – must investigate any reported violation of the act, and

Section 7(6) provides that the school must "cure all actions relating to [any] violation" found by the board. The statute does not define what is necessary to "cure all actions relating to [any] violation," but this language seems to allow the school to terminate or otherwise discipline any educator who, contrary to Section 3(b), "engages in divisive concepts," including (to quote Section 2(d)) by "increasing awareness or understanding of issues related to race, sex, color, gender identity, sexual orientation or national origin." Under Sections 7(3) and (4), a complaint of a violation can be made by any employee, faculty, staff or contractor, student, or parent, guardian, or next friend of a student under 18.

89.     Obviously, complaints can and will be made against teachers, librarians, and other administrators. But it stands to reason they will also be made against students who speak or write about the banned subjects. The previous discussions about the exceptions in Sections 5(b) and 5(d) seem to confirm that individual students can be charged. Also, Section 3(h) states that students and educators cannot be penalized for refusing to support an undefined "diversity, equity or inclusion concept," implying that students can be penalized for actually supporting such a concept. In the face of these indications that students are covered, there is nothing in the act that states the prohibitions cannot be applied to students, that complaints cannot be made against students, and that students cannot be disciplined as part of the "cure [of] all actions relating to [any] violation."

90.     Further, Section 7(7) provides that any person who complains to one these boards of an alleged violation and who is aggrieved by a formal final finding of the board may file an appeal de novo in chancery court. If the chancery court finds a violation has occurred, it "may award relief in the form of an injunction and/or actual damages."

91.    On top of that, Section 9 allows the Attorney General, after notification by a complainant of aggrievement of the action or inaction of the respective board, to file a writ of mandamus in the chancery court, which can then "award relief in the form of an injunction and/or actual damages." The act does not specify whether the injunction and damages obtained through either of these routes can be awarded only against the school or can be awarded against the teacher, administrator, or student who allegedly committed the violation.

92.    The potential consequences for schools, administrators, teachers, and students are exacerbated by the absence of an explicit scienter requirement in the statute. There is no direction or guidance for administrators, teachers, and students of whether the law is violated, and whether the schools must "cure all actions relating to the violation" if the teacher or student did not realize that their words allegedly violated the act.

93.    Finally, and most ominously, Section 8 provides that if a school violates the law by failing to cure all actions relating to two or more specific violations, "the State of Mississippi *shall withhold* the disbursement" of "any and all funds appropriated by the Legislature" for the particular university, community college, junior college, or K-12 public school at issue. (Emphasis added). Thus, if there are two uncured violations – whether caused by a teacher, a student, an unregistered student organization, a registered student organization if state funds are determined to have been used, or a guest speaker or performer if state funds are determined to have been used – all state funds "shall" be withheld and the school would likely close, all students would be sent home, and all teachers and other employees would be terminated.

## HARMS

94.    The challenged provisions of HB 1193 violate the First and Fourteenth Amendment rights of the named Plaintiffs and class members in this case. The plaintiffs who are

teachers, and the teacher members of the plaintiff organizations, the JFT and the UCW, are prohibited by the challenged bans from saying anything that "increase[s] awareness or understanding of issues related to race, sex, color, gender identity, sexual orientation or national origin" as described in Section 2(d) which is incorporated through 3(b) and 3(i), from saying anything about the "divisive concepts" described in Section 2(e) as incorporated through 3(b), from saying anything that might be perceived as "promot[ing]" or "endors[ing]" certain other concepts or any "related formulation of those concepts" as defined in Section 3(f), and from saying anything that might be perceived as "[r]equir[ing]" a student "as a condition of enrolling . . . [or] continuing enrollment, to participate in diversity, equity and inclusion training" under Section 3(g).

94.    Each of the plaintiff teachers, Professor Thomas, Professor Aderer and Professor Phillips, and many members of the JFT and UCW, have heretofore taught about, written about, and/or discussed, inside and outside the classroom, "issues related to race, sex, color, gender identity, sexual orientation or national origin," as prohibited by 3(b) and 3(i), as well as the "divisive concepts" prohibited by 3(b). Moreover, the plaintiff teachers and some members of the JFT and UCW, have taught about, written about, discussed and/or made statements, as part of their coursework, that could be construed as "promot[ing] diversity, equity and inclusion" and "endors[ing]" concepts covered by Section 3(f) and "any related formulation of these concepts." As part of their coursework, some of them have acted, or fear they may act, in ways that are prohibited or deemed to be prohibited by Section 3(g) as required "diversity, equity, and inclusion training."

96.    The plaintiff teachers, and various members of the JFT and UCW, consider all or some of these matters to be integral to their jobs, their academic freedom, and the exercise of

their rights to free speech as part of their jobs, and would like to continue doing their jobs as before.

97.     The librarian plaintiff, Dawn Zimmerer, and some librarian members of the plaintiff organizations are bound by the same bans and apparently are prohibited from providing information and keeping books on their shelves that violate the bans. They maintain books and other sources that are available for circulation that "increase awareness or understanding of issues related to race, sex, color, gender identity, sexual orientation or national origin," as prohibited by Section 3(b), that could be construed as relating to the "divisive concepts" prohibited by 3(b) and 3(i), and that could be construed as "promot[ing]" or "endors[ing]" certain other concepts or any "related formulation of those concepts," as encompassed in Section 3(f).

98.     They consider maintaining these materials is integral to their jobs as librarians and would like to continue maintaining them. They believe they have the right to do as part of their professional responsibilities and their rights to free speech.

99.     Ashley Rogers and the administration members of the plaintiff organization UCW are also bound by the same bans and apparently required to enforce the bans and prohibit speech which violates them. Some administration members of the UCW who provide information and materials to teachers and librarians, or allow or require teachers and librarians to utilize and maintain materials, are engaged in activity prohibited by the bans or could be construed as violating the bans.

100.    These administrators believe that providing this information, and allowing or requiring use of this information, is integral to their jobs and they would like to continue doing so. They believe they have the right to do so as part of their professional responsibilities and their

rights to free speech. Further, these administrators believe the bans are unconstitutional and do not want to enforce them. They believe that being forced to enforce the unconstitutional bans will violate their own rights to free speech.

101.    As indicated by certain provisions of the act, the student plaintiffs, Madisyn Donley and Alexis Cobbs, and members of the WISE and FLARE student groups, also appear to be bound by the bans and prohibited from saying anything that violates the act, although they previously have done so and wish to continue doing so. So do the minor children of plaintiff L.E. JiBol, Joy Parikh, Greg Powell, Jakob Clark, and Ashley Rogers.

102.    The right to an education of plaintiffs' children will be violated by the challenged provisions, which should be free from discrimination and viewpoint and content censorship. The children will be prohibited from receiving protected speech and activity, including extracurricular speech, now banned by Sections 3(b), 3(f), 3(g) and 3(i).

103.    Students Donley and Cobbs, and members of the WISE and FLARE student groups, plan to take several classes in the upcoming 2025–26 academic year where they would expect to and wish to receive information and discuss many topics which may be or are banned by the law including by Sections 3(b), 3(f), 3(g) and 3(i). These classes would include discussion on race, racism, gender and sexual identity, and systemic barriers to justice. They will receive an inferior education and will be less prepared than students from other states if their access to these discussions is limited. In addition, they may be subjected to sanctions for participating in discussion of concepts prohibited by the challenged law.

104.    WISE has in the past held, and intends to continue to hold in the future if they are allowed, conferences and other events which engage students, educators and the Hattiesburg community in the STEM fields in an effort to expand who participates in STEM and to change

the perception of what a scientist looks like. These conferences and efforts have focused on concepts and topics which may be or are banned by the law including by Sections 3(b), 3(f), and 3(i) because they focus on female students and scientists, LGBTQ people and others underrepresented in STEM.

105.    The law, including Sections 3(b), 3(f), and 3(i), does or may prohibit FLARE's activities, and even the very existence of the group. Mississippi State University recently reorganized FLARE's structure in light of school officials' belief about the requirements of the law. This new structure resulted in a change in the student group funding that FLARE has received. Moreover, FLARE is changing the nature of the activities it conducts and its speech around those activities in light of school officials' beliefs about the requirements of the law.

106.    Ms. Donley is president of a student organization, the ACLU chapter at the University of Mississippi Law School, which wishes to hold meetings and take actions that will include discussions and advocacy around the banned subjects, as they have done in the past, but they are uncertain as to which activities in which places would violate the bans. The same is true for WISE and FLARE.

107.    The student organizations which are plaintiffs or which include individual plaintiffs among their membership, are at risk of losing school funding because Defendants or other school officials may conclude that the funding violates the act or that the organizations have somehow violated the act.

108.    Many provisions of the act are vague, confusing, and inconsistent, and make it difficult for the teachers, librarians, administrators, and students who are plaintiffs or members of the plaintiff organizations to differentiate what is prohibited from what is allowed. The teachers, librarians, administrators, and students who are plaintiffs or members of the plaintiff

organizations are threatened with the prospect of penalties and harmful consequences posed by Sections 7–9 that are undefined, unrestrained, and subject to arbitrary and capricious enforcement. All of these plaintiffs and many members of the plaintiff organizations are uncertain as to which of their actions will violate the provisions of the act and are concerned that the actions they take as educators, administrators, or students (or that the actions that the plaintiff parent's children take) will later be held against them and that they will be disciplined or terminated for saying and doing things that are protected as part of their right to free speech. They will self-censor and refrain from saying certain things that they otherwise would say and/or will subject themselves to discipline and termination for things they say that are protected by their rights to free speech. This harm is compounded by the fact that the law conflicts with other codes and laws that bind plaintiffs, including professional codes of conduct, accreditation standards, and conflicting state laws, leaving plaintiffs unclear on what they can and cannot do.

109.    All of this harms each of the plaintiffs, the children of a plaintiff, and the teachers, librarians, administrators, and students who are members of the plaintiff organizations. It discourages and chills their speech, and it prevents them from hearing certain prohibited speech, in a way that prevents them from exercising their rights under the First and Fourteenth Amendments.

110.    The act is enforced, and these harms are caused, by the Defendants in this case.

111.    Defendants are required by Section 3 of the act to "ensure that each institution, college and public school, as applicable, shall not" do any of the things prohibited by Section 3, including those bans that are challenged in this case. Section 6 requires each institution, college or public school to submit annual reports, complaints and dispositions to the defendants. Section 7(2) requires these defendants to adopt a model complaint process and policies and procedures

for investigating alleged violations. Sections 7(3) and 7(6) require them to receive complaints, investigate them, make findings as to any alleged violations, trigger the obligation of public schools and post-secondary institutions "to cure all actions relating to [any] violation" found by these defendants, and issue a formal finding detailing any alleged violation they found and the curative response. These defendants, and any findings they make of alleged violations, also play an important part in the operation of Section 8 of the act, which requires the State of Mississippi to withhold the disbursement of state educational funds to any public school or public postsecondary institution upon the occurrence of two uncured violations of the act. If these defendants are enjoined from enforcing this act, the harms will be abated. If not, the harms will continue.

112.    Defendant Fitch, in her role as Attorney General, is authorized by Section 9(1)(b) of the act to file, under certain circumstances, an application for writ of mandamus in chancery court for injunctive relief "compelling the state institution of higher learning, community or junior college, public school board or charter school governing board to comply with this act if such entity has failed to cure [an] error with[in] the thirty day curative period." Section 9(2) then authorizes the chancery court to "award relief in the form of an injunction and/or actual damages." Section 8(2) states that any withdrawal of state funds pursuant to Section 8(1) "shall remain in effect until such as the violating entity demonstrates full compliance with the provisions of this act, as certified by the appropriate governing authority and confirmed by the Attorney General or a court of competent jurisdiction."

## ALLEGATIONS OF CLASS REPRESENTATIVE PLAINTIFFS

113.    Plaintiffs seek to litigate this case for themselves, for their children where relevant, and on behalf of classes of all others similarly situated.

114.    Plaintiffs propose the following class definitions:

115.    **Class 1**: All educators at postsecondary public educational institutions and K-12 public schools in Mississippi.

**Subclass (a):** All educators at state-supported two-year community or junior colleges under the purview of the Mississippi Community College Board, and at state-supported four-year colleges or universities under the purview of the Board of Trustees of the State Institutions of Higher Learning.

**Subclass (b):** All educators at K-12 public schools in Mississippi.

116.    **Class 2:** All students and parents or guardians of minor students at postsecondary public educational institutions and K-12 public schools in Mississippi.

**Subclass (a):** All students at state-supported two-year community or junior colleges under the purview of the Mississippi Community College Board, and at state-supported four-year colleges or universities under the purview of the Board of Trustees of the State Institutions of Higher Learning.

**Subclass (b):** All parents or guardians of students at K-12 public schools in Mississippi.

117.    For purposes of the classes and subclasses listed above, "school" or "public school" has the same meaning from Miss. Code Ann. § 37-68-5(c): "public school districts, agricultural high schools, the Mississippi School for the Deaf and Blind, the Mississippi School of the Arts and the Mississippi School for Mathematics and Science and public charter schools."

118.    Plaintiffs readily meet the requirements of both Rule 23(a) and Rule 23(b)(2) with respect to each subclass.

119.    Each subclass is sufficiently numerous that joinder would be impracticable. Fed. R. Civ. P. 23(a)(1). Although the numerosity requirement can be satisfied by only a few dozen members, each subclass includes hundreds, if not thousands, of members.

120.    There are numerous questions of law and fact common to each subclass, *see* Fed. R. Civ. P. 23(a)(2), including:

- Are the challenged provisions of HB 1193 unconstitutional under the First Amendment because they discriminate against certain viewpoints?

- Are the challenged provisions of HB 1193 unconstitutional under the First Amendment because they impose content-based restrictions?

- Are the challenged provisions of HB 1193 unconstitutional under the Fourteenth Amendment because they are so vague that they fail to provide a reasonable person sufficient guidance to know what will subject them to penalty?

- Are the challenged provisions of HB 1193 unconstitutional under the Fourteenth Amendment Equal Protection Clause because they restrict engagement with "issues related to race, sex, color, gender identity, sexual orientation or national origin," while permitting engagement with many other issues, including those related to economics, social class, religion, and political party?

- Are the challenged provisions of HB 1193 unconstitutional under the Fourteenth Amendment Due Process Clause because they require the withholding of state funds to any school or educational institution where there are two uncured violations?

- Is HB 1193 narrowly tailored to achieve any compelling state interest?

121.    The Putative Subclass Representatives have claims that are typical of other members of the class. Fed. R. Civ. P. 23(a)(3). As it does for other members of each subclass, the

challenged provisions of HB 1193 restrict the First Amendment protected speech of each of the Putative Subclass Representatives and establish vague criteria for what can and cannot be said. They also violate the 14th Amendment Equal Protection and Due Process rights of each Putative Subclass member by prohibiting engagement with "issues related to race, sex, color, gender identity, sexual orientation or national origin" and by requiring the withholding of state funds to schools and educational institutions when there are two uncured violations of the statute.

122.    The Putative Subclass Representatives will serve as adequate subclass representatives. Fed. R. Civ. P. 23(a)(4). There is no conflict of interest between the representatives and members of each of their respective subclasses, and they are prepared to vigorously assert the interests of all members of their respective subclass.

123.    Defendants have acted and failed to act in a manner that applies generally to the subclasses as a whole, rendering class-wide injunctive and declaratory relief appropriate. *See* Fed. R. Civ. P. 23(b)(2).

124.    It is appropriate to divide each class into subclasses and treat each subclass as a class pursuant to Rule 23(c)(5).

125.    Class counsel are experienced litigators well-versed in this case and the legal issues implicated by it. *See* Fed. R. Civ. P. 23(g).

**VIOLATIONS**

*Count One: First Amendment Right to Speak*

126.    The prohibitions in Sections 3(b), 3(f), 3(g), and 3(i) of the act run afoul of the plaintiffs' right to speech protected by the First Amendment free of viewpoint and content-based discrimination.

127.    HB 1193 prohibits plaintiff educators from teaching about topics that are disfavored by the Mississippi Legislature and would require them to change the content of their instruction and the discussions in their classes.

128.    HB 1193 will also prevent plaintiff students and the children of the parent plaintiff from speaking about disfavored topics in the classroom setting, and it may prevent them from speaking about these topics during student group events, inviting speakers onto campus to discuss those topics, or publishing materials about the topics in student newspapers and other publications.

129.    HB 1193's restrictions are based on content and viewpoint and are not justified by any compelling state interest.

*Count Two: First Amendment Right to Receive Information*

130.    The prohibitions in Sections 3(b), 3(f), 3(g), and 3(i) of the act run afoul of the First Amendment rights of the student plaintiffs and the children of the parent plaintiff on behalf of their minor children to receive information protected by the First Amendment.

131.    By censoring educators and prohibiting particular viewpoints and content in the course of instruction, HB 1193 denies student plaintiffs and the children of the parent plaintiff the right to learn from those viewpoints and content.

132.    HB 1193's restrictions are based on content and viewpoint and are not justified by any compelling state interest.

*Count Three: First Amendment Loss of Student Funding*

133.    The student and student group plaintiffs will be harmed by any loss of student group funding implemented by schools as a result of the enforcement of HB 1193. They are at

risk of losing that funding because schools officials conclude that the funding violates the act or that the organizations have somehow violated the act.

134.    Student organizations within publicly funded schools are entitled to have their access to available state funds determined by viewpoint- and content-neutral policies.

135.    When a public school has created a forum generally open for use by student groups it must justify speech restrictions in those forums under applicable constitutional norms. The school may not favor certain views over others in allocating resources in a limited public forum.

136.    Any loss of student group funding will be the result of the viewpoint and content of the student groups and the discussions at their meetings and their advocacy. Meanwhile, other student groups at these same universities with different viewpoints and content will be allowed to maintain their funding.

137.    HB 1193's restrictions are based on content and viewpoint and are not justified by any compelling state interest.

138.    Any loss of funding by the plaintiff student groups and the groups to which the individual plaintiffs belong will violate the First Amendment rights of those student groups and their members, including some student plaintiffs.

*Count Four: First and Fourteenth Amendment Vagueness*

139.    Many of the provisions of the act are vague, confusing, and overbroad, do not allow people of ordinary intelligence to distinguish prohibited speech from permissible speech, and allow for arbitrary and capricious enforcement, all in violation of the plaintiffs' rights under the First Amendment and the Due Process Clause of the Fourteenth Amendment. These include the challenged bans themselves contained in Sections 3(b), 3(f), 3(g), and 3(i), the purported

exceptions contained in Sections 5(b), 5(c), 5(d), 5(h), 5(i) and 5(j), and the provisions on consequences contained in Sections 7, 8, and 9.

*Count Five: Fourteenth Amendment Equal Protection*

140.    By explicitly singling out and prohibiting engagement with "issues related to race, sex, color, gender identity, sexual orientation or national origin," while permitting engagement with many other issues, including those related to economics, social class, religion, and political party, Section 3(b) of the act, which incorporates Section 2(d) of the act, violates the rights of the plaintiffs under the Fourteenth Amendment Equal Protection clause. Alternatively, even if does not violate the rights of all plaintiffs, it violates the rights of those plaintiffs and members of the plaintiff organizations who are people of color, women, and/or LGBTQ+.

*Count Six: Fourteenth Amendment Due Process Violation*
*Stemming From the Withdrawal of State Funding and Closing of the Schools*

141.    By requiring the withdrawal of state funding to a particular school, whether a state university or a local elementary, middle, or high school, anytime there are two uncured violations, Section 8 of the act mandates the extreme consequences that will result from the closing of the school. Students will be deprived of their education and teachers and other employees will be deprived of their jobs even though nearly all of them will not have participated in the two uncured violations that lead to the closure. The potential for this sort of arbitrary and capricious action violates the rights of the plaintiffs to their liberty and property interest to a public education under the Mississippi Constitution and laws and to their employment in that educational system, all in violation of the Due Process Clause of the Fourteenth Amendment.

**RELIEF**

Plaintiffs request the following:

1.    A declaration that Sections 3(b), 3(f), 3(g), and 3(i) and Sections 7, 8, and 9 of the act violate the First and Fourteenth Amendments to the United States Constitution;

2.    A preliminary and permanent injunction preventing the defendants and any other individuals and entities acting in concert with them from enforcing Sections 3(b), 3(f), 3(g), and 3(i) and Sections 7, 8, and 9 of the act;

3.    An award to the plaintiffs of their costs and attorneys' fees;

4.    And all other relief that is just and equitable.

Dated: August 19, 2025                          Respectfully submitted,

s/ ROBERT B. MCDUFF
ROBERT B. MCDUFF
 MS BAR NO. 2532
PALOMA WU
 MS BAR NO. 105464
MISSISSIPPI CENTER FOR JUSTICE
210 E. CAPITOL STREET, STE 1800
JACKSON, MS 39201
601-259-8484
RMCDUFF@MSCENTERFORJUSTICE.ORG
PWU@MSCENTERFORJUSTICE.ORG

s/ AMIR BADAT
AMIR BADAT
 MS BAR NO. 106599
BADAT LEGAL PLLC
P.O. BOX 15
TOUGALOO, MS 39174
PHONE: 601-462-9592
AMIR.BADAT@GMAIL.COM

COUNSEL FOR PLAINTIFFS

s/ JOSHUA TOM
JOSHUA TOM
 MS BAR. NO 105392
MCKENNA RANEY
 MS BAR NO. 106330
AYANNA HILL
 MS BAR NO. 106590
AMERICAN CIVIL LIBERTIES UNION OF
MISSISSIPPI FOUNDATION, INC.
P.O. BOX 2242
JACKSON, MS 39225
PHONE: (601) 354-3408
JTOM@ACLU-MS.ORG
MRANEY@ACLU-MS.ORG
AHILL1@ACLU-MS.ORG

s/ NICOLAS STANOJEVICH
NICOLAS STANOJEVICH*
RICHARD ROUCO*
QUINN, CONNOR, WEAVER,
DAVIES & ROUCO LLP
2 20TH STREET NORTH SUITE 930
BIRMINGHAM, AL 35203
PHONE: (205) 870-9989
NSTANOJEVICH@QCWDR.COM
RROUCO@QCWDR.COM
*ADMITTED PRO HAC VICE

## CERTIFICATE OF SERVICE

I hereby certify that on this date all counsel of record were served with the foregoing by operation of the Court's electronic filing system on August 19, 2025.

*s/ McKenna Raney*

Co-counsel for Plaintiffs