# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

October 22, 2026

Thomas B. Plunkett, III
Clerk

---

No. 25-60496

---

JACKSON FEDERATION OF TEACHERS; BARBARA PHILLIPS, *Individually and on behalf of a class of all others similarly situated*; JAMES THOMAS, *Individually and as next friend to minor children, and on behalf of a class of all others similarly situated*; DAWN ZIMMERER, *Individually and on behalf of a class of all others similarly situated*; L.E. JIBOL, *Individually and as next friend to minor children, and on behalf of a class of all others similarly situated*; UNITED CAMPUS WORKERS SOUTHEAST LOCAL 3821; MADISYN DONLEY, *Individually and on behalf of a class of all others similarly situated*; ALEXIS COBBS, *Individually and on behalf of a class of all others similarly situated*; KAREN ADERER, *Individually and on behalf of a class of all others similarly situated*; FOSTERING LGBTQ+ ADVOCACY, RESOURCES, and ENVIRONMENTS; WOMEN IN SCIENCE AND ENGINEERING; JOY PARIKHA, INDIVIDUALLY *and as next friend to minor children, and on behalf of a class of all others similarly situated*; GREG POWELL, *Individually and as next friend to minor children, and on behalf of a class of all others similarly situated*; JAKOB CLARK, *Individually and as next friend to minor children, and on behalf of a class of all others similarly situated*; ASHLEY ROGERS, *Individually and as next friend to minor children, and on behalf of a class of all others similarly situated*,

*Plaintiffs—Appellees*,

*versus*

LYNN FITCH, *in her official capacity as Attorney General of Mississippi*; GEE OGLETREE, *in their official capacity as President of the Board of Trustees of* STATE INSTITUTIONS OF HIGHER LEARNING; STEVEN CUNNINGHAM, *in their official capacities as Members of the Board of Trustees of* STATE INSTITUTIONS OF HIGHER LEARNING; AMY ARRINGTON, *in their official capacities as Members of the Board of Trustees of*

State Institutions of Higher Learning; Donald Clark, Jr., *in their official capacities as Members of the Board of Trustees of* State Institutions of Higher Learning; et al.,

*Defendants—Appellants.*

---

Appeal from the United States District Court
for the Southern District of Mississippi
USDC No. 3:25-CV-417

---

Before Smith, Haynes, and Engelhardt, *Circuit Judges.*

Jerry E. Smith, *Circuit Judge*:

The district judge issued a preliminary injunction barring enforcement of a new state law regarding diversity, equity, and inclusion. We vacate the injunction and remand for reassignment to a different district judge.

* * * * *

In April 2025, Mississippi enacted House Bill 1193 (H.B. 1193), a law designed to keep Mississippi public education funds from being spent on diversity, equity, and inclusion ("DEI") initiatives and similar controversial programs. The law prevents government-run institutions from requiring activities such as diversity training or pushing DEI ideology, so defined, in the course of government-funded business.

H.B. 1193 does four main things. First, it prevents educational institutions from mandating DEI programs and diversity trainings in a variety of contexts. Second, it stops public educational institutions from punishing students for their views on DEI. Third, it prohibits regulated institutions from endorsing or promoting DEI through course materials. Finally, it prevents institutions and their educators from otherwise engaging in DEI methods or actions, preventing bad actors from circumventing prohibitions and frustrating its purposes. The statute also creates an administrative process to handle

claims that a given educational institution is not in compliance. H.B. 1193 excepts several activities from its sweep, including scholarly work, the activities of students and their groups, and creative engagement.

Plaintiffs, a smattering of teachers, professors, students, parents, and activist organizations, filed a pre-enforcement facial challenge, claiming the law violates the First Amendment, unconstitutionally contravenes the void-for-vagueness doctrine, and otherwise violates various Fourteenth Amendment doctrines.

The proceedings in the district court were a botch job, to say the least. Judge Henry Wingate issued a temporary restraining order ("TRO") enjoining enforcement of H.B. 1193 that contained several factual assertions nowhere to be found in the record, or indeed, in any proceeding of the case. Those included mention of plaintiffs and defendants not in the complaint, supposed "declarations" from non-existent or never-present individuals, false quotations purporting to be taken from the text of H.B. 1193, and several erroneous claims that the law had already led to the demise of apparently fictitious programs.

After this came to light, Judge Wingate replaced the TRO without explaining.

Forging forward despite the bungled TRO, Judge Wingate issued a pre-enforcement preliminary injunction. The various state defendants appeal.

At oral argument in this court, it was discovered that even the "corrected" TRO—which was incorporated by reference into the preliminary injunction order—still contained hallucinated information (namely, a citation to a purported Fourth Circuit case, "*Cousins v. School Bd. of City of Norfolk*," that does not exist).

This district judge carelessly exercised his Article III power by issuing sloppy edicts based on falsehoods and fabrications. Upon discovering some of these falsehoods, Judge Wingate dug in his heels and claimed that the hallucinated claims had no bearing on its reasoning; he offered no explanation as to why he included such apparently irrelevant material in the original TRO or why the TRO nevertheless was justified in its absence.

Moreover, the district court got the law wrong. The TRO and preliminary injunction order rested on impoverished legal analysis that barely paid lip-service to the precedents of the Supreme Court or this court, seeming at times purposely to misconstrue the law by manipulating the words of statutes and cases, without regard to their texts' meaning as a whole.[1] The district court—or perhaps, being charitable, its AI agent—ignored and manipulated governing law, apparently to satisfy a policy agenda.

Because of the extraordinarily grave errors by the district court, we vacate and remand for assignment to a different district judge. Per the Supreme Court's decision in *Moody*, we instruct the new judge to conduct proceedings consistent with federal law as interpreted by the Supreme Court and this circuit.

---

[1] *See, e.g.*, *Green v. Bock Laundry Mach. Co.*, 490 U.S. 504, 528–29 (1989) (SCALIA, J., concurring in the judgment) (Best interpretation of law will "rationally" fit with "the policy of the law in general and the [statutory scheme] in particular."); DIG. 1.3.17 (Celsus, Dig. 26) ("*Scire leges non hoc est verba earum tenere, sed vim ac potestatem.*") ("To know the laws is not to grasp their words, but their strength and power." (author's translation)). *Cf. Babbitt v. Sweet Home Chapter of Cmtys. for a Great Oregon*, 515 U.S. 687, 717–18 (1995) (SCALIA, J., dissenting) (impermissible for courts to isolate and extract words of statutory definition divorced from the whole of the law). *Accord Webster v. Doe*, 486 U.S. 592, 608–09 (1988) (SCALIA, J., dissenting).

## I.

### A. Procedural History

Plaintiffs are a teachers' group, a campus union, two student groups, professors, teachers, college students, and parents of K-12 students. Sets of plaintiffs propose to represent putative classes of Mississippi teachers, professors, students, and parents or guardians of minor students. In June 2025, they filed a pre-enforcement suit two months after the passage of H.B. 1193, naming several state officials charged with enforcing the act as defendants.

On July 20, 2025, Judge Wingate entered the TRO. Two days later, defendants filed a motion to clarify or correct the order, pointing out several factual inaccuracies. Later that same day, the district court removed the original TRO from the docket and replaced it with a seemingly corrected version backdated to July 20.

The court denied defendants' request to restore the original TRO to the docket as a superseded order, claiming that the hallucinated parties, hearings, and facts were merely "clerical." After accusations that AI had been used in the original TRO made national headlines, Judge Wingate admitted to having used AI to prepare the TRO and blamed the errors on his law clerk's employment of AI in drafting it.

On August 18, 2025, Judge Wingate granted the plaintiffs' motion for a preliminary injunction, claiming that H.B. 1193 facially violated the First Amendment and was void for vagueness.

On September 16, 2025, defendants timely appealed.

### B. Jurisdiction and Standard of Review

Plaintiffs sued under 42 U.S.C. § 1983. Because there is a federal cause of action, the district court had jurisdiction under 28 U.S.C. § 1331,

and this court has jurisdiction under 28 U.S.C § 1292(a)(1).[2]

We review a preliminary injunction for abuse of discretion. *Atchafalaya Basinkeeper v. United States Army Corps of Eng'rs*, 894 F.3d 692, 696 (5th Cir. 2018). Questions of law within the analysis are reviewed *de novo*, factual determinations for clear error. *Id.* A district court that grants a preliminary injunction based on incorrect legal principles "[b]y definition" abuses its discretion. *Little v. Llano County*, 138 F.4th 834, 842 n.7 (5th Cir.) (en banc), *cert. denied*, 146 S. Ct. 886 (2025).

## II. This Case Must Be Reassigned on Remand.

The details of the district judge's orders frame our holding that reassignment is necessary to do justice.

### A. The District Judge's Actions

#### 1. The TROs

The original TRO—the one actually issued on July 20, 2025—named as plaintiffs eleven individuals and organizations who had never been party to the case[3]; named as defendants two officials who were not actually sued[4]; claimed, without evidence, that three post-secondary institutions had already cancelled DEI initiatives or programming because of the act[5]; further declared, again without evidence, that staff at another school had been told not

[2] *See, e.g.*, *Jiao v. Xu*, 28 F.4th 591, 596 & n.5 (5th Cir. 2022).

[3] These were Dr. Daphne Chamberlain, Dr. Robert Luckett, Dr. Brian Pugh, Z. Luckett, Mississippi Votes, the Black Student Union at Jackson State University, Spectrum (a purported student organization), Aidan Carr, Christopher Brent, the Mississippi Library Association, and Delta Sigma Theta Sorority, Inc. – Mississippi Chapters.

[4] These were the Commissioner of Higher Education Dr. Al Rankins, Jr. and State Superintendent of Education Dr. Lance Evans (who is a defendant in another capacity but not as Superintendent of Education).

[5] ECF 54 at 3; *see* ECF 22.

to discuss certain topics, including "historical interpretations involving systemic racism"[6]; misquoted H.B. 1193 as applying to "race or sex stereotyping," "race or sex scapegoating," "critical race theory," and "institutional bias," despite none of these terms' appearing in the act's text; and referenced purported declarations of four individuals who do not appear in the record at all and may not even exist.

On July 22, 2025, defendants filed a motion to clarify, pointing out these errors. ECF 54. In response, the court, without explanation, replaced the original TRO with a seemingly corrected version. Though that document was docketed on July 22, it was backdated to July 20. ECF 58 at 2; *see also* ECF 58-2. Defendants requested that the original order be restored to the docket to keep the record whole and requested that the court explain the inaccuracies in the original order. The district court denied that motion, claiming the factual inaccuracies were merely "clerical."[7]

In response, U.S. Senator Chuck Grassley accused the district court of using artificial Intelligence ("AI") to prepare the TRO, with the substantive errors' arising from AI-generated hallucinations.[8] Fifteen days later, Judge Wingate admitted the errors, claiming that a law clerk had used AI to assist drafting an earlier version of the TRO that was docketed by mistake.[9] His letter stated that he had removed the original TRO from the docket to avoid confusion and that the errors were clerical, in his view, because they

---

[6] ECF 54 at 3. Other topics were also listed as banned that never were, and "confusion" was described with no evidence thereof in the record.

[7] We are grateful—and, indeed, lucky—that the defendants provided a copy of the original TRO as an exhibit in their July 28 motion, ECF 58-1, given that Judge Wingate kept it from public view.

[8] Letter from Sen. Charles E. Grassley (Oct. 6, 2025), bit.ly/42tKEKg.

[9] Letter from Hon. Henry T. Wingate at 1 (Oct. 2, 2025), bit.ly/430akP3.

did not relate to "core legal reasoning or the ultimate judgment on the merits" but instead to "failure to confirm the accuracy of certain information."[10]

The seemingly corrected TRO did not explain how or why the factual inaccuracies were not necessary to the reasoning of the original TRO. The merits analysis failed to cite a binding authority from after the year 2000.[11] It claims that H.B. 1193 constitutes viewpoint discrimination, without any analysis whatsoever of a state government's authority to regulate its own speech.[12] And the document did not correct all of the errors: At Fifth Circuit oral argument, it was discovered that the doctored TRO cited to "*Cousins v. School Bd. of City of Norfolk*, 503 F.2d 422, 426–27 (4th Cir. 1974)." ECF 51 at 2–3. That case does not even exist; it is an apparent AI hallucination.[13]

2. The Preliminary Injunction

The order granting the preliminary injunction likewise lacks thoroughness.[14] For example, defendants explained that, because of the facial

---

[10] *Id.* at 2. It is not clear to this court how so many mistaken facts could not at least marginally "affect" "core legal reasoning" or support for the judgment on the merits.

[11] *See* ECF 51 at7–13. The order managed to cite *Conant v. Walters*, 309 F.3d 629 (9th Cir. 2002), for a proposition of substantive law that flies in the face of this circuit's *Garcetti* framework. *See* ECF 51 at 9. A decision of the Ninth Circuit binds neither us nor the district court. The order's public-interest analysis did manage to cite more recent binding caselaw. *See* ECF 51 at 13.

[12] ECF 51 at 7.

[13] The citation, 503 F.2d 422, is in the middle of *United States v. Anderson*, 503 F.2d 420 (6th Cir. 1974). *See id.* at 422. The pincite is to two pages of *Avis Rent A Car Sys., Inc. v. United States*, 503 F.2d 423 (2d Cir. 1974). *See id.* at 426–27. Neither case "discuss[es]" the "interplay between TRO and preliminary injunction." ECF 51 at2–3. Even if the case did exist, it wouldn't be binding in this circuit.

[14] In fact, given that the preliminary injunction order "generally incorporates by reference its discussion and analysis in its TRO," the hallucinated case discussed above is

posture of this case, the regulation only "theoretically" may apply to the plaintiffs; Judge Wingate took that as proof that the "regulations . . . almost assuredly would spill over to the public." ECF 74 at18. The district court's holding as regards the facial First Amendment challenge, meanwhile, cites only two cases (only one from the last two decades)[15] and instead focuses on things such as what "[o]ne witness wondered" and what one parent "thought . . . could be considered" excised by the State of Mississippi's regulation. ECF 74 at 18–21. The court referenced *Moody v. NetChoice*, 603 U.S. 707 (2024), only to circumvent it. Indeed, the district court's conclusory analysis claims that *Moody*'s framework is only "supposedly" required:

> Essentially, Defendants argue that Plaintiffs have not made the showing supposedly necessary under *Moody v. NetChoice*. This Court disagrees. Plaintiffs, through declarations, testimony, and logical argumentation, have identified many concrete examples of [materials and programs] that are arguably on the chopping block should HB 1193's content-based restrictions be enforced. Plaintiffs affirmatively stated that they could think of no constitutional applications of the challenged provisions. Defendants, on the other hand, while they carry no burden, did not offer competent evidence and argument as to constitutional applications adequately to rebut Plaintiffs' showing.

ECF 74 at 20–21.

The district court brushes off the *Moody* framework as a "supposed" formality that was satisfied merely because plaintiffs identified programs and books that, in their view, are "arguably on the chopping block." That does not come close to satisfying the inquiry demanded by *Moody*. It is egregious

---

arguably part of the shoddy reasoning of the preliminary injunction, too.

[15] That was an erroneous citation of "*Kennedy v. Bremerton* [sic]," ECF 74 at 19, referring to *Kennedy v. Bremerton School District*, 597 U.S. 507 (2022).

for the district court just to assume that plaintiffs' assertions that certain materials are "on the chopping block" must mean a constitutional violation has occurred, without any independent legal analysis whatsoever.[16]

It is even worse for the court merely to take the plaintiffs' claims as true, with barely a glance at the arguments of the defendants. That is legal analysis so poor that it hardly deserves the label. The order defends its analysis by claiming that the plaintiffs "do not seek to challenge HB 1193's prohibitions on unlawful discrimination," ignoring the fact that several of the challenged portions arguably do nothing more than prohibit unlawful discrimination.[17] ECF 74 at 9.

*Moody* demands that a plaintiff raising a facial First Amendment challenge show that the law's "unconstitutional applications substantially outweigh its constitutional ones." *Moody*, 603 U.S. at 724. A facial challenge may succeed only by following *Moody*'s two-step process: first, establish the scope of the law, *i.e.*, which activities and which parties the law regulates; second, determine which would and would not be constitutional and "compare the two sets" to see whether there is a "sphere of [constitutional] applications" that can defeat the facial claim. *Id.* at 724–25, 726. The key inquiry of the second step, our circuit has held, is whether the plaintiff can meet the "rigorous" standard by showing that "the ratio of unlawful-to-lawful applications" is so "lopsided" as substantially to outweigh the lawful reach of the

---

[16] The district court cannot claim that it followed *Moody* in good faith by hiding behind the thin reed of defendants' alleged failure to "offer competent evidence and argument as to constitutional applications." Since defendants argued that there are many constitutional applications and that Plaintiffs' worries were mistaken, *see* ECF 43 at 8–17, the district court's statement is not a reflection of forfeiture by defendants.

[17] *See infra* part III.A.

law.[18]

That Judge Wingate twice refers to the *Moody* framework as "supposedly" required calls into question whether he even tried in good faith to follow the law.[19] ECF 74 at 15, 20. Inferior courts must perform the *Moody* analysis exactly "in the way . . . described" in order properly to rule on a First Amendment facial challenge. *Moody*, 603 U.S. at 726. The district court's laxity in observing the binding authority of the Supreme Court is yet another reason to doom the preliminary injunction.

The district court's remaining substantive reasoning is poor at best. Judge Wingate cites a couple of parents who were allegedly worried about the law's impact, ECF 74 at 18–19; the fact that defendants are "loudly noncommittal," something bordering on paradoxical that has nothing to do with legal analysis, *id.* at 19; and, on vagueness, the passing thought that "if [H.B. 1193] lives down to the fears it has generated, has a mouthful of sharp teeth which could inflict deep bites," *id.* at 21.

More subtle, but still deeply troubling, are the legal basis for, and scope of, the preliminary injunction. Citing the fact that defendants admitted that the law of university academic publication freedom "remains unclear," Judge Wingate wrote that "Defendants' recognition, alone, at this time, preaches that an injunction should issue when a key consideration is yet undetermined. This Court should pause when faced with an unsettled area with such dire possible consequences." ECF 74 at 19.

---

[18] *Students Engaged in Advancing Tex. ex rel. Fernandez v. Paxton*, 177 F.4th 665, 672 n.19 (5th Cir. 2026) (first quoting *Moody*, 603 U.S. at 723, then quoting *United States v. Hansen*, 599 U.S. 762, 784 (2023) (internal quotation marks omitted)).

[19] Then again, Judge Wingate may merely have been expressing legitimate confusion, since he seems to think, in at least one instance, that *Moody* requires a certain "showing" by plaintiffs "with their vagueness theory." ECF 74 at 15.

That gets the entire law of injunctive relief completely backwards. Maybe Judge Wingate thinks that preliminary injunctions are not extraordinary relief that interrupt the normal function of a democratically elected legislature and executive, but instead are a way for courts to "pause" in the face of "an unsettled area" of law. ECF 74 at19. Under U.S. law, however, things are different. The law forbids district courts from "pausing" if the outcome is totally uncertain. To impose preliminary injunctive relief, a court must find that the party requesting it is *likely* to succeed on the merits. *Planned Parenthood v. Kauffman,* 981 F.3d 347, 353 (5th Cir. 2020) (en banc). And the burden is on that party—in this case, the plaintiffs—because injunctive relief is, by its nature, an extraordinary remedy requiring a high bar. *Id.* A preliminary injunction cannot stand just because there is a *possibility* of success on the merits. The authorizing judge may justify injunctive relief only by ruling that there is *likelihood* of success.

Finally, the scope of the preliminary injunction is impermissibly broad. The order badly misunderstands *Trump v. CASA, Inc.*, 145 S. Ct. 2540 (2025).

Judge Wingate cites *CASA*'s holding that injunctive relief should be scoped as is "necessary to provide complete relief to each plaintiff," *id.* at 2562–63 (2025), for the proposition that "[i]n this Court's eye, injunctions of this type should be all-or-nothing renditions," ECF 74 at 16. That is almost exactly the opposite of what *CASA* says. The quoted portion was the Supreme Court's cautioning against overbroad relief and urging judges to tailor relief to what is absolutely necessary and nothing more: In other words, the Court rejects precisely the notion that injunctions "should be all-or-nothing renditions."[20] The Court instructs inferior courts to avoid the kind

[20] At least, to the extent that an injunction could be considered a "rendition."

of hand-waving that presumes injunctions should issue broadly merely because the stakes are high or the legal issues are complex.

The district court later gestures toward putative class certification to establish a statewide scope, but its misunderstanding of *CASA* tainted its decision to issue such a broad injunction. Indeed, *CASA* flatly rejects the idea that class actions may be used to circumvent the prohibition on universal injunctions: The whole point of its ruling was that class actions are more constrained and more fair than universal injunctions.[21] A district court that took *CASA* and Federal Rule of Civil Procedure 23 seriously would never grant such sweeping relief to such putative and dubious classes.

B. Our Circuit Precedent Demands Reassignment on Remand.

This court may reassign any case on remand when necessary for justice, per our supervisory power over the district courts.[22] Admittedly, however, reassignment on remand is an "extraordinary" and "rarely invoked" power; indeed, this power is so sparingly exercised that our court has not settled on which of two "independent"[23] tests it uses to determine whether the circumstances demand reassignment in the interest of justice. *Willey*,

---

[21] *CASA*, 145 S. Ct. at 2555; *see id.* at 2566 (ALITO, J., concurring) ("[T]oday's decision will have very little value if district courts award relief to broadly defined classes" without going through the "rigorous analysis" required by Rule 23. (citation omitted)).

[22] *United States v. Andrews*, 390 F.3d 840, 851 (5th Cir. 2004); *see also Willey v. Harris Cnty. Dist. Att'y*, 27 F.4th 1125, 1137 (5th Cir. 2022) ("[A]ppellate courts may reassign cases to a different judge on remand under their authority to 'require such further proceedings to be had as may be just under the circumstances.'" (quoting 28 U.S.C. § 2106)). *Accord Liteky v. United States*, 510 U.S. 540, 554 (1994).

[23] *Willey*, 27 F.4th at 1137 (quoting *In re DaimlerChrysler Corp.*, 294 F.3d 697, 700 (5th Cir. 2002)). The two tests are actually not so independent, since the second test essentially asks whether an objective observer would reasonably question which way the second factor of the first test tilts, at least, as regards a judge's impartiality. *See id.* (citing *United States v. Khan*, 997 F.3d 242, 249 n.4 (5th Cir. 2021)).

27 F.4th at 1137.

The first way to determine whether reassignment is warranted considers (1) whether the original judge would, on remand, "reasonably be expected . . . to have substantial difficulty in putting out of his or her mind previously-expressed views or findings determined to be erroneous or based on evidence that must be rejected"; (2) "whether reassignment is advisable to preserve the appearance of justice"; and (3) whether any "waste and duplication" caused by reassignment would disproportionately outweigh "any gain in preserving the appearance of fairness." *Id.* (quoting *DaimlerChrysler*, 294 F.3d at 700–01).

The second test asks whether the facts and circumstances of the proceedings "might reasonably cause an objective observer to question the judge's impartiality." *Id.* (quoting *DaimlerChrysler,* 294 F.3d at 701). Thus, the second test is a simplified one that essentially collapses the more complex test's first two factors and recognizes that satisfaction of those almost certainly means that the third is satisfied except, perhaps, in the most complicated, fact-intensive cases.[24]

This case easily calls for reassignment. We begin with the first test. On the first factor, the fact that the district court merely excised the AI-hallucinated "facts" from its original TRO—without explaining why the order should still stand even without the false evidence to support it—may already evince a "substantial difficulty" in setting aside views based on

[24] Some panels of this circuit have instead held the second test is entirely redundant of the first. *See Pulse Network, L.L.C. v. Visa, Inc.*, 30 F.4th 480, 495 n.25 (5th Cir. 2022). We continue with the two tests, however, because the first test is broader in some ways than the second (for example, where a judge may have trouble putting aside evidence ruled inadmissible on appeal but where his partiality is not at issue).

"findings determined to be erroneous."[25] Given the embarrassment of the AI hallucinations and mistakes of law in the two TROs and the preliminary injunction, it would be an understandable—though obviously unjust—temptation for the judge to want to find a way to prove that, even with correct law and fact, his initial view should prevail. The judge would therefore reasonably be expected to have substantial difficulty in setting aside previous views and unfounded "findings."

From there, the second and third factors are easily met. On the former, the public esteem for the judiciary would be diminished by sending this case back to the same judge for judgment on facts and law entirely different from those upon which he supported his initial TRO. As for the latter factor, the benefit to the rule of law will handily outweigh the costs of process under a new judge—especially because our holding clarifies the scope of H.B. 1193 and lays out the law for the new judge to apply to each circumstance within his or her sweep, per the Supreme Court's instructions in *Moody*. And, "regrettably," the waste of the tainted proceedings is "already on the balance sheet." *Latiolais v. Cravins*, 574 F. App'x 429, 436 (5th Cir. 2014).

The second test is also satisfied. We are confident that an objective observer might question the impartiality of the proceedings, for the reasons stated above, and therefore might further question later proceedings run by the same judge.

We now turn to the proper scope of H.B. 1193 and the correct law to apply on remand.

---

[25] The wording of the second TRO is certainly worse than the strong language that merited reassignment in *DaimlerChrysler*, smacking of prejudgment of the issues in this case. *See DaimlerChrysler*, 294 F.3d at 701 n.1 (judge frequently referenced the "enormous coffers" and "elite force of lawyers" of defendant automaker, alleging "the most manipulative and craven [sic]approach to litigation that this Court has ever witnessed").

## III. Instructions for the District Court on Remand

*Moody* recognized that, in constitutional facial challenges to laws implicating the First Amendment, it is often "necessary to say more" about the factual sweep of the underlying law and how the law of our constitution relates to it, "to ensure that the facial analysis proceeds on the right path in the courts below." *Moody*, 603 U.S. at 726. The *Moody* Court provided the inferior courts with an explication of the constitutional law to apply on remand, *id.* at 727–33, as well as a detailed outline of the underlying state statutory scheme to bind the factual analysis, *id.* at 736–40. This circuit followed that scheme on remand after *Moody*.[26]

### A.

"The first step in the proper facial analysis is to assess the state [law's] scope." *Moody*, 603 U.S. at 724. To give shape to the district court's proceedings on remand, we lay out the law and clarify its scope. In particular, there were differences of opinion at oral argument concerning to whom the law applies and what exactly it prohibits regulated parties from doing. We write to clarify.

H.B. 1193 regulates public schools and public colleges, including teachers, professors, and other educators, §§ 1, 2(f), (g); it does not regulate students.[27] Regulated parties are prohibited from engaging in certain DEI-

---

[26] *See NetChoice, L.L.C. v. Paxton*, 121 F.4th 494, 498–500 (5th Cir. 2024); *see, e.g.*, *Mary v. QEP Energy Co.*, 798 F. App'x 811, 813–14 (5th Cir. 2020) (instructions as to law and fact on remand).

[27] While the exception for student groups in § 5(c) does not cover student-group events receiving state funding, this is properly read as applying to school administrations funding student group events as a means of evading the law. Additionally, nothing in § 3 of the Act indicates that the statute intends to regulate student conduct in the first place, because students are generally not granted authority to set curricula, create university offices, or mandate DEI or diversity training. We follow Mississippi's rule of statutory

related activities unless the engagement is for the purposes of "scholarly research" or "creative work[s] by students, faculty, employee[s,] or staff," § 5(b); unless it occurs under the auspices of extracurricular organizations and their guests not funded as agents of the state, § 5(c); or unless lack of such nondiscriminatory engagement would form part of a "policy to limit or restrict freedom of speech . . . that undermines the duty of a public school" to "protect academic course instruction, intellectual diversity and true expression," § 5(d). Additionally excepted are policies necessary to comply with "academic accreditation standards or requirements," § 5(j); actions against a student, teacher, or other regulated party to comply with state or federal law, § 5(h); and certain educational methods related to students with disabilities, § 5(i).

The Act explicitly lists the DEI-related activities it prohibits, which fall into five main categories:

> 1. Taking action against a student for disagreement with identified DEI concepts,[28] § 3 (h);

---

analysis:

> The primary rule of construction is to ascertain the intent of the legislature from the statute as a whole and from the language used therein. Where the statute is plain and unambiguous there is no room for construction, but where it is ambiguous the court, in determining the legislative intent, may look not only to the language used but also to its historical background, its subject matter, and the purposes and objects to be accomplished.

*DePriest v. Barber*, 798 So. 2d 456, 458 (Miss. 2001) (quoting *Clark v. State ex rel. Miss. State Med. Ass'n*, 382 So. 2d 1046, 1048 (Miss. 1980)). *Cf. Stanford ex rel. Phillips v. Brandon Nursing & Rehab. Ctr., L.L.C.*, 160 F.4th 118, 121 (5th Cir. 2025) (citing *DePriest*'s rule of construction for Mississippi state law).

[28] Here and elsewhere, for purposes of the challenged portions of H.B. 1193, our term "DEI concepts" refers to § 2(e), which the state labels "divisive concepts" and sweeps broader than its definition of "Diversity, Equity, and Inclusion" in § 2(a). Because of the awkwardness of the phrasing and the capaciousness of "DEI" as a label, this seems

2. Maintaining programs "including academic programs or courses" "offices," or programs that promote or otherwise "endorse" the listed DEI concepts or "concepts promoting transgender ideology, gender-neutral pronouns, deconstruction of heteronormativity, gender theory, sexual privilege or any related formulation of these concepts," § 3(f);

3. Giving racial or sexual preference in employment or contracts, § 3(e), or requiring DEI training or diversity statements as a condition of enrollment, employment, or contracting, § 3(g), (d);

4. Requiring "any 'diversity training,'" § 3(i), defined in § 2(d) as required activities like seminars, workshops, or programs "that focus on increasing awareness or understanding of

---

appropriate as an exercise of reading the law well. These "divisive" DEI concepts are as follows:

- The notion that a given "race, sex, color, or national origin is inherently superior to another," § 2(e)(i);
- Asserting that an individual "is inherently racist, sexist, or oppressive" "by virtue of his or her race, sex, color, [or] national origin," § 2(e)(ii);
- Teaching that individuals must be "discriminated against or treated adversely" solely because of race, sex, and so on, § 2(e)(iii);
- Teaching that one cannot and should not strive for equal treatment "without respect to" race, color, sex, national origin, "gender identity," or "sexual orientation," § 2(e)(iv);
- Teaching that an individual's moral character is determined by or is personally responsible for past actions committed by his or her race, color, sex, or national origin, § 2(e)(v–vi);
- Asserting that individuals should feel guilt, discomfort, anguish, "or any other form of psychological distress on account of his or her race, color, sex, or national origin," § 2(e)(vii); and
- The view that meritocracy, "hard work ethic," or other "traits" "are racist or sexist, or were created by a particular class to oppress another class," § 2(e)(viii).

issues related to race, sex, color, gender identity, sexual orientation[,] or national origin"; or

5. Otherwise "engaging in" DEI ideology or diversity training, § 3(b).

Sections 7 through 9 detail how complaints of violations of the Act are handled. State agencies hear assertions of violations by students, parents, employees, or faculty; regulated parties receive 25 days to cure a violation before a complainant can seek an injunction. § 7. If a school is formally adjudicated to have violated the act twice and the first violation is not yet cured after 30 days, the state will withhold funds from the school until it demonstrates full compliance. § 8. Finally, a person may notify the Attorney General of Mississippi if an agency rules adversely to his complaint, and if the violation is not cured in 30 days, the AG may seek a writ of mandamus for compliance. § 9(1). Relief of that kind may be either injunctive or actual damages. § 9(2).

Thus, the Act would prevent an action against a student for his or her disagreement with DEI concepts, except in cases where federal law might demand such action. §§ 3(d), (e), (h), 5(h). It would prevent a school from, say, mandating DEI training (so defined) or diversity training aimed at "awareness or understanding of" certain social justice issues. § 3(g), (i). It would also apply to school curricula, including courses, that "promote" DEI or the related gender theory concepts spelled out in § 3(f), except insofar as those curricula include such content via faculty or student creative work or scholarly research, or to comply with accreditation requirements.[29] §§ 3(f),

[29] A history course on black nationalism from an objective perspective, therefore, likely does not serve to "promote" DEI, especially because the word "promote" is cabined by the exceptions for scholarly research. But a course on the evils of the white race or a university administrative office for the redress of past racial evils, however, probably lies within the sweep of § 3(f).

5(b), (j). And, per the residual clause, schools, teachers, and professors may not otherwise "engage[] in" DEI concepts or diversity training through their public work.[30]

For all of the above, the Act would not apply to the activities of student organizations except when state funds are used[31]; so, presumably, a student organization may invite a speaker who promotes DEI unless the school is using the organization as its organ via use of school funds. § 5(c).

As defendants assert, many of these provisions bar activities and concepts that would already seem to constitute unlawful discrimination. But others—e.g., training to increase "awareness or understanding," § 3(i), and the views described in §§ 2(e)(iv) and (viii)—do not seem on their face to

---

[30] Section 3(b) is best read to bar back-door implementation of concepts such as those listed in 2(e) (*e.g.*, by a teacher acting in accordance with the ideas they endorse, using DEI concepts to decide the attention paid to students, which students are chosen for in-class activities, and the kinds of materials added to classes) and to prevent *de facto* requirement of diversity training as described in § 2(d). It is a residual clause focused on preventing evasion of the rest of the statutory scheme.

Reading the clause residually to cover gaps makes sense, given the detailed statutory prohibitions in the other clauses of § 3 of H.B. 1193. *See, e.g.*, *Green v. Bock Laundry Mach. Co.*, 490 U.S. 504, 528–29 (1989) (SCALIA, J., concurring in the judgment) (explaining that ordinary reading of one part of a statutory scheme [there, a rule of evidence] will "rationally" fit "the policy of the law in general and the [statutory scheme] in particular."). Plaintiffs are therefore wrong to claim that § 3(b) would ban "discussion of civil rights history, Dr. Martin Luther King, Jr., the Ku Klux Klan, the Fourteenth Amendment, Juneteenth, and the novel *Of Mice and Men.*" The content of classroom curricula is squarely dealt with in § 3(f).

[31] Thus, plaintiffs vastly overstate the "plainly legitimate sweep" at which *Moody* commands we get. *Moody*, 603 U.S. at 723 (quoting *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595 (2021)). They are incorrect to claim that H.B. 1193 attempts to excise "all discussion of issues related to race, sex, and the other prohibited subjects" or "talking about subjects like race and sex." While it is true that § 2(d) defines diversity training as focused on "increasing awareness or understanding of issues related to" various identity categories, this part of the statute is not applicable to the classroom setting on a basic reading. Indeed, H.B. 1193 bans only *required* diversity training. § 3(i).

encompass solely unlawful discrimination.[32]

In sum, the Act does not apply to students. Within its scope is a good deal of unlawful discriminatory conduct. Although certain sections may go further than proscribing government speech that would be arguably discriminatory in the first place, that fact does not determine anything about the constitutional legitimacy of the law itself.

B.

Per *Moody*, 603 U.S. at 725, "[t]he next order of business is to decide which of the [law's] applications violate the First Amendment, and to measure them against the rest." To that end, we instruct the district court as to the law governing its analysis of each potential application of the Act.

1. Law of the First Amendment

As regards textbooks, curricula, classroom instruction, administrative activities, and other official activities of public institutions, states possess broad power "free from [the First Amendment's] viewpoint-neutrality requirement" to "promote policies and values of its own choosing" and ensure that taxpayer money spent on education "accomplishes the states' educational objectives."[33] H.B. 1193 primarily regulates the curricula and public

---

[32] The diversity training described by § 3(i) could merely be used to make people aware of racial or sexual differences without an eye toward discrimination. Similarly, the view that color-blindness or gender-blindness are bad goals—excised by § 2(e)(iv)—may be held by those who sincerely believe these are the best methods to combat discrimination or by, e.g., those espousing the theory of the complementarity of the sexes. Finally, the view that meritocracy and hard work are racist, sexist, or tools of racism or sexism does not (unlike the views proscribed by §§ 2(e)(i–iii) and (v–vii)) necessarily go to a discriminatory animus toward or an unequal view of another race, sex, color, or national origin. § 2(e)(viii).

[33] *Chiras v. Miller*, 432 F.3d 606, 613, 611 (5th Cir. 2005); *see Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Vill. Sch. Dist.*, 624 F.3d 332, 340 (6th Cir. 2010) (state government "has ultimate responsibility for what goes on in the classroom," and therefore

speech of official organs of the state—schools and colleges—and therefore most of its sweep rests squarely within the heartland of the state government's plenary police power.

If there is any "interplay" between personal speech rights and a state's prerogative to hold its agents accountable to the will of the people, the district court should apply the *Garcetti* framework as outlined in *Kennedy v. Bremerton School District*, 597 U.S. 507, 527 (2022).[34] Under *Kennedy*, there

---

"legitimately" exercises power "over what teachers may (or may not) teach in the classroom."). *Cf. Shurtleff v. City of Boston*, 596 U.S. 243, 247–48 (2022) (government's regulation of its own speech need not be viewpoint-neutral).

In addition to being binding precedent in this circuit, *Chiras* is the textbook example of the law governing curricular decisions in most of the country. *See* DEREK BLACK, EDUCATION LAW: EQUALITY, FAIRNESS, AND REFORM 856–61 (3d ed. 2021) (reprinting *Chiras* as the seminal federal case demonstrating that viewpoint discrimination challenges are inapplicable in selection of textbooks and regulation of curricula).

[34] Plaintiffs urge us to hold *Kennedy*'s *Garcetti* framework inapplicable in the university context, citing the Eleventh Circuit's recent decision regarding an as-applied challenge to a state educational regulation in *Pernell*. *Pernell* held—without support from any case, statute, or constitutional principle, but rather, based only on circumstances and "the traditional value of academic freedom"—that *Kennedy*'s applicability ends with high school. *See Pernell v. Fla. Bd. of Governors of State Univ.*, 181 F.4th 1135, 1149 (11th Cir. 2026), *petition for cert. filed* (Oct. 5, 2026) (No. 26-475). But, as the dissent there notes, the *Pernell* panel majority failed to undertake the required *Moody* analysis, needlessly extended the atextual "academic freedom" clause read into the First Amendment in the late 1950s, and misread the concept of "academic freedom" to focus on in-classroom speech (where professors act as public school teachers) as distinguished from out-of-classroom speech such as academic publications (where professors are generally free to write as they please). *See id.* at 1169–74 (LAGOA, J., dissenting).

Indeed, *Kennedy* did not even offer a full endorsement of the "academic freedom" line of cases, acknowledging only that academic freedom "may or may not involve 'additional' First Amendment 'interests' in some cases." *Kennedy*, 597 U.S. at 528; *see also Evans-Marshall*, 624 F.3d at 344 (stating that academic freedom does not shield professor whose "pedagogical attitude" and "teaching methods" do not conform to state institutional standards.). Thus, no matter how much the *Pernell* majority relished telling the people of Florida "Emphatically[,] no," *Pernell*, 181 F.4th at 1149, Judge Lagoa had the better of the argument in her forceful dissent: The task of a federal court that is reviewing

are two steps: First, the court must determine whether a public employee is speaking per official duties, that is, within the scope of his or her employment; and second, if not, the court must balance the interests of the state in pursuing its public policies against the individual speech rights at issue. *Id.* at 527–28 (citing *Garcetti v. Ceballos*, 547 U.S. 410, 421, 423, 417 (2006)).

Where academic freedom—e.g., professors' license to produce and publish scholarly work—may be implicated, "'additional'" First Amendment interests "may or may not" come into play "in some cases." *Id.* at 528 (quoting *Garcetti*, 547 U.S. at 425).[35] But, as the Supreme Court noted in *Rosenberger v. Rector & Visitors of the University of Virginia*, "[w]hen the University determines the content of the education it provides, it is the University speaking, and we have permitted the government to regulate the content of what is or is not expressed," even "when it enlists private entities" such as professors "to convey its own message." 515 U.S. 819, 833 (1995).[36]

---

a state statute is "not to decide what the State *should* do, but what it *may* do." *Id.* at 1166 (LAGOA, J., dissenting).

[35] Plaintiffs cite broad language from cases from the middle of the last century to try to tie up the government's regulation of its own speech. Specifically, they note that the First Amendment does not permit the state to cast a "pall of orthodoxy over the classroom," quoting *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967), and that its "mandate in our educational system" is to "safeguard the fundamental values of freedom of speech and inquiry," quoting *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968). But, as Mississippi notes, *Keyishian* dealt with speech and association both inside and outside the classroom, and *Epperson* targeted religion in public life. At any rate, *Chiras* handily dealt with the inapplicability of *Epperson* and other academic freedom cases to the context of clear instances of government speech, such as school curricula and instruction: This court is bound to that more recent and more relevant precedent.

[36] The Sixth Circuit has implied that *Garcetti* controls analysis of state regulation of instructor speech "[e]ven to the extent academic freedom" applies, at least with respect to "curricular and pedagogical choices." *Evans-Marshall*, 624 F.3d at 333–44. Plaintiffs are incorrect to counter with the plurality opinion in *Board of Education, Island Trees Union Free School District No. 26 v. Pico*, 457 U.S. 853 (1982), since, as we stated in *Little v. Llano County*, "our en banc court ruled long ago that *Pico* carries no precedential weight" in this

So, as concerns textbooks, curricula, mandatory activities, and instruction, *Chiras* applies and rightly protects Mississippi's constitutionally preserved plenary power to "promote policies and values of its own choosing" and to maintain that all education funded at the expense of Mississippians "accomplishes [Mississippi's] educational objectives." *Chiras*, 432 F.3d at 613, 611. Meanwhile, as far as the personal (e.g., non-curricular) statements of teachers and professors in the classroom are implicated, the district court must follow *Kennedy*'s application of *Garcetti* and balance the interests of the state in pursuing its public policies against the individual speech rights at issue. *See Kennedy*, 597 U.S. at 527–28 (citing *Garcetti*, 547 U.S. at 421, 423, 417 (2006)). Thus, *Chiras* and *Kennedy* harmonize well, given that curricula, instruction, and textbooks are in the heartland of the scope of employment of educators.

2. Law Governing Void-for-Vagueness Challenges

A law may be found facially void for vagueness only where it "is so unclear" that people "'must necessarily guess at its meaning and differ as to its application'" "'in all of its applications.'"[37] Vagueness challenges will

---

circuit. *Little*, 138 F.4th at 843 (citing *Muir v. Ala. Educ. Television Comm'n*, 688 F.2d 1033, 1045 n.30 (Former 5th Cir. 1982) (en banc)).

*See also Chiras v. Miller*, 432 F.3d at 611–13, 612 n.25 (general values discussed in *Epperson* do not trump plenary state discretion in government speech, including curricula, "even where it chooses to employ private speakers" such as professors "to transmit its message" unless government does so *ultra vires*). *Cf. Buchanan v. Alexander*, 919 F.3d 847, 853 (5th Cir. 2019) ("[I]n the college classroom context, speech that does not serve an academic purpose" is not of public concern and therefore "falls outside the protection of the First Amendment.").

[37] *McClelland v. Katy Indep. Sch. Dist.*, 63 F.4th 996, 1013 (5th Cir. 2023) (first quoting *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926), then quoting *Home Depot, Inc. v. Guste*, 773 F.2d 616, 627 (5th Cir. 1985) (itself quoting *Vill. of Hoffman Ests. v. Flipside*, 455 U.S. 489, 495 (1982))).

Plaintiffs are mistaken to cite *Merriott v. City of Bossier City*, 179 F.4th 393 (5th Cir.

not succeed in striking down statutes with "hypothetical interactions" and "speculative scenarios" when context allows the average observer to understand its "'common-sense core of meaning.'"[38] Words and phrases such as

---

2026). That case dealt with a challenge to a municipal policy restricting public participants at city council meetings from "personal, impertinent, . . . slanderous" or "boisterous" remarks or conduct, on pain of a bar from "further audience before the [Bossier City] Council" unless the council granted permission by majority vote. *Id.* at 400. The First Amendment's protections are stronger in the cases, like *Merriott*, dealing with political assemblies. *See, e.g.*, *Morse v. Frederick*, 551 U.S. 393, 403 (2007).

*McClelland*, meanwhile, dealt with a vagueness challenge with First Amendment implications in the education context, just as does the case at bar. *See McClelland*, 63 F.4th at 1004–05, 1008–09, 1013–14. For facial void-for-vagueness claims in the education context, *McClelland* is the law of the circuit, even if the First Amendment is implicated.

The district court should not confuse necessity and sufficiency. While it is true that "[e]ven under a 'stringent' test, this court 'will not hold a law unconstitutionally vague on its face if it is clear what the ordinance as a whole prohibits or if the ordinance is surely valid in the vast majority of its intended applications,'" that does not mean that clarity of prohibition or validity in "the vast majority of intended applications" sets the standard for surviving a vagueness challenge. *Merriott*, 179 F.4th at 407 (quoting *Roy v. City of Monroe*, 950 F.3d 245, 252 (5th Cir. 2020) (quotation marks omitted)). That language was and remains descriptive of the heartland of laws that suffice to pass vagueness challenges; *McClelland* sets the standard of what is necessary for a vagueness challenge to strike down a law. That standard is high because part of the role of courts is to bring clarity to facially complicated laws at the stage of application. *See Gamble v. United States*, 587 U.S. 678, 720 (2019) (THOMAS, J., concurring) (judiciary must "clarify and settle" the "meaning and operation" of laws, even where unclear (citation omitted)).

[38] *La Union del Pueblo Entero v. Abbott*, 167 F.4th 743, 758–59 (5th Cir. 2026) (quoting *Tuilaepa v. California*, 512 U.S. 967, 973 (1994) (in turn quoting *Jurek v. Texas*, 428 U.S. 262, 279 (1976) (WHITE, J., concurring in judgment))).

"expressing or celebrating views or ideas,"[39] "promote,"[40] and "support"[41] have been held to survive a vagueness challenge, especially where the context of a complex statutory scheme informs the meaning of such terms.

If there is a foreseeable application of the law in which there is a clear core of meaning that a rational regulated party could understand—*i.e.*, if there is at least some identifiable set of conduct that the prohibitions reasonably probably cover—a void-for-vagueness challenge must fail. The fact that a portion of a law's application is vague or that an isolated term is subject to different meanings in hypothetical scenarios will not lead to a successful vagueness challenge.

* * * * *

The plaintiffs have a high burden to show that this policy is unlawful. Their chore is even greater given the fact that theirs is a facial challenge rather than a challenge to the law as-applied, making their case "hard to win." *Moody*, 603 U.S. at 723. On remand, the new district judge should apply the above law in each applicable situation within the foreseeable scope of H.B. 1193 and proceed to determine the constitutionality of the law in each arena. Once that judge has done so, he or she will determine whether "the ratio of unlawful-to-lawful applications" of H.B. 1193 is so "lopsided" as to

---

[39] *SEIU, Loc. 5 v. City of Hous.*, 595 F.3d 588, 601–02 (5th Cir. 2010) (phrase provided "a discernible and objective standard."). Notably, the terms principally at issue here are verbal, like those which survived the challenge in *SEIU*, whereas those that *SEIU* struck down as too vague (e.g. "public gathering" without further definition) are noun phrases. *See id.* at 601–02, 605.

[40] *McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 170 n.64 (2003), *overruled on other grounds by Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010).

[41] The Fourth Circuit has also found the word "encourage" not void for vagueness under its more stringent standard of specificity. *Lumumba v. Kiser*, 116 F.4th 269, 286 (4th Cir. 2024), *cert. denied*, 145 S. Ct. 1189 (2025).

substantially outweigh the lawful reach of the law.[42]

The preliminary injunction is VACATED, and this matter is REMANDED. The Chief Judge of the Southern District of Mississippi is DIRECTED to assign this case to a different district judge for all further proceedings.

[42] *Students Engaged in Advancing Tex. ex rel. Fernandez v. Paxton*, 177 F.4th 665, 672 n.19 (5th Cir. 2026) (per curiam) (first quoting *Moody*, 603 U.S. at 723, then quoting *United States v. Hansen*, 599 U.S. 762, 784 (2023) (internal quotation marks omitted)); *see also Moody*, 603 U.S. at 724.

HAYNES, *Circuit Judge*, concurring:

I concur in the last paragraph of the majority opinion. I think it is important on the remand to take a more full look at the House Bill 1193 in play. I also think it is very important to make sure that teachers at school are in no way limited or forbidden from teaching the students not to discriminate as set out in Title VII, including race, color, religion, sex, gender, etc.